UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALAN MARTIN and DAX PARTNERS LP,        :        07 Civ.7592
individually and behalf of all other        :        ECF CASE
persons similarly situated,        :
        :        **<u>CLASS ACTION COMPLAINT</u>**
        Plaintiffs,        :
        :
        -against-        :        **JURY TRIAL DEMANDED**
        :
AMARANTH LLC, AMARANTH ADVISORS,        :
L.L.C., AMARANTH ADVISORS (CALGARY)        :
U.L.C., AMARANTH GROUP INC.,        :
AMARANTH INTERNATIONAL LIMITED,        :
AMARANTH PARTNERS LLC, AMARANTH        :
CAPITAL PARTNERS LLC, NICHOLAS M.        :
MAOUNIS, BRIAN HUNTER, MATTHEW        :
DONOHOE, J.P. MORGAN CHASE & CO.,        :
J.P. MORGAN CHASE BANK, INC.,        :
J.P. MORGAN FUTURES, INC., AND JOHN        :
DOES NOS. 1-10,        :
        :
        Defendants.        :
-------------------------------------------------------------x

Plaintiffs complain of defendants upon knowledge as to matters relating to plaintiffs and

upon information and belief as to all other matters:


**<u>SUMMARY OF ALLEGATIONS</u>**

1.        (a) Between February 16 and October 5, 2006 ("Class Period"), Defendants

engaged in "price level",  "twisting" and "volatility" manipulation of the prices of New York

Mercantile Exchange ("NYMEX") natural gas futures contracts in violation of Sections 6(c),

6(d) and 9(a)(2) of the Commodity Exchange Act (the "CEA" or the "Act"), 7 U.S.C. §§ 9,

13b and 13(a)(2), as well as the common law.

(b) Defendants did so by various means. These include the J.P. Morgan Defendants' creation of extraordinary leverage which the Amaranth Defendants used to acquire unlawfully large, manipulative natural gas future contract positions on the NYMEX, the Intercontinental Exchange ("ICE"), and over-the-counter.

( c) Among other things, Defendants' "price level" manipulation artificially changed general price levels principally by means of the Amaranth Defendants' extraordinarily large future positions, the J.P. Morgan Defendants' financing, and the Amaranth Defendants' lies and deceptive steps. The "twisting" part of defendants' manipulation artificially changed well-established "spread" relationships between differing expirations of NYMEX natural gas futures. The "volatility" part of defendants' manipulation greatly increased the changes in price levels, despite stable supplies of natural gas, and included specific manipulative devices such as "slamming the market".

2.    <u>Hedge Fund on Steroids</u>.  In contrast to episodic, one direction and one dimension manipulations of earlier decades, the Amaranth Defendants, according to plaintiffs' investigation, did the following. They based the compensation of Amaranth traders on very large bonuses that systematically created an on-going extraordinary motive to use investor capital and J.P. Morgan financing to manipulate natural gas prices and generate profits in both a long term and short term, overlapping manipulative scheme. Tens of millions of dollars of these trader bonuses and compensation in respect of fiscal year 2006 are being withheld from Amaranth employees, remain unpaid today and constitute unjust enrichment that should be paid into Court or impressed in a trust for the benefit of plaintiffs and the Class. Defendants' "self-fulfilling prophecy" manipulative trading, whereby the

sheer size of Amaranth's positions intentionally moved the market to artificial levels which profited Amaranth's positions, finally crashed in September and October 2006.

3.    (a) <u>Serial Aider and Abettor</u>. The Amaranth Defendants' ongoing manipulative trading schemes were not disclosed to the market except to the J.P. Morgan Defendants which provided extraordinary financing to enable the manipulative scheme of trading and acted as the broker, clearing member or counter-party who actually carried these extraordinary trades.

(b) The J.P. Morgan Defendants specifically knew that their ostensible lending and associated activities could facilitate manipulation of commodity futures prices because the J.P. Morgan Defendants had previously been charged with or settled similar civil claims in this District and others. *See, e.g., In re Sumitomo Copper Litig.*, 96 Civ. 4584 (MP), Final Judgment and Order of Dismissal, dated June 21, 2001 (approving $10,750,000 settlement payment by J.P. Morgan & Co., Inc. and related company to class of futures traders). With such knowledge, the J.P. Morgan Defendants again facilitated manipulation - - - and this time improved their supra-competitive returns by masterfully profiting from what is known in the futures markets as the "run in" in late September and October 2006 as the manipulation crashed.

4.    (a) From the beginning of the Class Period (or February 23, 2006, at the latest) forward, various of the Amaranth Defendants' positions violated legal position limits and confused the NYMEX market (except the J.P. Morgan Defendants). As members of NYMEX clearing house, the J.P. Morgan Defendants specifically knew that such position limits were designed to prevent manipulation. As the J.P. Morgan Defendants also well knew, defendants' positions, at times, approximated in size the entire United States

3

consumption of natural gas during the contract expiration month and constituted 40-70% or more of the open interest in such contracts. Yet J.P. Morgan, just as it did in the *Sumitomo* manipulation, kept creating extraordinary leverage to facilitate Defendants' manipulative positions and the resulting artificial prices.

(b)  Although some (including United States Senate personnel and others) have wrongly referred to the legal limit violations as mere excessive speculation, these violations constitute manipulation by manipulative positions.  They were intentionally designed to inject and maintain artificial, and unlawful elements into the supply-demand equation for natural gas futures contract prices.  At other times, these positions and various defendants' associated conduct intentionally injected other artificial elements into the supply-demand equation for prices.

( c)  When the NYMEX belatedly sought to mitigate some of Defendants' artificial effects on prices, Defendants injected more artificiality into pricing relationships by repeatedly violating NYMEX rules and misrepresenting facts.  As a result, defendants were able misleadingly and intentionally to maintain a substantial artificial impact on prices.

5.     (a)  On February 24, March 29, and April 26, 2006, the Amaranth Defendants intentionally manipulated prices of, respectively, the March, April and May 2006 NYMEX natural gas futures contracts expiring on those days as well as of other natural gas NYMEX futures contracts.

(b)    This included by "slamming the close", *i.e.*, by selling an extraordinary amount of these contracts during the last 30 minutes of trading before the expiration of the contracts. The sales were done with the purpose and effect of driving down the NYMEX natural gas contract settlement prices.  Also, this further specifically includes "slamming the close"

4

orders which caused NYMEX natural gas futures prices to plummet to artificially low levels. This "twisted" the price relationships among varying expirations of natural gas futures on and after at least the following dates: February 24, March 29 and April 26, 2006.

( c) This benefited the Amaranth Defendants' natural gas swaps and options positions on NYMEX and elsewhere.

6.     Although the Amaranth Defendants' manipulation was more complex than previous manipulations, in the end, just as with prior manipulations, the behavior of prices after the manipulation collapsed "tells the story."

7.     After the Amaranth Defendants' efforts to avoid NYMEX restrictions on Amaranth's unlawfully large positions partially failed in August and September 2006, the price artificiality that had been intentionally caused by Amaranth at first seeped out of natural gas prices and then plummeted. With respect to the "twisting" part of defendants' manipulation, the most affected spreads declined by more than 90%. With respect to the "price level" part of defendants' manipulation, the leading indicators of NYMEX natural gas futures and spot prices declined by between 44-55%. These extraordinary declines reveal the extent of price artificiality that defendants' multi-faceted manipulation had intentionally caused.

8.     Defendants' manipulation caused losses and damages to plaintiffs and members of the class who traded natural gas futures contracts in this District during, at least, the Class Period.

9.     Common Law Unjust Enrichment. Commodity futures trading is a zero sum game and the markets therefor are affected with a public interest that imposes legal responsibilities on the market participants. The J.P. Morgan Defendants, Defendants

5

Nicholas Maounis, Brian Hunter and Matthew Donohoe, and other defendants unlawfully profited and unjustly enriched themselves from the above-alleged manipulation. They did so through supra-competitive charges, interest, revenues and management, compensation, and associated fees. This unjust enrichment should be impressed in a trust, preserved from creditors, subjected to equitable subordination, declared not to be the lawful property of defendants or their creditors, and compelled to be returned to the United States. Such unjust enrichment should be paid to plaintiffs and class members.

## JURISDICTION AND VENUE

10.    Natural gas is a "commodity" and is the "commodity underlying" NYMEX natural gas futures and options, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25.

11.    Jurisdiction lies in this Court under Section 22 of the CEA, 7 U.S.C. §§ 1, *et seq.*, 28 U.S.C. §§ 1331 and 1337, and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d), *et seq.* This Court also has diversity jurisdiction over the Class (as defined herein) pursuant to §§ 1332(d)(2) and (d)(6) of CAFA because one or more members of the Class are citizens of a State different from the Defendant and the aggregate amount in controversy exceeds five million dollars, exclusive of interest and costs.

12.    Venue lies in this Court under Section 22 of the CEA, 7 U.S.C. § 25( c), in that Defendant J.P. Morgan Chase is headquartered in this District, each of the Defendants transacted business in this District, the claims arose in this District, the conduct described herein was carried out, in substantial part, within this District, and defendants' unlawful acts manipulated the prices of NYMEX natural gas futures and options which were traded in this district on the NYMEX.

13.     Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of transportation or in communication, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

14.     Plaintiffs have reviewed various public documents, including legal complaints against various defendants[1], and United State Senate materials, but plaintiffs disagree with various parts thereof and evaluations therein.  Plaintiffs do not incorporate these complaints and U.S. Senate materials into this complaint.

## PARTIES

### Plaintiff

15.     Plaintiff Alan Martin traded natural gas futures contracts on the NYMEX during the Class Period and suffered a loss.

16.     Plaintiff Dax Partners LP traded natural gas futures contracts on the NYMEX during the Class Period and suffered a loss.

### Defendants

17.     Defendant Amaranth LLC is a Cayman Islands company which purported and represented itself to be a multi-strategy trading fund, *i.e.*, a hedge fund.  But Amaranth LLC degenerated, by the Class Period, largely into a manipulative trader.  It was "advised" by Defendant Amaranth Advisors L.L.C and its affiliates.

---

[1] These complaints include *San Diego County Employees Retirement Association v. Nicholas Maounis, et al.*, 07-CIV2618 (DAB)(S.D.N.Y.);  *In the Matter of Amaranth Advisors*, SEC Admin. Pro. File No. 3-12632;  *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C., et al.*, 07-CIV-6682 (DC)(S.D.N.Y.);  Order to Show Cause and Notice of Proposed Penalties, Federal Energy Regulatory Comm'n Docket No. IN07-26-000.

18.     Defendant Amaranth Group Inc. ("Amaranth Group") is a Delaware S corporation. Amaranth Group employed all of Amaranth's natural gas traders, and executives such as president and chief investment officer Nicholas M. Maounis.

19.     Defendant Amaranth Advisors L.L.C. ("Amaranth Advisors") is a Delaware company, with its principal place of business in Greenwich, Connecticut. Defendant Amaranth Advisors is the investment and trading advisor and manager of the Amaranth group of investment funds, including Amaranth LLC.

20.     Defendant Amaranth Advisors (Calgary) U.L.C. ("Amaranth Advisors (Calgary)") is a Nova Scotia company, registered with the Alberta Securities Commission, with its principal place of business in Calgary, Alberta, Canada. Defendant Amaranth Advisors (Calgary) is an indirect subsidiary of Amaranth Advisors.

21.     Amaranth International Limited ("Amaranth International") is a Bermuda Company. Amaranth International serves as an off-shore "feeder fund" for non-United States and tax-exempt investors, in the "master-feeder" fund structure. During the Class Period, investors invested directly into Amaranth International, which invested substantially all of its capital into Amaranth LLC.

22.     Amaranth Partners LLC and Amaranth Capital Partners LLC are Delaware limited liability companies. They both serve as a domestic "feeder fund" for United States taxable investors, in the "master-feeder" fund structure. During the Class Period, investors invested directly into these entities, which then invested substantially all of their capital in Amaranth LLC.

23.     Defendant Nicholas M. Maounis ("Maounis") is a managing member of Amaranth and was a control person of Amaranth during the Class Period. Defendant

Maounis was chief executive officer of Amaranth LLC and the president, chief investment officer and 100 percent owner of Amaranth Group.

24.    Defendant Brian Hunter ("Hunter"), a Canadian citizen, was the head natural gas trader at Amaranth stationed in Calgary, Alberta at all times relevant to this complaint. From on or about October 2005 until on or about September 2006, Defendant Hunter was president of Defendant Amaranth Advisors (Calgary).

25.    Defendant Matthew Donohue ("Donohoe") is an individual who was employed by Defendant Amaranth Group Inc. On information and belief, Defendant Donohoe is a citizen of the United Sates currently residing in Canada. Defendant Donohue was Defendant Hunter's execution trader at Amaranth.

26.    Defendants Amaranth LLC, Amaranth Group, Amaranth Advisors, Amaranth Advisors (Calgary), Amaranth International, Amaranth Partners LLC, Amaranth Capital Partners LLC, Maounis, Hunter and Donohoe are collectively referred to herein as the "Amaranth Defendants".

27.    Defendant J.P. Morgan Chase & Co. ("J.P. Morgan Chase") is a leading global financial services firm that is a leader in commercial banking, investment banking, financial and advisory services, and financial transaction processing.

28.    Defendant J.P. Morgan Chase Bank, Inc. ("J.P. Morgan Chase Bank") is an approved bank margin depository of the NYMEX and a registered user of NYMEX ClearPort Clearing Network, an internet-based system which provides a market gateway to trading and clearing services.

29.    Defendant J.P. Morgan Futures, Inc. ("J.P. Morgan Futures") is a global futures commission merchant and a NYMEX clearing member. Defendant J.P. Morgan

Futures offers research, sales, execution and clearing services on more than 70 exchanges, with electronic trading access to over 40 of them. Defendant J.P. Morgan Futures has a strong presence in various commodity exchanges, including NYMEX and ICE. Defendant J.P. Morgan Futures is a registered user of the NYMEX ClearPort Clearing Network. Defendant J.P. Morgan Futures acted as the prime broker to the Amaranth Defendants during the Class Period.

30.     Defendant J.P. Morgan Chase, J.P. Morgan Chase Bank and J.P. Morgan Futures are collectively referred to herein and "J.P. Morgan Defendants".

## CLASS ALLEGATIONS

31.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on their own behalf and as representatives of a class ("Class") defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates and co-conspirators) that purchased, sold and/or held NYMEX natural gas futures and/or options on futures contracts between February 16, 2006 and October 5, 2006 ("Class Period").

32.     FRCP Rule 23(a)(1).   Class members number in the thousands and are geographically dispersed such that joinder is impractical.

33.     FRCP Rule 23(a)(2).   Common issues of fact and law include but are not limited to:

(a)          Whether defendants manipulated NYMEX natural gas contract prices in violation of the CEA;

(b)          Whether defendants aided and abetted such manipulation;

10

(c)        Whether such manipulation caused prices of NYMEX natural gas

futures contracts to be artificial and whether the extent of such artificiality may be

established by regression analysis or econometric formula;

(d)        Whether defendants unjustly enriched themselves or otherwise

violated the common law;  and

(e)        What are the correct measure of damages and the appropriate

equitable, compulsory, or other relief.

34.     Rule 23(a)(3).  Plaintiffs interests are typical of, and not antagonistic to the

interests of, the Class.

35.     Rule 23(a)(4).  Plaintiffs are adequate class representatives and have retained

adequate counsel.

36.     Rule 23(b)(3).  Common issues predominate over individual issues (if any).  A

class action is superior to other methods (if any) for a fair and efficient adjudication of this

case.  Indeed, a class action is the only method by which plaintiffs and the Class can

efficiently seek redress because of "negative value" claims.  That is, the size of individual

damages is less than the costs of prosecuting the complex claims against defendants.

Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## UNDERLYING ALLEGATIONS

### The Natural Gas Market

37.     The primary purpose of the CEA is "to deter and prevent price manipulation

or any other disruptions to market integrity."  7 U.S.C. § 5.

38.     Commodity futures contracts are standardized agreements the form of which

is created by the exchange on which the contract is traded.  The contract "long" is to purchase

and the contract "short" is to sell the specified commodity for delivery in the future at a price that is determined at initiation of the contract. Contracts may be satisfied by delivery or (more than 99% of the time) by liquidation. That is, the "long" who originally purchased one contract would sell one contract, or the "short" who originally sold one contract would buy one contract.

39.    NYMEX has been designated a contract market by the Commodity Futures Trading Commission ("CFTC") pursuant to Section 5(b) of the CEA, 7 U.S.C. § 7(b), and Commission Regulations 38.3(a)(i), (ii) and (iii). NYMEX submits to the CFTC for approval various rules and regulations through which NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options on futures contracts, including futures and options for natural gas.

40.    NYMEX's Disciplinary Rules provide, in relevant part, that "[n]o Member, Member Firm, or any employee of the foregoing, shall engage in any practice which results in the manipulation of prices or the cornering of any commodity dealt on the Exchange." NYMEX Disciplinary Rule 8.52.

41.    During the Class Period, the Amaranth Defendants were the largest market participants in exchange-traded and over-the-counter ("OTC") derivative contracts including futures, options, and swaps.

### Chronology

42.    Prior to the Class Period, the Amaranth Defendants represented to NYMEX that Amaranth had assigned a risk manager to sit among their energy traders. In or around October 2005, the Amaranth Defendants allowed Defendant Hunter, who oversaw most of their natural gas trading, to transfer his trading desk from Greenwich, Connecticut to

Calgary, Alberta. Over the spring and summer of 2006, four other Amaranth natural gas traders --- Defendant Donohoe, Matthew Calhoun, Shane Lee and Brad Basarowich --- transferred from Greenwich to Calgary. After Hunter moved his trading desk to Calgary, no risk manager sat among the traders until May 2006.

43.    In early 2006, the Amaranth Defendants accumulated tens of thousands of natural gas contracts in multiple months, primarily on NYMEX but also on ICE. To do so, the Amaranth Defendants was required to post substantial margins with their clearing firm, Defendant J.P. Morgan. The Amaranth Defendants' total margin requirements routinely exceeded $1 billion.

44.    By the end of January 2006, the Amaranth Defendants held a short position of about (40,000) March 2006 natural gas contracts, about two-thirds of which were on NYMEX and one-third of which on ICE.

45.    During February 2006, the Amaranth Defendants shifted their short position in March 2006 contracts into April 2006 contracts. This involved large purchases of March contracts and large sales of April contracts. Also during February 2006, the Amaranth Defendants began building a large spread position between January 2007 and November 2006 contracts.

46.    The Amaranth Defendants' legal position limit violations occurred as early as the start of the Class Period or by February 23, 2006 at the latest.

47.    February 23, 2006 was the day before the expiration day of the March 2006 NYMEX natural gas futures contract. On this day, Defendant Hunter instructed the Amaranth Defendants natural gas trader Defendant Donohoe in an instant message conversation to "make sure we have lots of futures to sell MoC [market on close] tomorrow."

AALLC_REG0684056.  At that time, the Amaranth Defendants operations personnel in Greenwich informed Defendant Hunter and his natural gas traders that they were "short -- 1,729 Nat Gas Mar 06" futures contracts and to "[p]lease make sure we are flat by the end of the day today."  AALLC_REG0672597.

48.    By around noon the next day, February 24, the expiration day of the March 2006 contract, the Amaranth Defendants reversed their natural gas March futures positions. The Amaranth Defendants went from short, to flat, to long by buying more than 3,111 March 2006 NYMEX natural gas futures contracts.  On the expiration day of the March 2006 contract, before the closing range, the Amaranth Defendants bought in excess of 4,800 March 2006 NYMEX natural gas futures contracts.

49.    On February 24 before the closing range, Defendant Hunter told another Amaranth trader, Matthew Calhoun, in an instant message conversation that he "just need H [March natural gas futures contract] to get smashed on settle . . . then day is done." AALLC_REG0684186.

50.    Less than one-half hour before the February 24 closing range, Defendant Hunter stated to Burt Glover, a natural gas trader at National Trading LLC:

```
Hunter:     We have 4000 to sell MoC
Hunter:     shhhh
Glover:     come on
Hunter:     y
Glover:     unless you are huge bearish
Glover:     position
Glover:     why the f would yo [sic] do that
Hunter:     all from options yesterday
Hunter:     so we ll see what the floor has
Hunter:     bit of an expiriment [sic] mainly
Glover:     what the f
Glover:     that is huge
Hunter:     I think John [Arnold] and Sempra [Energy] are sellers too.
```

AALLC_REG0684277. The Amaranth Defendants were the largest seller in the February 24 closing range and their selling represented at times between 40 and 50 percent of all sales in the opening minutes of the close. Defendant Donahoe executed Defendant Hunter's instructions by placing a series of six orders from 2:00 p.m. to 2:28 p.m. directing ALX Energy, Inc. ("ALX"), Amaranth's primary NYMEX floor brokerage firm during the Class Period, to sell a total of 3,111 March 2006 NYMEX natural gas futures contracts.

51.    After the start of the closing range, when Mr. Glover asked Defendant Hunter "aren't you done" selling your futures, Defendant Hunter responded "no . . . have a lot more to sell . . . waiting until 2:20." AALLC_REG0684264. The Amaranth Defendants large sales "slammed the close" and drove down March contract prices and other futures prices, including natural gas prices.

52.    At the same time, the Amaranth Defendants held significant positions in the prompt-next month: the Amaranth Defendants held a short position of (16,613.25) April 2006 natural gas futures contracts and swaps. The Amaranth Defendants also maintained a short swaps position of at least 12,000 contracts (futures equivalents) that would benefit from a lower settlement price of the March 2006 natural gas contract. Trading on February 24 benefited the Amaranth Defendants' position in their natural gas futures contracts and swaps in both the March 2006 and April 2006 contract months.

53.    The Amaranth Defendants profited from their manipulation of the March 2006 NYMEX natural gas futures contract on and after February 24, 2006.

54.    By the end of February 2006, the Amaranth Defendants held a short position of approximately (30,000) April 2006 contracts, a short position of more than (25,000) November 2006 contracts, and a long position of more than 25,000 January 2007 contracts.

15

By the end of February 2006, the Amaranth Defendants held nearly 70% of the open interest in the NYMEX natural gas futures contract for November 2006, and nearly 60% of the open interest in the NYMEX natural gas futures contract for January 2007. J.P. Morgan Defendants financed these extraordinarily large, manipulative positions.

55.     During March 2006, the Amaranth Defendants continued to hold a short position in nearby Spring months. In a letter dated March 13, 2006, NYMEX advised the Amaranth Defendants that "At the close of business on February 23, 2006, Amaranth maintained an open commitment of 3,646 short contracts, 1,146 contracts over its spot month hedge exempt position limit. . . . Owing to your firm's violation of the spot month NG position limit, and in accordance with the provisions of Exchange Rule 9.36, this letter shall constitute a warning to your firm." Letter from NYMEX Compliance Division (by Nancy Minnett) to Amaranth LLC's Chief Compliance Officer Michael Carreiri.

56.     By the end of March 2006, the Amaranth Defendants shifted a short position of (30,000) April 2006 natural gas contracts into May 2006. The Amaranth Defendants also maintained their large Fall/Winter 2006 spread  between a short position in November 2006 natural gas contracts and a long position in January 2007 natural gas contracts, shifting some of their short positions from November 2006 contracts into October 2006 contracts. The Amaranth Defendants continued to trade primarily on NYMEX and, to a lesser extent, on ICE.

57.     March 22 – March 29, 2006 was the week before the expiration day of the April 2006 NYMEX natural gas futures contract. During this week, the Amaranth Defendants built an aggregate April swap position from a short position of around (9,500) futures contract equivalents on March 21 to a short position of (17,884) futures contract

16

equivalents on March 29. Thus, the amount of short swap contracts that stood to benefit from a lowered natural gas futures contract prices was much greater.

58.    On March 29, the expiration day of the April 2006 NYMEX natural gas futures contract, the Amaranth Defendants entered the day with a long position of 1,603 April natural gas futures contracts. In three separate orders, the Amaranth Defendants directed ALX to sell 303 April natural gas futures contracts before the close between 12:41 p.m. and 1:50 p.m. Shortly after the start of the close, the Amaranth Defendants placed additional orders for ALX to sell 1,300 April 2006 natural gas futures contracts "MOC."

59.    These orders "slammed the close" and artificially decreased prices of April as well as other natural gas futures contracts. The Amaranth Defendants profited from their manipulation of the April 2006 NYMEX natural gas futures contract on March 29.

60.    In early April 2006, the Amaranth Defendants maintained their short position in the nearby spring and summer months, and increased their winter/fall spread position. On April 7, 2006, the Amaranth Defendants' position of approximately (32,000) May 2006 NYMEX natural gas futures contracts far exceeded position limits.

61.    Thereafter, the Amaranth Defendants continued to roll their short May 2006 contracts into short June 2006 contracts. They did so by purchasing May contracts and selling June contracts.

62.    Also during April 2006, the Amaranth Defendants increased their January 2007-November 2006 spread position by several thousand contracts. By the end of April, the Amaranth Defendants held a short position of (30,000) November 2006 contracts and a long position of more than 34,000 January 2007 contracts.

63. Meanwhile, on or about April 21, 2006, the Amaranth Defendants began to reverse their May 2006 futures position by purchasing futures contracts. For the first time in that month, the Amaranth Defendants were long May 2006 natural gas futures contracts.

64. From then, until the April 26 expiration day of the May 2006 contract, before the closing range, the Amaranth Defendants built a long futures position of 3,044 May 2006 natural gas futures contracts.

65. At that time, the Amaranth Defendants also had a short swap position of over 19,000 contracts (futures equivalents). In addition, unlike before the March and April 2006 NYMEX natural gas futures contracts termination days, the Amaranth Defendants were establishing significant options positions which would benefit from lower prices and a declining market. On April 25 and 26, the Amaranth Defendants bought 14,750 June puts and 300 July puts, but did not trade any other natural gas futures options.

66. Over two minutes into the close, Defendant Hunter told an Amaranth Defendants' energy risk manager in Greenwich, Connecticut that there are "definitely buyers . . . but we have yet to sell". A_CFTC032878. And seven minutes into the close, Defendant Hunter told the same energy risk manager in an instant message conversation that "we are wa[i]ting to sell". A_CFTC032910.

67. Beginning around the middle of the close on April 26, 2006, Defendant Donohue placed three separate orders to sell 3,044 May 2006 natural gas futures contracts, with instructions to hold execution of the orders to sell until the last eight minutes of the close. The Amaranth Defendants sold 2,517 contracts in the final four minutes of trading on April 26, of which contracts 1,897 were sold during the final minute of trading. A 2,000 lot sell order was so large and came so late that the ALX broker was unable to execute the order

during the close. Overall, the Amaranth Defendants' selling accounted for 15% of the trading volume during the last eight minutes of trading, during which the price of the May contract fell significantly.

68.     The Amaranth Defendants profited from their manipulation of the May 2006 NYMEX natural gas futures contract on April 26.

69.     Defendants manipulated the settlement price of the NYMEX natural gas futures contracts for March 2006, April 2006 and May 2006 by holding open the Amaranth Defendants' NYMEX natural gas futures positions until the start of and then selling the positions in the closing ranges on the respective contract expiration days of February 24, March 29, and April 26, 2006. This further "twisted" the spread relationships. Defendants sold these large positions in the closing ranges to lower the prices of NYMEX natural gas futures contracts in order to benefit the Amaranth Defendants' swaps and options positions on ICE and elsewhere.

70.     On those three contract expiration days, the Amaranth Defendants held a substantially larger short natural gas swaps position, primarily on ICE. Upon the expiration of an ICE natural gas swap, the holder will either pay or be paid the difference in the price paid for the swap and the settlement price of the swap. ICE uses the NYMEX settlement price in calculating the settlement price of its natural gas swaps.

71.     The Amaranth Defendants' sale on April 26 of more than 3,000 May 2006 NYMEX natural gas futures contracts in the final minutes of trading triggered both a NYMEX letter asking Amaranth to explain its trading and an investigation and eventual complaint by the CFTC.

72.    In May 2006, the Amaranth Defendants increased their position in the January/November price spread to nearly 60,000 contracts and increased their total short position for the nearby summer months to nearly 70,000 contracts. The Amaranth Defendants' positions in the January 2007 NYMEX natural gas futures contract consisted of more than 50% of the open interest in that contract on 18 of 21 trading days in May, and their positions in the November 2006 contract consisted of at least 55% of the open interest in that contract on all trading days in May.

73.    Thereby, Defendants' artificial impact on prices increased. Although the market for the winter/summer price spreads fell sharply in late May, the Amaranth Defendants were able to report a net return of more than 15% for the first five months of 2006, due to their large gains in the previous months of 2006.

74.    Despite relatively high and stable natural gas supplies in June and July 2006, the Amaranth Defendants then continued to increase their natural gas futures positions and the resulting price artificiality. They did so by continuing to increase the size of their extraordinary positions. At the start of June, the Amaranth Defendants held around 53,000 January 2007 contracts, almost all of which were held on NYMEX. By the end of June, the Amaranth Defendants held the largest positions they held to date. These included the following:

| CONTRACT MONTH | LONG | SHORT |
| --- | --- | --- |
| August 2006 | | (44,000) |
| September 2006 | | (46,000) |
| October 20006 | 26,000 | |
| November 2006 | | (51,000) |
| January 2007 | 60,000 | |

20

75.     The Amaranth Defendants continued to build these positions in July. At the
end of July, for example, the Amaranth Defendants held a long position of nearly 80,000
January contracts. The amount of natural gas represented by 80,000 natural gas contracts is
almost equal to the amount of natural gas used by U.S. residential customers nationwide in
January 2007.

76.     On August 2, 2006, NYMEX sent a letter to Amaranth requesting that
Amaranth review its trading of May 2006 NYMEX natural gas futures contracts on April 26,
2006, and provide an explanation of the commercial need and justification for Amaranth's
trading.

77.     The Amaranth Defendants' August 15 written explanation of their April 26
trading acknowledged that, by April 26, they held a short position of around (13,000) May
swaps and thus had a net short position in May NYMEX natural gas futures contracts and
May swaps of (10,000). But defendants failed to disclose that the Amaranth Defendants sold
an additional 10,000 May swaps on April 26 so that the Amaranth Defendants' net position
(which stood to gain from any manipulation) was short (19,334) contracts. Thus, in
responding to the NYMEX letter inquiry, the Amaranth Defendants misled the regulator with
respect to their position in May 2006 swaps and failed to disclose that they had sold an
additional 10,000 May swaps on April 26. The Amaranth Defendants also claimed falsely
(a) that their trading of the May 2006 NYMEX natural gas futures contract at the end of that
day was related to their desire to reduce their overall Summer-Winter spread position, and (b)
that they were forced to trade the natural gas futures contract when they did (*i.e.*, roughly

3,000 contracts in the final three minutes) because of their inability to sell the desired amount of winter contracts.

78.     In late August 2006, the Amaranth Defendants' March/April and January/November spreads lost value. Amaranth lost $600 million on the September/October spread, a loss masked by other profits in August.

79.     In late summer 2006, the NYMEX began meaningfully to restrict Amaranth's NYMEX positions. The Amaranth Defendants then intentionally maintained their artificial pressure on natural gas futures contract prices by then greatly increasing Amaranth's natural gas contract positions on the ICE, which was not subject to NYMEX limits. The J.P. Morgan Defendants well knew of the stratagem. This stratagem continued Amaranth's manipulation but not at the same levels because artificiality began to seep out of natural gas futures prices and spreads.

80.     Because Amaranth's natural gas positions lost value due to this decline in artificiality, on August 30, its margin requirements increased by $944 million.

81.     As the value of the positions fell, the margin calls increased from $944 million at the end of August to more than double that a week later. On August 31, Amaranth margin requirements on ICE and NYMEX exceeded $2.5 billion and, by September 8, stood at over $3 billion.

82.     By September 15, 2006, Amaranth had lost some $6.5 billion and could not meet its margin calls due to the size of its positions and its leverage.

83.     The J.P. Morgan Defendants quickly dismantled the remains of Amaranth's natural gas trading portfolio in late September and early October. This "run in" liquidation of Amaranth's positions removed the artificiality in prices that had been built-up previously

by Amaranth.  The J.P. Morgan Defendants collected fees for taking over the risky trades, which cost Amaranth over $6 billion in less than one month as gas prices plummeted by records amounts.

84.     With regard to Amaranth's "twisting" manipulation, the spread between Amaranth's two major positions in the natural gas futures market (long March 2007 and short April 2007) plummeted from more than $2/MMBtu to pennies within days.  This extraordinary 95% decline in such prices directly reflected the degree of price artificiality that had earlier been caused by the Amaranth Defendants' manipulative positions in those specific spreads.

85.     The Amaranth Defendants also had caused substantial but lesser percentage amounts of artificiality in other NYMEX natural gas futures contracts.  For example, with regard to Amaranth's "price level" manipulation, the October 2006 contract fell from $8.45 to $4.80, a 44% decline, and spot natural gas fell from $7.49 to $3.66, a more than 50% decline.  Even these lesser percentage declines in absolute price levels were characterized by market participants as unprecedented.

86.     The Amaranth Defendants intentionally and continuously caused price artificiality in NYMEX natural gas futures contracts during the Class Period.

### AS AND FOR A FIRST CLAIM FOR
### MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 1, *et seq.*)

87.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

88.     By their conduct, the Amaranth Defendants each violated Sections 6( c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

89.     Defendants' trading and other activities alleged herein constitute manipulation of the prices of NYMEX natural gas futures, and/or the price of natural gas underlying those contracts, all in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

90.     Plaintiffs purchased or sold one or more NYMEX natural gas futures contracts during the Class Period, and were injured as a result of the Defendants' manipulations of the price of those contracts, in violation of the Commodity Exchange Act, 7 U.S.C. § 1, et seq.

91.     Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM FOR
## AIDING AND ABETTING VIOLATIONS OF SECTION 22 OF THE COMMODITY EXCHANGE ACT
### (7 U.S.C. § 25)

92.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

93.     All defendants, including the J.P. Morgan Defendants, knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. The J.P. Morgan Defendants did so knowing of other Defendants' manipulation of natural gas and natural gas futures and option prices. Defendants willfully intended to assist these manipulations to cause the price of NYMEX natural gas futures contracts and options to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

94.     Other non-defendant persons willfully intended to assist these manipulations to cause the price of NYMEX natural gas futures contracts and options to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1). They are John Does 1-10.

95.     Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## AS AND FOR A THIRD CLAIM FOR
## UNJUST ENRICHMENT

96.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of the Complaint, and further allege against Defendants as follows.

97.     Defendants have benefited from their unlawful acts by forcing Plaintiffs and members of the Class to pay artificially high prices for natural gas futures contracts.

98.     As a result of the higher prices paid by Plaintiffs and members of the Class, it would be inequitable for Defendants to be permitted to retain the benefit of this increased revenue, which was obtained at the expense of Plaintiffs and members of the class.

99.     Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

100.    Alternatively or additionally, each defendant should pay its own unjust enrichment and unjust enrichment in its possession, custody or control of another defendant, to Plaintiffs and members of the class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(B)     That Plaintiffs and the Class recover damages and defendants unjust enrichment, and that judgment be entered against Defendants on behalf of Plaintiffs and the Class;

( C)     That defendants be ordered and adjudged to pay Plaintiffs and the Class any and all sums of defendants' unjust enrichment.

(D)     That a constructive trust be temporarily, preliminarily, permanently or otherwise impressed on defendants' unjust enrichment, including the portions thereof that were obtained at the expense of plaintiffs and the Class;

(E)     That Plaintiffs and the Class recover their costs of the suit, including attorney's fees; and

(F)     For prejudgment interest and such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

Dated: New York, New York
       August 24, 2007

LOVELL STEWART HALEBIAN LLP

By _____

Christopher Lovell (CL 2595)
Ian T. Stoll (IS 3424)
500 Fifth Avenue
New York, New York 10110
(212) 608-1900

Attorneys for Plaintiffs

26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CV 7592

---------------------------------------------------------

ALAN MARTIN and DAX PARTNERS, LP,
individually and behalf of all other
persons similarly situated,

                                         Plaintiffs,

-against-

AMARANTH L.L.C.,
AMARANTH ADVISORS, L.L.C.,
AMARANTH ADVISORS (CALGARY)
U.L.C., AMARANTH GROUP INC.,
AMARANTH INTERNATIONAL LIMITED,
AMARANTH PARTNERS LLC, AMARANTH
CAPITAL PARTNERS LLC, NICHOLAS M.
MAOUNIS, BRIAN HUNTER, MATTHEW
DONOHOE, J.P. MORGAN CHASE & CO.,
J.P. MORGAN CHASE BANK, INC.,
J.P. MORGAN FUTURES, INC., AND JOHN
DOES NO. 1-10,

                                 Defendants.

---------------------------------------------------------x

**RULE 7.1 STATEMENT**



RECEIVED
AUG 2 4 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, the undersigned

counsel for **Dax Partners LP**, a Cayman Islands Corporation, certifies that there is no

parent corporation or publicly held corporation owning ten percent or more of its stock.

Dated: New York, NY
      August 24, 2007

                                  Ian T. Stoll (IS-3424)