**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
                               :

IN RE: AMARANTH NATURAL GAS      :   Master File No.
COMMODITIES LITIGATION            :   07 Civ. 6377 (SAS)
                               :

-------------------------------------------------------------:    ECF Case
                               :

This Document Relates To:            :   **Oral Argument Requested**
                               :

      ALL ACTIONS                 :
                               :

-------------------------------------------------------------- x

### DEFENDANT BRIAN HUNTER'S MEMORANDUM OF LAW
### IN SUPPORT OF HIS MOTION TO DISMISS
### THE CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT

KOBRE & KIM LLP

800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

*Attorneys for Brian Hunter*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT .................................................................................................................3

    I.    The Complaint Should Be Dismissed For Lack of Personal
        Jurisdiction Over Hunter, A Non-Resident Foreign National.......................3

    II.    The Manipulation Claim (Count I) Should Be Dismissed For Failure
        To State a Claim Under Rule 12(b)(6) ..........................................................8

    III.    The Manipulation Claim (Count I) Should Be Dismissed For Failure
        To Plead Scienter With Requisite Particularity ...........................................10

        A.    Plaintiffs Do Not Allege That Hunter Had Any Motive .............12

        B.    Plaintiffs Do Not Allege Facts Constituting Strong
            Circumstantial Evidence Of Intent To Manipulate .....................13

    IV.    The Secondary Liability Claim (Count II) Fails ..........................................20

        A.    Plaintiffs Fail To Allege That Hunter "Aided and Abetted"
            the Alleged Violation ..................................................................20

        B.    Plaintiffs Lack Standing for Liability As "Control
            Persons" and Alleged Violations of CFTC Rule 166.3 ...............21

        C.    Plaintiffs Do Not Allege The Requisite Elements of An
            Agency Relationship For Purposes of Liability Under
            Section 2(a)(1)(B) ......................................................................22

    V.    The Unjust Enrichment Claim (Count V) Fails ..........................................23

    VI.    The Dismissal of the Complaint Should Be With Prejudice........................24

CONCLUSION .............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ..............................................10, 12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..........8, 10, 11

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002).......................................................................................................7

*Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S. Ct. 1955 (2007)................................21

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975).........................................4, 5

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004)....................23

*City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381 (N.Y. App. Div. 4th Dep't 1999)..........................................................................................................23

*Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991).........................................13

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298 (S.D.N.Y. 1999) ......................................................................................................................23

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999)...............................................................1

*Huang v. Sentinel Government Securities*, 657 F. Supp. 485 (S.D.N.Y. 1987)....................4

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................................................................................13

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) .................................................................10

*In re Hohenberg Bros.*, C.F.T.C. No. 75-4, 1977 WL 13562 (C.F.T.C. Feb. 18, 1977) ...........................................................................................................11

*In re Indiana Farm Bureau*, C.F.T.C. No. 75-14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982)...........................................................................................................11

*In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...................1

*In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) .....................21

*In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336 (S.D.N.Y. 2005) .....................10

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005)........................................7

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000) ...............................................................23

*Krause v. Forex Exchange Market, Inc.*, 356 F. Supp. 2d 332 (S.D.N.Y. 2005) ..........20, 21

*Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972)...........................................................................................................4, 5

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)..............................................................................................................3

*Modica v. Modica*, 791 N.Y.S.2d 134 (N.Y. App. Div. 2d Dep't 2005) ............................24

*New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109 (2d Cir. 2007) ...................................................................................5

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..................................................12

*Reading Intern., Inc. v. Oaktree Capital Management LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003).......................................................................................23

*Redtail Leasing, Inc. v. Bellezza*, 95 Civ. 5191 (JFK), 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)...................................................................23, 24

*S.E.C. v. U.S. Environmental*, 82 F. Supp. 2d 237 (S.D.N.Y. 2000) ..................10

*S.E.C. v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ..........................................4

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).............................................2

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ............11, 12, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ----, 127 S.Ct. 2499 (2007).................................................................................................11, 14

*Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993) ........................................................................................................7

*Vitanza v. Bd. of Trade of the City of New York*, No. 00 Civ. 7393 (RCC), 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002) ...........................................6

## Statutes and Rules

17 C.F.R § 166.3 ..................................................................................................22

7 U.S.C. § 13(b) ...................................................................................................22

7 U.S.C. § 2(a)(1)(B) ...........................................................................................22

Fed R. Civ. P. 9(b) ...............................................................................................10

Defendant Brian Hunter ("Hunter") respectfully submits this memorandum of law in support of his motion to dismiss Plaintiffs' Corrected Consolidated Class Action Complaint ("the Complaint").

## PRELIMINARY STATEMENT

Plaintiffs' so-called manipulation claim essentially alleges that Hunter (and the other "Amaranth Defendants") took large positions and made large trades that allegedly affected the price of futures contracts. Such conduct is simply *not* manipulation under the law.

As this Court has recognized in the closely analogous securities context, "In the end, '[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'" *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 387 (S.D.N.Y. 2003) (Scheindlin, J.) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). There was no deception here.

Here, Plaintiffs seek to hold Hunter liable for alleged conduct—taking large positions and making large trades—that is simply not "manipulative" under any legally recognized definition. Hunter is not alleged to have "rigged" the price of the futures at issue. His trades are not alleged to have been fictitious or inherently deceptive, such as in the case of wash sales, matched orders or rigged prices. He is not alleged to have effected a "corner" or "squeeze" on the underlying commodity, or to have otherwise forced counterparties to deal with him. Moreover, Hunter is not alleged to have bought or sold futures at anything other than the prevailing market prices.

In short, there is not a single factual allegation supporting the notion that Hunter committed any act of manipulation, *i.e.*, an act "intended to mislead investors by

1

artificially affecting market activity." *Id.* (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476-77 (1977)).  The manipulation claim should therefore be dismissed under Rule 12(b)(6) for failure to state a claim.  *See* Point II, *infra*.

The manipulation claim suffers from another fatal defect:  There is not a single factual allegation that gives rise to the inference—let alone the requisite "strong inference"—that Hunter specifically intended to create an artificial price, which is a requirement for a manipulation claim.  As such, the claim fails to plead manipulation with the requisite particularity and should therefore be dismissed under Rule 9(b).  *See* Point III, *infra*.

With respect to the remaining claims against Hunter, Plaintiffs take a "kitchen sink" approach, seeking to hold Hunter liable under assorted theories of secondary liability and a claim for "unjust enrichment."  Not only does each of these theories depend entirely upon (and therefore fail along with) Plaintiffs' fatally flawed theory of primary liability for manipulation, but Plaintiffs lack standing to bring several of these claims and otherwise fail to allege facts supporting any of them.  Thus, these claims should be dismissed as well. *See* Points IV and V, *infra*.

But the Court need not address any of these issues as to Hunter, as the Complaint suffers from a more fundamental, threshold defect.  It fails to establish, as it must, that this Court's exercise of personal jurisdiction over Hunter satisfies due process.  As such, it should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction.  *See* Point I, *infra*.[1]

---

[1]    Pursuant to Your Honor's Individual Rule III.B., counsel for Mr. Hunter certifies that pre-motions letters were exchanged in advance of the filing of this motion.

**ARGUMENT**

I.    **The Complaint Should Be Dismissed For Lack of Personal Jurisdiction Over Hunter, A Non-Resident Foreign National**

Plaintiffs do not allege facts legally sufficient to establish this Court's personal jurisdiction over Hunter.  Indeed, having acknowledged that Hunter is a foreign national who acted and resided outside the United States during the entire Class Period (¶ 30),[2] Plaintiffs do not even assert in the Complaint that this Court has personal jurisdiction over Hunter, let alone allege facts that would support such a conclusion.  It is Plaintiffs' burden to establish jurisdiction, *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996), and Plaintiffs have clearly failed to meet it.  The Complaint should therefore be dismissed under Rule 12(b)(2).

To meet their burden, Plaintiffs must demonstrate that Hunter had sufficient "minimum contacts" with the United States such that subjecting him to this Court's jurisdiction comports with "traditional notions of fair play and substantial justice."  *See id.* at 568.  Plaintiffs have failed to allege such facts.  As Plaintiffs allege, Hunter is a Canadian citizen.  (¶ 30.)  He was an employee of a Canadian entity.  (¶ 28.)  He resided in Canada during the entire Class Period (*see* ¶ 30.)  *Hunter is not alleged to have committed a single act within the United States.  Indeed, he is not alleged even to have been present here at any time during the Class Period.*

Presumably, Plaintiffs are attempting to argue that the alleged effect on the price of NYMEX natural gas futures contracts caused by Hunter's purportedly large trades and positions form the basis for jurisdiction.  However, this allegation is insufficient.  The Second Circuit has warned that the principle of "causing effects" within the forum is one

---

[2]    All references to "¶" numbers are to the Complaint.

3

that "must be applied with caution, particularly in an international context." *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972). It has further held that, "[N]ot every causal connection between action abroad and ultimate injury to American investors will suffice" for personal jurisdiction purposes. *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 1000 (2d Cir.), *cert. denied*, 423 U.S. 1018 (1975)). Moreover, "Not every securities law violation involving shares of a United States corporation will have the requisite effect within the United States." *Unifund SAL*, 910 F.2d at 1033. Rather, "there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Leasco*, 468 F.2d at 1340. Further, "there must be a significant causal relation between defendant's jurisdictional contacts and plaintiffs' cause of action." *Huang v. Sentinel Government Securities*, 657 F. Supp. 485, 488 (S.D.N.Y. 1987).

Here, with rare exceptions discussed below, Plaintiffs do not specifically allege that their causes of action arise from trades made or positions taken on a U.S. exchange. *See Unifund SAL*, 910 F.2d at 1033 (finding jurisdiction over foreign defendant who traded shares of a U.S. corporation that were traded exclusively on a U.S. exchange). Rather, they allege that Hunter somehow affected the price of the NYMEX contracts by his allegedly large trades and positions in undifferentiated "net futures equivalents," some category that Plaintiffs have defined to also include a variety of financial instruments that do not trade on the physical floor of a United States exchange, but rather are traded electronically over-the-counter on the "IntercontinentalExchange" ("ICE") by participants located anywhere in the world (*see* ¶ 72). *See New York Mercantile Exchange, Inc. v.*

*IntercontinentalExchange, Inc.*, 497 F.3d 109, 110 (2d Cir. 2007) ("IntercontinentalExchange, Inc. operates an electronic, Internet-based, trading market for trading of physical commodities and over-the-counter derivative contracts.").

In other words, other than by alleging some effect in the United States, Plaintiffs have not actually connected Hunter's trades and positions in "net futures equivalents" to the United States. Indeed, trades on the Internet-based ICE trading market are actually cleared in the United Kingdom, not in the United States. *Id.* at 112 ("While ICE cannot clear trades itself, it contracts with the London Clearing House ('LCH') to do so.") This purported "contact" with the United States is too attenuated to form the basis of personal jurisdiction. We are unaware of any case finding personal jurisdiction over a non-resident foreign national for his allegedly manipulative trades on an over-the-counter electronic exchange, not alleged to have been made in the United States, based on the rationale that such non-U.S. trades nevertheless eventually affected the price of instruments traded on a U.S. exchange.

Even if an effect on the price of the NYMEX contracts could be deemed "foreseeable" from Hunter's allegedly large trades and positions in "net futures equivalents," the Second Circuit has made clear that "attaining the rather low floor of foreseeability necessary to support a finding of tort liability is not enough to support *in personam* jurisdiction." *Leasco Data Corp.*, 468 F. 2d at 1341. "[T]he test for *in personam* jurisdiction is somewhat more demanding" than some "causal relation" to the alleged injuries of U.S. residents or citizens. *Bersch*, 519 F.2d at 1000.

In certain instances, Plaintiffs do allege trades and positions specifically in NYMEX futures contracts.  However, these NYMEX trades and positions nevertheless do not create jurisdiction.

The majority of these alleged NYMEX trades relate to an alleged scheme to depress the NYMEX settlement price on three occasions by selling large amounts of NYMEX futures during the closing period.  (*See* ¶¶ 100-146.)  However, such NYMEX trading cannot form the basis of specific jurisdiction over Hunter because the alleged manipulation of the settlement price cannot form the basis of Plaintiffs' cause of action under the Commodity Exchange Act ("CEA"):    As described in greater in the memorandum of law submitted by Defendant Amaranth Advisors L.L.C.,[3] Section 22(a) of the CEA does *not* provide a private cause of action based on manipulation of the NYMEX settlement price.  *See Vitanza v. Bd. of Trade of the City of New York*, No. 00 Civ. 7393 (RCC), 2002 WL 424699, at *4-5 (S.D.N.Y. Mar. 18, 2002) (dismissing cause of action based upon alleged manipulation of settlement price).  Furthermore, Plaintiffs cannot circumvent this limitation by arguing that the alleged manipulation of the settlement price had some effect on the price of their NYMEX futures contracts (*see* ¶¶ 120, 126, 146). That very argument was rejected in *Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993), where the court held that "while defendant's alleged manipulation of the . . . Treasury notes may have adversely impacted positions plaintiffs took in the Treasury bill and eurodollar futures markets, Treasury notes are not the commodity 'underlying' either Treasury bill futures or eurodollar futures.  Since plaintiffs

---

[3]    We do not wish to burden the Court by reiterating legal arguments that apply equally to Hunter and so hereby incorporate by reference the memorandum of law submitted by Amaranth Advisors L.L.C.  We endeavor to address herein those issues that apply specifically to Hunter.

have not adequately pled the 'condition precedent' in § 22(a)(1)(D), defendants' motion to dismiss . . . is granted." *Id.* at 1043. Thus, since Plaintiffs do not have a cause of action arising out of these NYMEX trades, they cannot form the basis for specific jurisdiction.[4] *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (defining specific jurisdiction as "where 'the claim arises out of, or relates to, the defendant's contacts with the forum" and "where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court'").[5]

Finally, Plaintiffs also allege certain specific trades and positions in the January 2007 and the March 2007 NYMEX futures contracts, which purportedly caused price effects on those contracts. (*See* ¶¶ 96-98.) However, Plaintiffs do not allege that any of them were actually purchasers of those contracts, as required by Section 22, 7 U.S.C. § 25(a)(1)(D). Thus, plaintiffs have again not alleged that their cause of action arises from these alleged contacts, such that they may not form the basis for jurisdiction. *See, e.g.*, *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005) (dismissing complaint as to those plaintiffs who had not alleged that they had actually purchased securities in the United States).[6]

---

[4]    As argued more fully in the memorandum of law submitted by Amaranth Advisors L.L.C., because the CEA does not provide a cause of action for manipulation of the settlement price, these allegations should be dismissed under Rule 12(b)(6) as well.

[5]    The Complaint has not alleged any facts that would even remotely suggest that Hunter had "continuous and systematic general business contacts" with the United States sufficient to give rise to "'general jurisdiction,' *i.e.*, jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts." *Bank Brussels Lambert* 305 F.3d at 127.

[6]    Plaintiffs also allege certain NYMEX positions in excess of NYMEX position limits and accountability levels (*see* ¶¶ 150-168). However, the plaintiffs do not allege that

Because Plaintiffs have failed to allege sufficient minimum contacts to satisfy traditional notions of fair play and substantial justice, the Court should dismiss the Complaint under Rule 12(b)(2).

## II.    The Manipulation Claim (Count I) Should Be Dismissed For Failure To State a Claim Under Rule 12(b)(6)

The Complaint is fatally deficient for another reason: In its 271 paragraphs, it does not allege a single act constituting manipulation. While plaintiffs attempt to dress up their allegations with novel labels like "self-fulfilling prophecy manipulation" (¶ 71) and "'slamming the close' trades" (¶ 99), at bottom plaintiffs are alleging simply that Hunter allegedly took large positions and made large trades and thereby affected the price of futures contracts. Contrary to Plaintiffs' suggestions that Hunter has engaged in "classic manipulative act[s]" (¶ 71), the Second Circuit has explicitly held that large volume trading does *not* constitute manipulation. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).

As demonstrated in the memorandum of law submitted by defendant Amaranth Advisors L.L.C., merely holding large positions or making trades in large volume does not constitute manipulation under the law. Yet that is all that Plaintiffs allege in the Complaint. There is no allegation that investors were deceived or that the price was the result of anything other than the product of the natural interplay of supply and demand. Hunter is not alleged to have "rigged" the price of the futures at issue or to have engaged in any fictitious or inherently deceptive trading. He is not alleged to have effected a "corner" or "squeeze" on the underlying commodity, or to have otherwise forced counterparties to

---

*they* actually purchased such contracts, nor that these positions actually had any manipulative effect on the price of these contracts.

deal with him.  Indeed, Hunter is not alleged to have bought or sold futures at anything other than the prevailing market prices.

Apparently recognizing that mere allegations of open market trading do not amount to a claim for manipulation, Plaintiffs attempt to cast their claim in a supposedly more sinister pall by alleging various position limit violations and NYMEX inquiries (¶¶ 147-168).  However, whatever scandalous insinuations Plaintiffs believe these allegations may generate, they have absolutely nothing to do with their manipulation claim.  Plaintiffs do not even allege that these supposed violations of regulatory limits actually had an effect on the price of contracts they purchased or sold, or even that such violations were made knowingly or intentionally.  In any case, the question for the Court is whether holding large positions and trading in large volumes is conduct that has the effect of deceiving investors about the price of the futures.  The answer, under clear Second Circuit law, is no. The fact that NYMEX looked into whether Amaranth had exceeded NYMEX's position limitations does not change that law.

Similarly, Plaintiffs try to add a specter of "concealment" to their claim by alleging that Amaranth began moving its positions from NYMEX to the ICE.  (*See* ¶¶ 166-168.) However, the notion that holding positions on ICE constitutes "concealment" is simply preposterous.  Everyone involved in futures trading knows that ICE exists in addition to NYMEX, and that there is no law or regulation prohibiting a party from trading on ICE versus NYMEX.   There is nothing wrong with holding positions on ICE, or even preferring ICE because it does not have position limits, and Plaintiffs do not and cannot allege otherwise.

Finally, Plaintiffs allege that the Amaranth defendants made false statements to NYMEX in response to its inquiries.  (*See* ¶ 149.)  Such alleged "deception" has no bearing on the manipulation claim, as there is no plausible allegation that *Plaintiffs* were deceived by the allegedly false letter.  In addition, there is no evidence cited that Brian Hunter made any statements to NYMEX.

### III. The Manipulation Claim (Count I) Should Be Dismissed For Failure To Plead Scienter With Requisite Particularity

In addition, the Complaint should be dismissed under Rule 9(b) for failing adequately to plead that Hunter had requisite state of mind.

As outlined in the memorandum of law submitted by Amaranth Advisors L.L.C., Rule 9(b) applies to this claim for manipulation.  Indeed, the Second Circuit recently held in the closely analogous context of the securities market that "a claim for market manipulation is a claim for fraud" and therefore "must be pled with particularity under Rule 9(b)."  *ATSI Communications,* 493 F.3d at 101.[7]  Thus, courts in the Second Circuit have applied Rule 9(b) to claims of manipulation under the Commodity Exchange Act. *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *4-5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) to a claim of manipulation); *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 342-43 (S.D.N.Y. 2005) (same).

Although "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally," Fed R. Civ. P. 9(b), this leeway is not a "license to base claims of fraud on speculation and conclusory allegations."  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks and citation omitted).  Thus, under Rule 9(b), Plaintiffs must state with particularity facts giving rise to a "strong inference" that the

---

[7]     *See also S.E.C. v. U.S. Environmental*, 82 F. Supp. 2d 237, 239 (S.D.N.Y. 2000).

defendant acted with the required state of mind.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Here, that required state of mind is "*specific* intent," *i.e.*, "*purposeful* conduct."  *In re Indiana Farm Bureau*, C.F.T.C. No. 75-14, 1982 WL 30249, at *5 (C.F.T.C. Dec. 17, 1982) (emphasis added).  In other words, Plaintiffs must show that it was Hunter's specific intent to effect a price that was *artificial* (i.e., the product of some fraud or deception).  *Id.* at * 4 (citing *In re Hohenberg Bros.*, C.F.T.C. No. 75-4, 1977 WL 13562, at *7 (C.F.T.C. Feb. 18, 1977).

    The Supreme Court recently observed that in determining whether the factual allegations give rise to a "strong inference":

> The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ----, 127 S.Ct. 2499, 2510 (2007).[8] Thus, for a complaint to give rise to a "strong inference," it is not enough that it "alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent."  *Id.* at 2506.  Rather, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences" and must engage in a "comparative inquiry."  *Id.* at 2509.  For an inference to be strong, "a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged."  *ATSI Communications*, 493 F.3d at 99 (quoting *Tellabs*, 127 S.Ct. at 2510) (emphasis in the original).

---

[8]    In *Tellabs*, the Supreme Court was specifically addressing the "strong inference" standard of the PSLRA; however, the logic obviously applies equally to the "strong inference" standard of Rule 9(b).

In the Second Circuit, a plaintiff may satisfy Rule 9(b) by alleging facts: (1) showing that the defendants had both motive and opportunity to commit the manipulation or (2) constituting strong circumstantial evidence that the defendant had the requisite state of mind. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994). Here, Plaintiffs do not come close to satisfying either of these alternatives.

### A.    Plaintiffs Do Not Allege That Hunter Had Any Motive

The Complaint is utterly devoid of any allegation that Hunter had a motive to commit the "manipulation" alleged.  The closest Plaintiffs come is alleging that, with respect to the allegations relating to manipulation of certain NYMEX settlement prices (¶¶ 100-146), "Amaranth's manipulation of the prices of the NYMEX NG Contracts during the settlement was intended to benefit Amaranth's substantially larger short natural gas swaps positions on ICE and elsewhere."  (¶ 103.)  But even if true, that allegation does not amount to a motive for Hunter personally.

To establish a defendant's scienter by demonstrating motive, it is necessary to allege facts that demonstrate that that defendant would "benefit[] in some concrete *and personal* way" from the alleged scheme.  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (emphasis added).  Here, Plaintiffs have not alleged that *Hunter* would obtain *any* benefit—let alone a "concrete and personal" one—from any purported benefit to "Amaranth" from the alleged scheme.

Even if the Court were to assume—despite the lack of any allegation in the Complaint—that Hunter may somehow benefit from "Amaranth's" positions, such a motive should surely fail.  Courts universally reject the idea that such "general motives," possessed by virtually all corporate executives, are sufficient to raise a strong inference of intent.  *See, e.g., Acito*, 47 F.3d at 54 (upholding dismissal and rejecting motive allegations

where plaintiffs had alleged motive because an increase in stock price would increase defendants' compensation); *Shields*, 25 F.3d at 1130-31 (rejecting motive allegations based on defendants' desire to "protect their executive positions and the compensation and prestige they enjoy thereby").[9]  In *Shields*, the Second Circuit stated:

> Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations.

*Id.*, at 1130 (quoting *Ferber*, 785 F. Supp. at 1107).

**B.    Plaintiffs Do Not Allege Facts Constituting Strong Circumstantial Evidence Of Intent To Manipulate**

Having failed to allege motive, Plaintiffs resort to quoting snippets of instant messages ("IMs"), from which they seek to establish the requisite specific intent to manipulate.  As a threshold matter, these allegations—the only specific factual allegations in the entire Complaint that arguably go to scienter—relate only to the alleged "manipulation" of the NYMEX settlement price by selling futures during the 30 minute closing range on three expiration days (¶¶ 100-146), and not to the broader allegations of manipulation of the prices of NYMEX futures contracts through various other large positions and sales (¶¶ 71-99).[10]  With respect to the broader alleged scheme, Plaintiffs allege no facts at all.

---

[9]    *See also Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991) (rejecting motive based on allegation that defendants were compensated based on yearly corporate financial performance); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 593-94 (S.D.N.Y. 2006) (rejecting motive based on large performance-based bonuses, stating "the law is clear that the desire of individual defendants 'to . . . increase their compensation by artificially inflating . . . stock price' is not sufficient to establish motive").

[10]    For reasons described above, the allegations relating to a scheme to an alleged manipulate the NYMEX settlement price should be dismissed under Rule 12(b)(6), as the CEA does not provide a cause of action for such allegations.

Moreover, the snippets quoted by Plaintiffs are extracted from broader, more extensive IM conversations that are incorporated by reference into the Complaint and may therefore be considered on a motion to dismiss. (*See, e.g.,* ¶ 106, n.5.)[11] These IM conversations do not give rise to *any* inference of intent to manipulate, let alone a "strong inference" that is "at least as compelling" as the inference that Hunter's trades were based on attempts to profit from indisputably legitimate trading strategies (in essence, attempting to time trades so as to buy low and sell high, based on observing price movements in the marketplace). As discussed above, the Court must consider these plausible opposing inferences and dismiss the Complaint where Plaintiffs' proffered inferences are not "cogent and at least as compelling as any opposing inference." *Tellabs,* 127 S.Ct. at 2510.

1.    February 24, 2006

Although Plaintiffs theory appears to be that Hunter allegedly intended to depress the NYMEX settlement prices in order to benefit certain larger short swap positions held by Amaranth on "ICE and elsewhere" (¶¶ 103, 105), Plaintiffs do not allege that Hunter was even aware of those other short positions. Indeed, the alleged short swap positions are—quite noticeably—never once mentioned in any of the IMs cited by Plaintiffs as evidencing just such a manipulative plan.

Moreover, among the hundreds of lines of IM text referenced in and appended to the Complaint, there is not a single suggestion that Hunter ever instructed Matthew Donohoe ("Donohoe") to sell the futures at less than the prevailing market price on NYMEX. Such an instruction—which would logically be integral to a plan to depress prices—is noticeably absent from precisely where one would expect it to be: Hunter's

---

[11]    The Complaint incorporates these IMs by reference. *See* ¶ 106 n. 5. For the convenience of the Court, we attach them hereto as Exhibit A ("Ex. A.").

alleged instruction to Donohoe, "make sure we have lots of futures to sell MoC tomorrow" (¶ 106).

Indeed, the *full* text of the conversation referenced in Paragraph 106, which Plaintiffs fail to quote, contain statements that support a far more plausible inference as to the purpose behind selling futures during the closing range—that it was part of a new strategy (what Hunter later allegedly refers to as an "expiriment" [sic]) (*see* ¶ 105) designed to respond to "big changes" observed in the marketplace during the close of trading on February 23. Such a reading is far more plausible than Plaintiffs' speculative theory, especially given that the alleged instruction is given shortly after Donohoe's observation "rallying here" and immediately following Hunter's comment "PBN trading 13.5 for size H.J [March/April spread]." (Ex. A, AALLC_REG0684055.)

Indeed, the IM conversation later cited at Paragraph 111 further supports the inference that Hunter's decision to sell contracts was a response to unusual market behavior observed in options contracts the day before, as Hunter apparently tells Glover that the reason he had "4000 to sell MoC" was "all from options yestrday [sic]." (Ex. A., AALLC_REG0684227.) Rather than supporting the theory that Hunter was seeking to depress prices by offering at beneath prevailing prices, this IM suggests that he was experimenting to see if he could make a profit on the futures, *i.e.*, if there would be sufficient market demand for the futures he planned to sell: Hunter tells Glover, "so we'll see *what the floor has* / bit of an expiriment [sic] mainly." (*Id.* (emphasis added).)

Plaintiffs imply manipulative intent from alleged comments between Hunter and Donohoe congratulating themselves "at about half way through the closing range." (¶ 116, Ex. A., AALLC_REG0704932.) However, Plaintiffs have again quoted selectively,

15

excising the portions that would negate the very inferences it propounds.  For example, Plaintiffs' quotation of Donohoe's comment "h will settle lower and h/j wider" is offered to suggest that Donohoe means, in substance, the price will settle lower and wider than it would have but for the manipulative scheme.  Indeed, Plaintiffs place the quote in a way to make it appear as if this comment immediately follows "today came together quite nicely" (¶ 116).[12]  In fact, however, the immediately preceding statement in the IM conversation makes it clear that Donohoe is responding to Hunter having sent him a new pricing "curve" (*i.e.*, estimates for the prices Amaranth would use to mark its portfolio) and to Hunter's question, "what' [sic] do you think? / of this curve?" (Ex. A, AALLC_REG0704932.)  Indeed, the rest of the message makes even more clear that the context of this conversation is Hunter's estimated price curves, not any manipulative scheme:  *See, e.g.*, "I might adjust a little"; "nice and concervative [sic] on cals [sic] spreads too." (*Id.*)   Clearly then, Donohoe's comment is merely commenting on Hunter's estimates.

The portion quoted by Plaintiffs also contain a number of apparently self-congratulatory statements (*e.g.*, "I am flexing here").  However, given the context, it is clear the statements refer to Amaranth's profit and loss *for the month* ("2nd best . . . sept/oct last year still the best"), and *not* to any alleged manipulative scheme performed that day during the closing range.

Without explanation, Plaintiffs also insinuate that Hunter's statement that he was waiting until 2:20 to sell futures (¶ 115) evidences some sort of intent to manipulate prices

---

[12]    It is also noteworthy that the "today came together nicely" comment occurred at 2:15, with half of the closing yet to occur and well before the alleged statement by Hunter that he had "a lot more to sell . . . waiting until 2:20" (¶ 115), strongly suggesting that the "came together nicely" comment had nothing to do with the sale of futures during the close.

downward. However, the very IMs cited in the Complaint demonstrate that there were plenty of plausible reasons why Hunter may have waited to sell during the closing range, including that he predicted increased buying during the close. *See, e.g.*, "Sandy and RBI bidding the H" (Ex. A., AALLC_REG0684227); "did you hear Merrill bought 10k 8.00 calls?" (Ex. A., AALLC_REG0684264). Thus, it is a far more plausible inference that the reason Hunter allegedly waited to sell was to benefit from the possibility of selling at a higher price.

Plaintiffs attempt to suggest from Hunter's alleged statement "just need H [March] to get smashed on settle / then day is done" that Hunter intended *to cause* the price of that contract to drop (¶ 109). In fact, despite alleging that "smashed" means simply "if prices fell really, really quickly" (¶ 110), Plaintiffs later morph the statement into an "instruction" to Donohoe to "smash" the settlement price (¶ 113). However, that is just a blatant mischaracterization (if not misquotation) of the statement alleged at Paragraph 109 and purportedly explicated at Paragraph 110. At best the alleged statement only shows that Hunter may have *hoped* that the price of March natural gas futures contracts would fall, not that he would attempt to cause it to do so. Furthermore, again noticeably absent from this long IM conversation is any reference to the alleged short swap position, the alleged *raison-d'être* of the attempted settlement price depression.

Finally, Plaintiffs' allegation that Amaranth's floor broker "disseminated to the pit on behalf of Amaranth that Amaranth would be a large seller" (¶ 114) only demonstrates the absurdity of Plaintiffs' manipulation claim. This is clearly not a case where the market was misled or where information that the market was entitled to have was somehow concealed from the market. This is a case where the market received information—correct

17

information—about supply and demand (*e.g.*, that "Amaranth would be a large seller"), and reacted accordingly. That is not manipulation. That is prices moving according to the natural forces of supply and demand.[13]

2. March 29, 2006

With respect to March 29, Plaintiffs allege nothing more than that Amaranth "held a large long position in the April 2006 contract prior to the settlement period, and proceeded to sell it 'MoC' during the close . . ." (¶ 122). Plaintiffs cite no IMs and provide no factual allegations to support the proposition that the purpose of the sales was to depress the settlement price. Further, Plaintiffs do not allege that Hunter played any role in this expiry.[14]

---

[13] Plaintiffs' suggestion that there is something improper to be inferred from their allegation that Hunter was told that he was short and to "[p]lease make sure we are flat by the end of today" (¶ 107), and that Amaranth "reversed its natural gas futures position from being short to being long" (¶ 108) barely deserves comment. There is no allegation or reason to presume that on the day of expiry speculative traders seek only to liquidate open positions and have no other purpose behind their trades for that day, and that it should therefore be perceived as unusual that Amaranth's futures position became long before ultimately zeroing out at the end of the day. Further, Plaintiffs' suggestion that there is something "conspiratorial" to be inferred from the fact that Hunter would tell his floor broker what Amaranth's position and intention was (¶ 112) is preposterous. A far more plausible inference is that Hunter would tell the floor broker what Amaranth's intentions were so that the floor broker could plan for the size of the order that would be incoming from Amaranth.

[14] Plaintiffs' allegation that "FERC found that Amaranth manipulated the settlement price of the April 2006 contract" (¶ 126) is flatly false. Such allegations have not yet been tested through any adversarial process either at the FERC or in the courts. *See* Commission Enforcement Staff's Brief Addressing Issues For Trial or a Ruling and in Opposition to Motion for Summary Disposition, filed under docket number IN07-26-000 by the Federal Energy Regulatory Commission's Division of Investigations, Office of Enforcement on March 18, 2008 and available at http://www.ferc.gov/docs-filing/elibrary.asp.

3.    April 26, 2006

Plaintiffs' allegations regarding April 26 fare no better.  Again, as with February 24, there is no allegation that Hunter ever instructed anyone to sell futures at below market prices.

Plaintiffs allege that Hunter was concerned about buy-side pressure stemming from the trading activity of Centaurus Advisors LLC [sic].  (¶ 131-133.)  However, at most, these IMs merely reflect that Hunter was attempting to predict what another trader may be thinking or doing, a natural thing for him to consider, given that a trader's job obviously involves attempting to predict price movements.  Nowhere in these IMs is there a suggestion that Hunter planned to do something improper in response to his predictions regarding the other trader.

Plaintiffs also generally allege that defendants "waited to sell" and placed orders to sell in the last eight minutes of the close (*see* ¶ 134-144).  However, even if true, there is nothing manipulative or unlawful about such an order.  Indeed, the scanned copies of the order tickets cited by Plaintiffs (¶ 139 and n.17) belie the claim that Hunter sought to depress prices, as they contain no instruction to sell the futures at anything other than prevailing market price.

Plaintiffs assert that "there is no legitimate explanation or business justification" for the instruction to wait to sell (¶ 142; *see also* ¶ 139).  But common sense demonstrates that not to be true.  Someone may "wait to sell" because they believe prices are going to rise.  Indeed, the allegations that Hunter anticipated that Centaurus Energy may be "running the market up on the close" (Ex. A., A_CFTC032875) only supports the inference that Hunter

19

believed prices would rise, and therefore "waited to sell" until he observed that happening in order to profit from the expected price increase.

We are not asking the Court to adopt any particular interpretation of these IMs and other allegations over another. However, these differing inferences demonstrate that the Plaintiffs' are not cogent and compelling, and therefore fail to meet the heightened pleading requirements of Rule 9(b).

## IV.    The Secondary Liability Claim (Count II) Fails

For reasons outlined above, Plaintiffs have failed to state a primary violation for manipulation against any defendant. Plaintiffs' claim against Hunter for secondary liability therefore necessarily fails. But moreover, each of the various theories offered by plaintiffs for secondary liability fail for the separate reasons discussed below.

### A.    Plaintiffs Fail To Allege That Hunter "Aided and Abetted" the Alleged Violation

Plaintiffs seek to hold Hunter liable for "aiding and abetting" the purported manipulation violation (*see, e.g.*, ¶¶ 251, 254). Because Plaintiffs do not articulate which defendant actually committed the primary violation that Hunter supposedly aided and abetted, and moreover how Hunter supposedly aided and abetted that primary violation, Plaintiffs' claim is nearly incomprehensible. However, under any theory, such a claim fails.

To recover on an aiding and abetting claim under the CEA, Plaintiffs must prove that the defendant: (1) had knowledge of the principal's intent to violate the CEA, (2) intended to further that violation, and (3) lent substantial assistance to the primary violator in committing the primary violation. *Krause v. Forex Exchange Market, Inc.*, 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498,

511 (S.D.N.Y. 2004).  Furthermore, Rule 9(b) applies to the aiding and abetting claim as well, since it applies to the primary violation.  *See Krause*, 356 F. Supp. 2d at 338.  Thus, Plaintiffs must allege with particularity, among other things, "facts that give rise to a strong inference of fraudulent intent."

To the extent Plaintiffs' "aiding and abetting" claim against Hunter refers to the alleged manipulation of the settlement prices of the March and May contracts (the only acts where Hunter is specifically alleged to have participated), the allegations fail to establish that Hunter had the requisite intent, for all the reasons described above. Plaintiffs' factual allegations fail to give rise to the inference that Hunter purposefully sought to manipulate the price, or that he intended to help someone else do so.

To the extent the claim refers to the broader alleged scheme to manipulate the price of the NG future contracts (¶¶ 71-99) or the alleged manipulation of the settlement price of the April contract, such a claim utterly fails to allege a single fact to support either that Hunter had the requisite intent or that he actually provided any "substantial assistance." Thus, the claim amounts to impermissible conclusory group pleading, insufficient even under Rule 8, let alone Rule 9(b).  *See Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S. Ct. 1955, 1964-65 (2007).

**B.    Plaintiffs Lack Standing for Liability As "Control Persons" and Alleged Violations of CFTC Rule 166.3**

Next, in classic "kitchen sink" approach, Plaintiffs attempt to make Hunter liable as a "control person" under Section 13(b) of the Commodity Exchange Act, 7 U.S.C. § 13c(b), and Rule 166.3, 17 C.F.R. § 166.3 (*see* ¶ 255).  However, for reasons articulated more fully in the memorandum of law submitted by Amaranth Advisors L.L.C., Plaintiffs lack standing to bring such a claim under either provision:  With respect to control person

21

liability under Section 13(b), the law is clear that such actions may only be "brought by the Commission." 7 U.S.C. § 13(b). With respect to alleged violations of Rule 166.3, the law is clear that there is no private right of action for failure to supervise under that rule. Furthermore, the Rule is not applicable, as Hunter is not alleged to be (and is not) a "Commission registrant." 17 C.F.R § 166.3 (requiring that "each Commission registrant" "must diligently supervise…").

### C.   Plaintiffs Do Not Allege The Requisite Elements of An Agency Relationship For Purposes of Liability Under Section 2(a)(1)(B)

Finally, Plaintiffs also seek to hold Hunter secondarily liable through an agency theory of liability under Section 2(a)(1)(B) (*see* ¶ 255). As with Plaintiffs' "aiding and abetting" theory, Plaintiffs' lack of articulation as to the basis for its theory makes it nearly incomprehensible.

Section 2(a)(1)(B) states: "The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." 7 U.S.C. § 2(a)(1)(B).

To the extent that Plaintiffs are alleging that some hypothetical violator—other than defendant Donohoe—"act[ed] for" defendant Hunter, Plaintiffs have utterly failed to support such a claim with a single factual allegation. Such a conclusory allegation surely fails under Rule 8, much less under the applicable Rule 9(b).

To the extent that Plaintiffs are alleging that defendant Donohoe "act[ed] for" Hunter, even assuming Plaintiffs' allegations satisfied the requirements of Section 2(a)(1)(B), Plaintiffs fail to allege a single act by defendant Donohoe, other than with

22

respect to the expiries of the March and May contracts. Hunter has already demonstrated how the allegations pertaining to those expiries fail to state a claim for manipulation under either Rule 12(b)(6) or Rule 9(b).

## V.    The Unjust Enrichment Claim (Count V) Fails

Seeking to overcome the well-established law that Plaintiffs' allegations do not amount to manipulation, plaintiff brings a vague claim for "unjust enrichment" and request the establishment of a "constructive trust." However, plaintiffs do not even attempt to establish facts that would support such a claim.

Unjust enrichment is a quasi-contractual remedy. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298, 301 (S.D.N.Y. 1999). Thus, some form of contractual or quasi-contractual relationship must exist between the parties. *Reading Intern., Inc. v. Oaktree Capital Management LLC*, 317 F. Supp. 2d 301, 333-34 (S.D.N.Y. 2003); *Redtail Leasing, Inc. v. Bellezza*, 95 Civ. 5191 (JFK), 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997) ("[A]n unjust enrichment claim . . . requires some type of direct dealing or actual, substantive relationship with a defendant."). Furthermore, to plead a claim for "unjust enrichment," a plaintiff must allege: (1) that the defendant was enriched; (2) that the enrichment was at plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 381 (N.Y. App. Div. 4th Dep't 1999)). The benefit must be "specific and direct" in order to support such a claim. *Id.*

Here, there is absolutely no allegation that Hunter received any benefit, let alone a benefit at Plaintiffs' expense. Furthermore, there is no allegation that Hunter had any relationship with Plaintiffs, let alone the type of quasi-contractual relationship necessary for recovery on an unjust enrichment theory. A contemporaneous trading relationship is insufficient. *Redtail Leasing*, 1997 WL 603496, at *8 (dismissing unjust enrichment claim where plaintiff only alleged a "contemporaneous trading relationship with Defendants" on the grounds that the relationship was not sufficiently direct or substantive). Therefore, there is no basis for the unjust enrichment claim.

In addition, Plaintiffs' prayer for constructive trust should be denied. A "constructive trust" is only appropriate where a plaintiff shows: (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment. *Modica v. Modica*, 791 N.Y.S.2d 134, 135 (N.Y. App. Div. 2d Dep't 2005). Here, not only have Plaintiffs failed to satisfy the unjust enrichment element (as described above), but they have again alleged no facts supporting any of the other elements of constructive trust, including a confidential or fiduciary relationship, a promise, or reliance.

## VI.    The Dismissal of the Complaint Should Be With Prejudice

For all the reasons described in Amaranth Advisor L.L.C.'s brief, the Complaint should be dismissed *with prejudice*, as Plaintiffs have had more than adequate opportunity to obtain discovery relevant to their claim.

## <u>CONCLUSION</u>

The Court should dismiss the Plaintiffs' Complaint against Hunter for lack of personal jurisdiction pursuant to Rule 12(b)(2), or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6) and for failure to plead intent under Rule 9(b).

Dated:  April 28, 2008
        New York, New York

Respectfully submitted,

KOBRE & KIM LLP


  /s/ Michael S. Kim
Michael S. Kim (MK-0308)
Leif T. Simonson (LS-5915)

800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

*Attorneys for Brian Hunter*