# Exhibit A

[¶ 21,145]   In the Matter of Richardson Securities, Inc., et al.

Commodity Futures Trading Commission. No. 78-10. January 27, 1981. Opinion and Order in full text.

**Aiding and Abetting—Willfulness—Unlawful Intent Necessary Element.**—Violations of Section 13(a) of the Commodity Exchange Act, the aiding and abetting provision, require the knowing participation in an unlawful venture just as the federal criminal aiding and abetting statute, 18 U. S. C. § 2. In the opinion of the Commission, an administrative law judge was not in error when he found no evidence to support an aiding and abetting claim against two officials of a futures commission merchant the facilities of which were used in connection with allegedly fictitious silver trades. The Commission rejected the argument of the Division of Enforcement that the willfulness element in the aiding and abetting provision is satisfied by knowing participation without unlawful intent, or by negligence. Also rejected was the contention that "but for" the use of the FCM's facilities, the allegedly fictitious trades would not have occurred.

See ¶ 10,005, "Liabilities—Prohibitions" division, Volume 1.

**Reports—Futures Transactions—Violation—Cease and Desist Order Not Warranted.**—Because there was no likelihood of future violations evident by a futures commission merchant and certain of its officials for failing to file required futures transaction reports, the Commission determined not to issue a cease and desist order. The basis of the violation, a time stamping infraction, was deemed to be insufficient for a prediction of future violations, a needed element for the issuance of a cease and desist order.

See ¶ 10,175, "Liabilities—Prohibitions" division, Volume 1.

I. *Procedural History*

This case is before the Commission on an appeal by the Division of Enforcement ("Division") from the June 15, 1979 initial decision of Administrative Law Judge George H. Painter. No respondent has appealed. The proceeding arose on December 22, 1977 when the Commission filed a Complaint and Notice of Hearing seeking the suspension or revocation of the registrations of Richardson Securities, Inc. ("RSI") as a futures commission merchant, of Kenneth S. Fuller and William A. McNair as associated persons, and of Arthur H. Lamborn III, Mark H. Levine and Larry J. Blankenship as floor brokers.[1] The complaint charged these respondents, along with Arthur B. Haberbush, an unregistered customer of RSI for whom the complaint proposed other sanctions, with violations of the antifraud and non-competitive trading prohibitions of the Commodity Exchange Act, as amended, ("Act") as well as time stamping, bookkeeping and registration violations. Specifically, all respondents were alleged to have violated or aided and abetted violations of § 4c of the Act, 7 U. S. C. § 6c, through the non-competitive trading of silver futures. Respondents were also alleged to have violated § 4b of the Act, 7 U. S. C. § 4b, and Commission Rule 1.38, 17 C. F. R. § 1.38, in that they filed false reports regarding the execution of the silver trades. In addition, all respondents were alleged to have violated the recordkeeping requirements of § 4g of the Act, 7 U. S. C. § 6g, and Commission Rule 1.35, 17 C. F. R. § 1.35, and the segregation requirements of § 4d(2), 7 U. S. C. § 6d(2), of the Act and Commission Rule 1.22, 17 C. F. R. § 1.22. Finally, RSI, Mr. Fuller and Mr. McNair were alleged to have violated the registration requirements of § 4k, 7 U. S. C. § 6k, of the Act by permitting Arthur Haberbush to act as an associated person without seeking registration for him with the Commission. The complaint also sought to impose civil money penalties and to deny respondents trading privileges.[2]

---

[1] RSI, a Canadian corporation, was registered with the Commission as a futures commission merchant ("FCM") and was a clearing member of a number of contract markets including the Commodity Exchange, Inc. ("Comex"). Kenneth Fuller and William McNair were president and vice president respectively of RSI. Both were registered associated persons; Mr. Fuller was a member of the Comex. Arthur Lamborn was a vice president of Shearson Hayden Stone, Inc. ("Shearson"), a member of the Comex and a registered floor broker.

Mark Levine was likewise a member of the Comex and a registered floor broker. Larry Blankenship was employed by Shearson as a commodity floor clerk at the Comex and later became a registered floor broker.

[2] Shortly after the Division filed its complaint against respondents in December, 1977, the Comex instituted a disciplinary proceeding as a result of these alleged improprieties. On February 11, 1977, the Committee on Business Conduct of the Comex filed a complaint
*(Continued on the next page.)*

A hearing was held from October 3 through November 14, 1978.[3] During the proceeding the Administrative Law Judge heard testimony from, among others, Mr. Fuller, Mr. McNair, and Graham Irvine.[4] On June 15, 1979 Judge Painter rendered an initial decision, which included the following conclusions of law:

1. The evidence fails to establish that Richardson Securities, Inc., Fuller, or McNair violated Section 4c of the Act by directly or indirectly offering to enter into, entering into, or confirming the execution of transactions in commodity futures contracts commonly known to the trade as "wash sales", "cross trades", "accomodation [sic] trades", or fictitious sales.

2. Respondents Lamborn and Blankenship violated Section 4c of the Act on June 3, 1976 . . . .

3. There is no probative evidence of record to show that Richardson Securities, Inc., Fuller or McNair violated Section 4b of the Act and Section 1.38 of the Commission's regulations.

4. Respondents Lamborn and Blankenship violated Section 4b(B) of the Act on June 3, 1976 . . . . The evidence fails to establish that Lamborn or Blankenship violated any other provision of Section 4b.

5. Respondents Richardson Securities, Inc., Fuller and McNair violated Section 4g of the Act and Commission rule 1.35(a) by failing to take appropriate measures to insure that customer order tickets were properly time stamped.

\* \* \*

7. Richardson Securities, Inc., Fuller and McNair filed timely and lawful applications for the registration of Fuller, McNair, and Irvine with this Commission, and the respondents complied with all the requirements of this Commission in regard to the registration of these persons. The *ultra vires* acts of Haberbush did not require the respondents to cause to be filed an application for the registration of Haberbush. The evidence fails to show that these respondents violated Section 4k of the Act.

The Administrative Law Judge ordered Arthur Lamborn and Larry Blankenship to cease and desist from violating §§ 4c and 4b(B) of the Act. The registrations of Mr. Fuller, Mr. McNair, Mr. Lamborn and Mr. Blankenship were ordered suspended for 15 days. The Administrative Law Judge did not enter a cease and desist order against RSI, Mr. Fuller or Mr. McNair as the Division had requested. Nor were any monetary penalties imposed against them.[5] The Division contends that the Administrative Law Judge erred in finding that RSI, Mr. Fuller and Mr. McNair did not aid and abet the violation of § 4c of the Act found to have been committed by Haberbush, Lamborn and Blankenship, did not violate § 4k of the Act, and ultimately in failing to issue a cease and desist order against RSI, Mr. Fuller and Mr. McNair.

II. *Factual Background*

Judge Painter's decision contains an exhaustive analysis of the evidence presented. The following excerpts from the opinion focus upon the facts pertinent to the issues raised in this appeal.

"Richardson Securities, Inc. ("RSI") is wholly controlled by an old-line Canadian

---

(Footnote 2 continued.)
against RSI, Mr. Fuller and others with the Supervisory Committee of Comex. The exchange's complaint alleged violations by RSI and Mr. Fuller of recordkeeping, margin and recording provisions of the Comex rules and regulations and also charged that the handling of customer accounts by Arthur Haberbush was fraudulent, and that Mr. Fuller and RSI were responsible for this fraud. In May 1977, an offer of settlement was submitted by RSI and Mr. Fuller to Comex and subsequently accepted by the Supervisory Committee, which issued a "Notice of Disciplinary Action, Findings and Order Imposing Fine and Sanctions." The Comex found that RSI, Mr. Fuller and others had been negligent in their supervision of RSI's business but did not find any fraudulent conduct. As a result RSI was fined $32,000 and RSI and Mr. Fuller were ordered to cease and desist from future violations. Mr. Fuller was censured and RSI undertook an extensive program of corrective action under the supervision of the Comex.

[3] On November 13, 1978, the charges against Mr. Haberbush were severed due to the death of Mr. Haberbush's attorney. On June 26, 1980 Mr. Haberbush was adjudged in a separate proceeding to have violated § 4c of the Act for his participation in the fictitious June 3 silver transactions described more fully *infra*. *In the Matter of Arthur B. Haberbush*, CFTC Docket No. 78-10a.

[4] Graham Irvine was Arthur Haberbush's commodity sales representative at RSI. Mr. Irvine, the individual directly responsible for Mr. Haberbush's activities at RSI, was not named as a respondent. He testified as a witness for the Division of Enforcement.

[5] As for Mr. Levine, on April 16, 1979, the Commission accepted his settlement offer and suspended him for fifteen days.

securities firm, Richardson Securities of Canada. During all relevant times RSI was headed up by two seasoned veterans of the securities business, President Kenneth S. Fuller and Vice President William A. McNair. Fuller and McNair are impeccably honest individuals, highly motivated to comply with all pertinent laws, regulations, and practices that affect the securities and commodity industries. It is unlikely that the instant Complaint, or the Comex proceeding that involved the same general facts, would have ever arisen had it not been for the examplary [sic] conduct of Fuller and McNair in making a full disclosure of facts to this agency and the Comex" (Initial Decision—"I. D."— at 1).

"The *sine qua non* of this whole proceeding are the June 3, 1976 silver transactions initiated by Haberbush. Had it not been for these phony trades, I doubt that the other issues, although not trivial, would have surfaced. It appears that prior to June 3, 1976, the RSI offices had been audited several times by Commission personnel, with no findings of impropriety on the part of the operation." (I. D. at 9).

"Irvine was in England in mid-May 1976. While at his home, he received a trans-Atlantic telephone call from Haberbush, who was at that time in a New York hotel. Haberbush told Irvine that he had opened or was about to open an account with RSC in Montreal, Canada. With Haberbush in the New York hotel was Len Ostrowski, an account executive in RSC's Montreal office. Ostrowski also spoke to Irvine during this conversation. When Irvine returned to the RSI offices on May 24, 1976, he did not report this telephone call to McNair or Fuller. I am convinced that Irvine, Haberbush, and Ostrowski were the only parties privy to what was to transpire on June 3, 1976: The transfer of funds from the accounts controlled by Haberbush and Haberbush's new Montreal account. I am persuaded that Fuller, McNair, and other RSI personnel were unaware of the Montreal account until June 4, 1976." (I. D. at 10).

"Lamborn and Blankenship admit that they executed or aided in the execution of fictitious trades on June 3 at the direction of Haberbush. There was a conspiracy between Haberbush, Lamborn, and Blankenship to cause fictitious trades to be reported as bona fide trades, and a conspiracy to make false reports concerning those patently fictitious trades. I do not find, however, that Lamborn and Blankenship had any knowledge of Haberbush's intentions regarding these phoney trades or any knowledge that these trades could do harm to a customer. While the conduct of Lamborn and Blankenship was contrary to the provisions of the Commodity Exchange Act and the rules of the Comex, I can understand how these individuals could reach the conclusion that they were committing technical violations, as distinguished from substantive violations. They had no reason to believe that they were taking advantage of a customer, and in fact, they were complying with instructions from the customer involved." (I. D. at 13).

"On June 4, 1976, Steve Owen, the manager of the Montreal office of RSC, telephoned Fuller to advise him of the Haberbush account in Montreal, and the amazing trades that were on the account. Fuller and Owen agreed to place a hold on the $20,000.00 profit generated in the account, but Haberbush's friend, Ostrowski, had authorized a wire transfer of these funds to Haberbush on that same day. Fuller did not understand the Comex switch trade rule, but he was originally of the view that Haberbush had used this device to make the profits on the Montreal account. At Fuller's request, Edick determined that the trades had cleared the Comex as bona fide trades. The end of the story is that Haberbush gave RSI a check in the amount of the profits generated in the Montreal account, and then stopped payment on the check. Haberbush was removed from RSI premises, and Irvine was suspended, and later resigned. On June 16 and June 17 Fuller and McNair, through their attorney, made a disclosure of these events to this Commission, and subsequently to the Comex." (I. D. at 13-14).[6]

"In summary, the record in this case shows that Irvine and Haberbush have brought a plague of troubles down on a number of people. Fuller and McNair . . . have paid dearly for their misplaced trust in Irvine, and for their lack of knowledge of the commodity business. Their failure to correct obvious flaws in the RSI operations in a timely manner has contributed to their present discomfiture. I see no reason to

---

[6] See note 2, *supra*.

mete out the severe sanctions proposed by the Division, as I am confident that the mistakes in judgment committed by Fuller and McNair will never be repeated. . . . As for sanctions against RSI, it must be remembered that the Comex met its responsibility by imposing sanctions against RSI, Fuller, Lamborn, and others. To the extent possible, RSI met is responsibilities by removing Irvine and Haberbush from the RSI premises and by overhauling its commodity operation. A flaw in the compliance scheme of the Comex permitted the June 3 fictitious transactions to take place. Similarly, a flaw in the RSI operation permitted these same and other events to develop. It has not been necessary to sanction the Comex, and by the same token I find it unnecessary to impose sanctions against RSI." (I. D. at 14-15).

### III. *Discussion of Issues Presented*

#### A.

The first issue presented is whether the Division of Enforcement proved by the weight of the evidence[7] that respondents McNair, Fuller and RSI "willfully" aided and abetted the unlawful June 3 silver trades perpetrated by Mr. Haberbush, and his co-conspirators. Asserting that the Administrative Law Judge "completely ignored the issue," the Division argues that the judge erred in failing to conclude from the evidence that respondents RSI, Fuller, and McNair had aided and abetted the June 3 transactions (Brief for Division at 10). Respondents Richardson, Fuller and McNair counter that "the Division has totally failed to demonstrate facts or law which would allow [respondents] to be held liable for wilfully aiding and abetting the violations of Section 4c committed by Haberbush, Irvine, Ostrowski, Lamborn, Levine and Blankenship" (Brief for Respondents at 17). For the reasons set forth below we agree with the Administrative Law Judge that "[t]he evidence fails to establish that Richardson Securities, Inc., Fuller and McNair violated Section 4c of the Act [either] . . . directly or indirectly . . ." (I. D. at 33, Conclusion of Law 1).

Before we review the evidence presented here we should discuss the essential elements of aiding and abetting under the Act, a specific statutory prohibition added to the Act in 1968. Act of February 19, 1968, Pub. L. No. 90-258, § 26, 82 Stat. 34. *See* § 13(a) of the Act, 7 U.S.C. § 13c(a). Although there is some pre-1974 decisional authority which discusses aiding and abetting, *see e.g., In re American Commodity Brokers, Inc.,* 32 A. D. 1765 (1973), the Commission heretofore has not had occasion to address § 13(a) of the Act.

Section 13(a) provides:

Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this Act, or any of the rules, regulations or orders issued pursuant to this Act, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this Act or any of such rules, regulations, or orders may be held responsible in administrative proceedings under this Act for such violation as a principal.

The section was modeled after the federal criminal aiding and abetting statute, 18 U. S. C. § 2.[8] *See Proposed Amendments to the Commodity Exchange Act: Hearings on H. R. 11930 and H. R. 12317 Before the House Comm. on Agriculture,* 90th Cong., 1st Sess. 66-67 (1967) ("Hearings"). The only significant departure from the language of the criminal statute was the addition of the word "willfully" as a modifier of "aids, abets, counsels, commands, induces, or procures" the commission of the particular violation. The express intent of the drafters of § 13(a) in so doing was to emphasize that, as under 18 U. S. C. § 2, proof of a specific unlawful intent to further the underlying violation is necessary before one can be found liable for aiding and abetting a violation of the Act. As counsel for the Department of Agriculture explained to (then) Congressman Robert Dole, the Chairman of the House Agriculture Committee, during the Hearings:

What we are trying to accomplish here is to make applicable to administra-

---

[7] *See* § 6(b) of the Act, 7 U.S.C. § 9; *Haltmier v. Commodity Futures Trading Commission,* 554 F. 2d 556, 560 (2d Cir. 1977).

[8] Section 2 of Title 18 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

tive proceedings, the same type of responsibility that applies in criminal proceedings under the provisions of title 18 U. S. C., section 2. Now, title 18 U.S.C., section 2, does not have the word "willfully" in it. It is perhaps inherent under the decisions in regard to offenses like abetting and I think it would be implied with respect to counseling, commanding, inducing, procuring, and so forth. It is not clear that it is inherent in the word "aiding." We did not tend to hold someone responsible for an unintentional aiding of someone's improper actions in an administrative proceeding. So we put in the word "willfully" in conjunction with "aiding," feeling that this would solve the problem from the standpoint of the trade who were concerned. (Hearings at 66).

* * *

Mr. DOLE. In other words, you mean one can commit a violation unknowingly or unwillfully and be punished under section 27 [§ 13(a)]?

Mrs. PROKOP. *No. You see, we put the word "willfully" ahead of "aiding," because the word "aid" under some of the decisions was not clearly limited to situations in which there was a knowing participation. It did not seem to be necessary to add that word with respect to the rest of the activities in that series, because inherently, they include some element of knowledge.*

What we are trying to do in this section is to make applicable to administrative proceedings the same standard that would apply under 18 U. S. C. 2.

Mr. DOLE. So really, it would not make any difference if the word "willfully" were moved ahead of the word "commits?"

Mrs. PROKOP. As long as it was understood that this is not going to add any requirement beyond what we would have to show in a criminal case.

* * *

Mr. DOLE. I do not think anyone wants to increase your burden in protecting the customer. Does it make any difference from the legal standpoint where the word "willfully" goes, whether it should be "willfully commits," or "willfully aids." *I do not think you are going to proceed unless somebody has willfully done this thing.*

Mrs. PROKOP. *If it is an unknowing action, we would not hold him, certainly.* (Hearings at 66-67; emphasis added.)

Given this expressed intent, we turn next to applicable standards developed in the criminal law area. As the Eighth Circuit explained in *Johnson v. United States*, 195 F. 2d 673, 675 (8th Cir. 1952):

Generally speaking, to find one guilty as a principal on the ground that he was an aider and abetter, it must be proven that he shared in the criminal intent of the principal and there must be a community of unlawful purpose at the time the act is committed. As the term 'aiding and abetting' implies, it assumes some participation in the criminal act in furtherance of the common design, either before or at the time the criminal act is committed. It implies some conduct of an affirmative nature and mere negative acquiescence is not sufficient.

"By far the most important element [of aiding and abetting] is the sharing of the criminal intent of the principal...." *Snyder v. United States*, 448 F. 2d 716, 718 (8th Cir. 1971).⁹ However, "[m]ere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting." *Id.*, citing *Ramirez v. United States*, 363 F. 2d 33, 34 (9th Cir. 1966);

---

⁹ The various federal criminal law recodification bills introduced in both House of Congress have uniformly retained intent as an essential element of aiding and abetting. H. R. 6915, the Criminal Code Revision Act of 1980, is typical. The Committee Report states that § 501, subsection (a)(1) of the bill provides that an individual is criminally liable for an offense committed by another if that individual, with the intent that an offense be committed, commands, induces, procures or aids the other to commit the offense. Current 18 U.S.C. 2 defines as a principal one who "aids, abets, counsels, commands, induces or procures" the commission of the offense. The Committee deleted the word "abets" as superfluous, and the word "counsels" because of concern that it might be interpreted as prohibiting activity protected by the first amendment. The Committee has followed the approach of the vast majority of Federal cases and has required an intent that the offense be committed .... The Committee rejected the suggestion that mere knowledge that an offense will be committed should suffice to establish accomplice liability. (Citations and footnote omitted).
H. R. Rep. No. 1396, 96th Cong., 2d Sess. 36-37 (1980). *See also* S. Rep. No. 605, 95th Cong., 1st Sess. 67-68 (1977).

*United States v. Joiner*, 429 F. 2d 489, 493 (5th Cir. 1970); *United States v. Garguilo*, 310 F. 2d 249, 253 (2d Cir. 1962). Furthermore, while it is not necessary to prove that an aider and abettor participated in every phase of the criminal venture or that he had knowledge of the particular means by which the principal would carry out the criminal activity, *United States v. Diecidue*, 603 F. 2d 535 (5th Cir. 1979), or knew every last detail of the substantive offense, "he must share in the principal's essential criminal intent." *United States v. Sanborn*, 563 F. 2d 488, 491 (1st Cir. 1977).[10]

While acknowledging on the one hand that "[s]ection 13(a) of the Act was drafted to make applicable the same type of responsibility pertinent in criminal proceedings under 18 U. S. C. § 2" (Brief for Division at 10), the Division nevertheless argues that respondents should be held liable under § 13(a) for aiding and abetting even though they acted without any knowledge of or any unlawful intent to further the success of the fictitious June 3 silver trades. The Division argues that "[a]t no point did Fuller and McNair make a sufficient attempt to stop the acts and practices of Haberbush until it was too late, that is, until the fictitious trades of June 3, 1976 had already taken place. That Fuller and McNair gave full disclosure of the June 3 event does not detract from their liability as aiders and abettors." (Brief for Division at 15.)[11]

---

[10] The theory of aiding and abetting has also frequently been applied in cases involving federal securities fraud. In its most recent articulation of the prerequisites to aiding and abetting in the securities area, *ITT, An International Investment Trust v. Cornfield*, 619 F. 2d 909 (2d Cir. 1980) ("ITT"), the Second Circuit lists the following elements of proof:
(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;
(2) "knowledge" of this violation on the part of the aider and abettor; and
(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation. *Id.* at 922 (citations omitted).
After reviewing the caselaw in this area we agree with Judge Friendly's observation in *ITT* that "we might be inclined to wonder whether the elaborate discussions have added anything except unnecessary detail to Judge L. Hand's famous statement made in the criminal context that, in order to be held as an aider and abettor, a person must 'in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, and that he seeks by his action to make it succeed.'" *Id.* quoting *United States v. Peoni*, 100 F. 2d 401, 402 (2d Cir. 1938), cited and quoted with approval in *Nye & Nissen v. United States*, 336 U. S. 613, 619 (1952).

[11] The "acts and practices of Haberbush" referred to by the Division are summarized by Judge Painter as follows:
"Even though Fuller and McNair are honest individuals and well experienced in the field of securities, they had no real understanding of futures trading at the time RSI made its entry into the retail commodity business in 1974. To compensate for this obvious shortcoming, Fuller and McNair set about the task of locating a knowledgeable person to employ as a commodity sales representative. They were subsequently approached by Graeme [sic] Irvine, a very intelligent, articulate, highly disciplined individual, a citizen of the United Kingdom . . . . He demonstrated an amazing recall of facts. But I place little confidence in his testimony." (I.D. at 1-2).
"Irvine was employed as the RSI commodity sales representative in August 1974. The following month he brought to RSI one Arthur Haberbush as a customer. And Haberbush brought along six other customer accounts that Haberbush controlled via powers of attorney." (I.D. at 2).
"To accommodate Irvine's wishes, Fuller and McNair agreed that Haberbush could occupy a chair at Irvine's desk, a not unusual occurrence in the commodity business. Initially, Irvine and Haberbush shared a desk adjacent to the order desk, but after a complaint from an employee at the order desk, McNair arranged for Irvine and Haberbush to be seated at back-to-back desks about 10 or 12 feet from the order desk. A time stamp clock was placed on Irvine's new desk. However, a small problem developed: the clock could not be plugged in without the aid of an extension cord, or a multiple wall socket plug. Irvine mentioned this fact to McNair on one occasion, and McNair said he would take care of the matter. That was not done, however, and Irvine was required to walk 10 or 12 feet to time stamp order tickets. Never again did Irvine complain. Irvine simply time stamped tickets when he deemed it to be convenient." (I.D. at 4).
"Haberbush knew a great deal more about the practical arts of commodity trading than Fuller and McNair, and he began to assist his friend, Irvine, at the sales desk. At first, he took calls for Irvine while Irvine was busy on another line. Haberbush's activities at the desk gradually increased to the point where he wrote up tickets. Still later, Irvine orally authorized at least two floor brokers to accept RSI orders from Haberbush. And the record shows that Irvine authorized respondent Lamborn, in writing, to not only take RSI orders from Haberbush, but also to cross RSI trades and take the opposite side of RSI trades at the direction of himself or Haberbush. The record is devoid of any probative evidence that Fuller or McNair approved or condoned these so-called authorizations." (I.D. at 4-5).
"Haberbush's intrusions into the functioning of RSI caused a stir on at least two occasions before the June 3, 1976 silver trades. During Irvine's absence from RSI in late 1974, Charles McGuire, manager of RSI's commodity department, observed Haberbush placing orders directly to the floor of the Comex. McGuire re-
*(Continued on the next page.)*

The Division relies on cases in which it contends that the defendants were found guilty of aiding and abetting violations of federal law even though they had no personal knowledge of the specific violations charged. Those cases, *United States v. Dotterweich*, 320 U. S. 277 (1943); *Carolene Products Co. v. United States*, 140 F. 2d 61 (4th Cir.), aff'd, 323 U. S. 18 (1944), are distinguishable. In the first place, *Carolene* does not hold, as the Division suggests, that one may be found to be an aider and abettor under 18 U. S. C. § 2 and, therefore, under § 13(a), without proof of unlawful intent. Criminal liability was found in *Carolene* because the individual defendants there had purposely set up a separate corporation to market a milk product which was clearly proscribed under the Filled Milk Act. The defendants were guilty of aiding and abetting the corporate violation of the Act because while they were not necessarily aware of the individual details of the day to day operation of the corporation, they had set up the unlawful corporation and *"knew* that the company was shipping this [unlawful] product in interstate commerce practically every business day." 140 F. 2d at 65 (emphasis added): It was the unlawful nature of the business itself and their *knowledge and participation* in this unlawful venture which resulted in guilt.[12] This is the classic intent formulation of aiding and abetting in the criminal law which cuts against rather than supports the Division's position.

Nor do we read *Dotterweich* as standing for the broad proposition attributed to it by the Division. The question resolved by the Court in *Dotterweich* was whether Dotterweich, the general manager of a corporation engaged in the distribution of a misbranded or adulterated drug in violation of the Federal Food, Drug, and Cosmetic Act, could be held personally liable under the statute. The Court concluded that as a matter of law "a corporation may commit an offense and all persons who aid and abet its commission are equally guilty. Whether an accused shares responsibility in the business process resulting in unlawful distribution depends on the evidence produced at the trial and its submission . . . to the jury under appropriate guidance." 320 U. S. at 284. According to the Court of Appeals summary of the evidence "appellant Dotterweich had no personal connection with either shipment, but he was in general charge of the corporation's business and had given general instructions to its employees to fill [pharmaceutical] orders from physicians." *United States v. Buffalo Pharmacal Co.*, 131 F. 2d 500, 501 (2d Cir. 1942). The jury concluded from this evidence that Dotterweich was "responsible" for the unlawful distribution where the underlying statute required no knowledge or criminal intent for conviction. Nowhere in its opinion does the Supreme Court suggest that one may aid and abet a criminal violation without intent to further the unlawful venture. The

---

(Footnote 11 continued.)
ported this to Irvine on Irvine's return. Whether this was ever brought to the attention of Fuller and McNair has not been established.

However, silver at that time was an unregulated commodity, and the incident did not seem to be of any great importance. Another stir developed in the Spring of 1976 while Irvine was away from RSI on vacation. John Craddock, an RSI employee who had passed the Chicago Board of Trade examination for registered commodity sales representative, was asked by McNair to stand in at Irvine's desk during Irvine's absence. On the first day at this new duty, Craddock observed that Haberbush was entering orders and refusing to pass order tickets over to Craddock to initial. Craddock promptly reported this to McNair, and McNair, according to Craddock, stated that this conduct was unacceptable. Thereafter, Haberbush continued to ignore Craddock, and continued to enter trades. Craddock then decided to leave the desk and return to his usual duties. He did not take the matter up with McNair again. I do not understand why McNair did not handle this problem promptly and expeditiously. It may be that he felt that Craddock was unhappy because of some personality conflict between Haberbush and Craddock. Whatever the reason, this was inex-

plicable conduct on the part of McNair." (I.D. at 5-6).

"Haberbush indulged in other practices that are strictly forbidden by the Commodity Exchange Act and exchange rules. Although there is no evidence of record to support the charge that Haberbush allocated trades on the accounts he controlled prior to June 3, 1976, there is solid evidence of record to show that he failed to write up order tickets when orders were placed, and instead simply noted trades down on a white sheet of paper. Irvine, the account executive, observed this conduct and did nothing. He made no reports to Fuller and McNair. . . . ." (I.D. at 6).

[12] As the Circuit Court emphasized in *Carolene*:

We do not here have the case of a corporation engaged in a proper and legal enterprise with an occasional violation of Federal law resulting therefrom. We have a case in which 50% of the company's business resulted in violations of the Filled Milk Act. No one could read the record in this case and come to any conclusion other than that Mr. Hartke and Mr. Hauser knew that the company was shipping this product in interstate commerce practically every business day. We must also bear in mind that intent is not a necessary element of this offense. 140 F. 2d at 65.

Court simply held that "the District Court properly left the question of responsibility . . . to the jury, and there was sufficient evidence to support its verdict." 320 U. S. at 285.

Equally unpersuasive is the Division's argument that inclusion of the word "willfully" in § 13(a) allows one to be found liable for aiding and abetting without the specific intent to further the underlying unlawful venture because judicial construction of the term as used in other statutes "has broadened 'willful' to include both intentional and negligent acts" (Brief for Division at 12). This argument flies in the face of the assurances given to Chairman Dole during the amendment hearings that only a "knowing participation" in an unlawful venture would run afoul of § 13(a). Because the meaning of "willfully" as used in § 13(a) is clear, it is unnecessary to resort to other interpretations of the term in other statutes, or, indeed, in other parts of the Act itself. *Cf.* 2a *Sutherland Statutory Construction*, §§ 45.15, 51.05 (1973).[13] Just as courts are bound to give effect to the expressed intent of the legislature, *United States v. Henning*, 344 U. S. 66 (1952), so too must we be faithful to the will of the legislature. Accordingly, we must construe our aiding and abetting provision in a manner consistent with, and not "in contrast to" (Brief for Division at 12), the criminal aiding and abetting statute as the Division would have us do. We conclude, therefore, that proof of unlawful intent is as essential an element of aiding and abetting under § 13(a) of the Act as it is under 18 U. S. C. § 2. Apropos of Judge Friendly's observation in *ITT*, *supra*, note 10, we draw upon Judge Hand's time tested expression of aiding and abetting, and hold that in order to violate § 13(a) of the Commodity Exchange Act, one must knowingly associate himself with an unlawful venture, participate in it as something that he wishes to bring about and seek by his actions to make it succeed.[14]

Turning to the record presented in the instant case we find, as did the Administrative Law Judge that there is no evidence to support the allegation that either Mr. Fuller or Mr. McNair directly participated in or indirectly aided and abetted the fraudulent June 3 silver trades. Indeed, there is no logical nexus between respondents' actions *vis-a-vis* Mr. Irvine and Mr. Haberbush at RSI and the fictitious trades perpetrated by Haberbush and his accomplices. The use of the RSI facilities and the trades are factually distinct propositions and the Division failed to show a causal link between them. Without any probative direct or circumstantial evidence linking Mr. Haberbush's use of the RSI facilities to the fictitious silver trades the Division's argument boils down to the proposition that "but for" the use of RSI's facilities Mr. Haberbush would not have been in the position to carry out successfully the June 3 trades. We reject this theory as have the Second and Third Circuit Courts of Appeal which have held this type of "but for" analysis insufficient to support a finding of aiding and abetting. *See Edwards & Hanley v. Wells Fargo Securities Clearance Corp.*, 602 F. 2d 478 (2d Cir. 1979), *cert. denied*, 100 S. Ct. 734 (1980); *Landy v. Federal Deposit Insurance Corp.*, 486 F. 2d 139, 163-164 (3d Cir. 1973), *cert. denied*, 416 U. S. 960 (1974). In sum, the evidence fails to establish that either Mr. Fuller or Mr. McNair knowingly associated with, participated in or sought to make the fraud concocted by Mr. Haberbush and his co-conspirators succeed.

The final issue presented is whether a cease and desist order should be issued against respondents RSI, Fuller and McNair on the basis of their violation of § 4g of the Act. The Administrative Law Judge refused to issue the order because he con-

---

[13] The term "willful", of course, may be construed to have different meanings depending upon the type of statute within which it is used. As the Court explained in *United States v. Illinois Cent. R. Co.*, 303 U.S. 239, 242 (1938): "In statutes denouncing offenses involving turpitude, willfully is generally used to mean with evil purpose, criminal intent or the like. But in those denouncing acts not in themselves wrong, the word is often used without any such implication." *Cf. Goodman v. Benson*, 286 F. 2d 896, 900 (7th Cir. 1961).

[14] We further conclude, based upon the legislative history of Section 13(a) that only those who knowingly participate in a violation of the Act may be held to be aiders and abettors, that proof of unlawful intent is necessary regardless of the *mens rea* required for the underlying violation of the Act. For instance, the Ninth Circuit imposed a *scienter* requirement under the fictitious sales provisions of Section 4c, but not under the antifraud provisions of Section 4o of the Act. *Savage v. Commodity Futures Trading Commission*, 611 F. 2d 270 (9th Cir. 1979). In our view this difference would not affect the level of intent requirement when one is charged under Section 13(a) with aiding and abetting violations of either of those provisions.

cluded that "[t]he possibility that [respondents] will repeat a violation of Section 4g of the Act and Commission rule 1.35(a) is so remote that [such an order] . . . is unwarranted" (Order at 1-2). The Division contends that Judge Painter should have issued the cease and desist order against respondents to "protect [] the public from future violations of Section 4g of the Act by RSI, Fuller and McNair" (Brief for Division at 22). It asserts that "this record is replete with indications that future violations by the respondents are likely —an inference that may be drawn from their past actions" (Brief for Division at 21). The only example cited, however, is the time-stamping violation itself. *Id.*

As a general proposition, cease and desist orders should be entered against those who have been adjudged to have violated the Act. We agree with the Division that "in the final analysis it is for the Commission to decide in the reasonable exercise of its discretion what remedy is necessary to effectuate the remedial purposes of the Act" (Brief for Division at 20). However, we cannot say from this record that the Administrative Law Judge erred in refusing to issue a cease and desist order against these respondents for their violation of § 4g here. In exercising our discretion we must look to whether "there is a reasonable likelihood that the wrong will be repeated." *Commodity Futures Trading Commission v. British American Commodity Options Corp.*, 560 F. 2d 135, 141 (2d Cir. 1977) (citations omitted). While "[a] likelihood of future violations may be inferred from past unlawful conduct," *id.* at 142, in light of the entire record herein, we cannot say that such a "likelihood" may reasonably be inferred. The time stamping infraction, while a serious violation of the Act, does not, in and of itself, suggest future repetition by respondents. There is no evidence of prior violations by respondents and apparently there has been no violation since the one at issue here occurred in 1974. We therefore decline to issue a cease and desist order at this time based on this record.[15]

Accordingly, IT IS ORDERED by the Commission that the June 15, 1979 initial decision of the Administrative Law Judge

---

[15] Two further matters need only brief discussion. The Division contends that respondents Fuller and McNair violated § 4k(1) of the Act, 7 U.S.C. § 6k(1), by failing to seek registration for Mr. Haberbush as an associated person (Brief for Division at 16-19). Section 4k(1) provides:

It shall be unlawful for any person to be associated with any futures commission merchant or with any agent of a futures commission merchant as a partner, officer, or employee (or any person occupying a similar status of performing similar functions), in any capacity which involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged, unless such person shall have registered, under this Act, with the Commission and such registration shall not have expired nor been suspended (and the period of suspension has not expired) nor revoked, and it shall be unlawful for any futures commission merchant or any agent of a futures commission merchant to permit such a person to become or remain associated with him in any such capacity if such futures commission merchant or agent knew or should have known that such person was not so registered or that such registration had expired, been suspended (and the period of suspension has not expired) or revoked: Provided, That any individual who is registered as a floor broker or futures commission merchant (and such registration is not suspended or revoked) need not also register under these provisions.

We have reviewed the record and conclude, consistent with the Administrative Law Judge's findings of fact (see e.g., I.D. at 18-20, Findings of Fact 16-20) that there was insufficient evidence to sustain a finding of a violation of § 4k. In short there was insufficient proof that prior to June 4, 1976 Mr. Haberbush's conduct was so inconsistent with his purported status as a customer that Mr. Fuller and Mr. McNair were culpable for failing to scrutinize the situation more closely. However, we do wish to emphasize that where a person's conduct on the premises under the supervision and control of a futures commission merchant becomes clearly inconsistent with being a mere customer, it is incumbent upon the firm's supervisory personnel to assure that no violation of § 4k(1) is occurring.

Respondents reassert the contention originally made in their answer to the complaint that the commencement of this proceeding discriminates against Messrs. McNair and Fuller, who are Canadian nationals, and RSI, whose parent corporation is Canadian, in violation of their right to treatment equal to that of American nationals and enterprises. They contend that the Commission has never before instituted enforcement proceedings against parties already disciplined by the contract market for the same transaction and that the Division has asked for no additional sanctions against the American respondents. In the first place we note that American nationals were also charged and found liable in this case. See note 1, supra. We, of course, recognize our obligation to treat foreign nationals and their commercial enterprises fairly. We find no evidence that the institution of the complaint, the Division of Enforcement's prosecution of respondents in this matter, or its appeal to the Commission was initiated or conducted in a manner even remotely smacking of the type of discriminatory enforcement alleged. Accordingly, we reject respondents' contention.

be and hereby is affirmed. IT IS FURTHER ORDERED that the stay of the initial decision entered by the Commission on July 12, 1979, is hereby vacated.

By the Commission (Chairman STONE and Commissioners DUNN, MARTIN and GARTNER).

---

[¶ 21,146]   Reed v. Lincolnwood Commodities, Inc., et al.

Commodity Futures Trading Commission. No. R 78-657-79-181. January 27, 1981. Initial Decision in full text.

**Associated Persons—Options—Disclosure to Customer—Responsible.**—An associated person may not avoid liability in reparations to a customer for failure to send an options disclosure statement, since the responsibility for sending the statement rests with the person soliciting or accepting the options order. The AP sought to shift the blame for not sending the statement to the customer to the futures commission merchant employing him. According to the administrative law judge, CFTC Reg. § 32.5, which requires options disclosure statements for customers, clearly states that the person soliciting the order must send the statement.

See ¶ 12,825, "Liabilities—Prohibitions" division, Volume 1.

JOOST, Hearing Officer: This proceeding was brought pursuant to section 14 of the Commodity Exchange Act[1] and the rules relating to reparation proceedings of the Commodity Futures Trading Commission.[2] Section 14 authorizes any person complaining of a violation of or under the Commodity Exchange Act to apply to the Commission for an order directing persons responsible for that violation to pay damages to the complainant.[3]

Pursuant to rule, the complaint in this proceeding was duly filed with and investigated by the Commission, served on the respondents named in the caption to this decision, and forwarded to the Chief Administrative Law Judge for a formal adjudicatory proceeding.

An Order of Default was entered against one of the respondents, Lincolnwood Commodities, Inc.[4] This decision, with respect to the complaint against the other respondent, Jack Emmons, is issued under the Commission's reparation rules relating to summary proceedings[5] in accordance with an order issued by Chief Administrative Law Judge Eugene Hunt on November 15, 1979.

II

The complaint in the instant proceeding was submitted to the Commission by Palmer H. Reed, Jr. on June 7, 1978. It alleged the following facts: Complainant was telephoned almost every day from December 1976 until March 25, 1977, when he agreed to buy one sugar option for $4,515. The calls were from, and the purchase was arranged with, an account executive for a brokerage firm. Both the executive, Jack Emmons, and the firm, Lincolnwood Commodities, were named as respondents in the complaint. Respondent Emmons told complainant "he was certain" that the price of sugar would rise from the current level of 10½ cents a pound to 24 cents a pound and that an investor would make $1,102 on each rise of 1 cent. Complainants never received a disclosure statement from either respondent. Respondent Emmons stopped calling him shortly after the purchase, and attempts by the complainant to telephone respondent Lincolnwood were frustrated by constantly changing names and a change in number. The complaint does not specify the amount of money lost by the complainant as a result of the alleged violation of the Act.

Followng the required investigation, the Commission's delegee served the complaint on each named respondent. An unverified answer was submitted to the Commission by respondent Emmons denying the alle-

---

[1] 7 U.S.C. 18 (1976).
[2] 17 C.F.R. § 12.1 et seq. (1980).
[3] According to the statute, the complaint must be presented within two years after the cause of action accrues and the alleged violator must be registered or required to be registered with the Commission. The statute grants broad discretion to the Commission to decide whether or not to serve a complaint on a respondent and to decide whether or not to afford a formal adjudicatory proceeding.
[4] Order of September 4, 1979 (Hunt, J.). See n. 6.
[5] 17 C.F.R. § 12.91 (1980). The summary proceeding rules do not provide for an oral hearing.