# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| | : |
| **IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION** | :          **Electronically Filed** |
| **This Document Relates to:** | :        **Master File No.: 07 Civ. 6377 (SAS)** |
| **ALL ACTIONS** | :          **Oral Argument Requested** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### MEMORANDUM OF LAW IN SUPPORT
### OF MOTION TO DISMISS
### THE CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT
### BY DEFENDANTS AMARANTH ADVISORS L.L.C.,
### AMARANTH ADVISORS (CALGARY) ULC,
### AMARANTH GROUP INC.,
### AMARANTH MANAGEMENT LIMITED PARTNERSHIP,
### AND NICHOLAS M. MAOUNIS

|  |  |
|---|---|
| WINSTON & STRAWN LLP | HELLER EHRMAN LLP |
| 200 Park Avenue | 7 Times Square |
| New York, New York 10166 | New York, NY 10036 |
| (212) 294-6700 | (212) 832-8300 |
| | |
| *Attorneys for Defendants* | *Attorneys for Defendant* |
| *Amaranth Advisors L.L.C.,* | *Nicholas M. Maounis* |
| *Amaranth Advisors (Calgary) ULC,* | |
| *Amaranth Group Inc., and* | |
| *Amaranth Management Limited Partnership* | |

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ...............................................................................4

    A.   The Parties ...............................................................................................4

         1.   Amaranth Advisors: Traders in Natural Gas Futures Contracts .............4

         2.   AGI and AMLP: Non-Trading Entities .................................................5

         3.   Nicholas Maounis: Amaranth's Non-Trading CEO ................................6

    B.   Plaintiffs' Complaints And Pre-Complaint Information ..................................6

ARGUMENT ...................................................................................................8

I.   PLAINTIFFS LACK STANDING TO ASSERT CLAIMS BASED ON
MANIPULATION OF SETTLEMENT PRICES (COUNT I) .................................8

II.   PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A CEA PRIMARY
MANIPULATION CLAIM AGAINST DEFENDANTS (COUNT I) ..................................9

    A.   The Primary Manipulation Claim Against AGI And AMLP Fails..................9

    B.   The Primary Manipulation Claim Against Nicholas Maounis Fails..............11

    C.   The Primary Manipulation Claim Against Amaranth Advisors Fails ...........12

         1.   The Relevant Standard Of Pleading.......................................................12

         2.   The Complaint Fails To Allege Sufficiently Intent To Manipulate.......15

         3.   The Complaint Fails To Allege Manipulative Conduct.........................20

         4.   The Complaint Fails To Allege Amaranth Advisors' Ability To Manipulate
The Market.........................................................................................23

         5.   The Complaint Fails To Allege Amaranth Advisors Caused Artificial Prices......25

III.   THE SECONDARY LIABILITY ALLEGATIONS AGAINST DEFENDANTS ALSO
FAIL TO STATE A CLAIM (COUNT II) ...........................................................25

    A.   Aiding and Abetting............................................................................25

         1.   AGI and AMLP..................................................................................26

         2.   Nicholas Maounis ...............................................................................27

**<u>TABLE OF CONTENTS</u>**

(continued)

Page(s)

       3.   Amaranth Advisors ........................................................................28

   B.  CEA Section 2(a)(1)(B) Claim ...............................................................29

       1.   AGI and AMLP.................................................................................29

       2.   Nicholas Maounis .............................................................................32

       3.   Amaranth Advisors ...........................................................................36

   C.  CEA Section 13(b).....................................................................................37

   D.  Rule 166.3 ...................................................................................................37

IV.  PLAINTIFFS FAIL TO PLEAD THE REQUIRED ELEMENTS OF UNJUST ENRICHMENT (COUNT V) ............................................................................38

V.   THE ELEMENTS FOR A CONSTRUCTIVE TRUST HAVE NOT BEEN PLED ...........39

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
    122 F.3d 130 (2d Cir. 1997)..............................................................................33

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................ passim

*Bangkok Crafts Corp. v. Capitalo di San Piertro in Vaticano*,
    331 F. Supp. 2d 247 (S.D.N.Y. 2004)...............................................................39

*Bd. of Trade of City of Chicago v. SEC*,
    187 F.3d 713 (7th Cir. 1999) ............................................................................24

*Bell Atlantic Corp. v. Twombly*,
    -- U.S. --, 127 S. Ct. 1955 (2007) ...............................................12, 14, 28, 33

*Benfield v. Mocatta Metals Corp.*,
    No. 91-CIV-8255 (LJF), 1992 WL 58879 (S.D.N.Y. Mar. 13, 1992)..............26, 27

*Browning-Ferris Indus. of Ill. v. Ter Maat*,
    195 F.3d 953 (7th Cir. 1999) ............................................................................34

*Cabrera v. Jakabovitz*,
    24 F.3d 372 (2d Cir. 1994)................................................................................32

*Cargill, Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) ....................................................................21, 24

*Cary Oil Co., Inc. v. MG Refin. & Mktg., Inc.*,
    230 F. Supp. 2d 439 (S.D.N.Y. 2002)..............................................................33

*CFTC v. Amaranth Advisors, L.L.C.*,
    No. 07 Civ. 6682, 2008 WL 2123323 (S.D.N.Y. May 21, 2008)...............13, 18, 22

*CFTC v. Amaranth Advisors, L.L.C.*,
    No. 07 Civ. 6682, 2008 U.S. Dist. LEXIS 45638 (S.D.N.Y. June 10, 2008)...................13, 22

*CFTC v. Atha*,
    420 F. Supp. 2d 1373 (N.D. Ga. 2006) .............................................................21

*CFTC v. Bradley*,
    408 F. Supp. 2d 1214 (N.D. Okla. 2005)...........................................................21

*CFTC v. Commodities Fluctuations Sys., Inc.*,
    583 F. Supp. 1382 (S.D.N.Y. 1984)..................................................................38

*CFTC v. Dizona*,
    Civil Action No. H-05-332, slip op. (S.D. Tex. Apr. 24, 2008) ...............................................14

*CFTC v. Johnson*,
    408 F. Supp. 2d 259 (S.D. Tex. 2005) ...............................................15, 21, 26, 28

*CFTC v. Reed*,
    481 F. Supp. 2d 1190 (D. Colo. 2007).................................................................21

*Christopher v. Harbury*,
    536 U.S. 403 (2002).................................................................33

*Cleveland v. Caplaw Enter.*,
    448 F.3d 518 (2d Cir. 2006).................................................................29, 30

*CompuDyne, Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006).................................................................38

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
    228 F.R.D. 508 (S.D.N.Y. 2005) .................................................................33, 35

*Ellison v. Am. Image Motor Co., Inc.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999).................................................................10

*Feitshans v. Kahn*,
    No. 06 Civ. 2125, 2007 WL 2438411 (S.D.N.Y. Aug. 24, 2007) .........................................34

*Fustok v. Conticommodity Servs. Inc.*,
    618 F. Supp. 1069 (S.D.N.Y. 1985).................................................................37

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
    122 F. Supp. 2d 407 (S.D.N.Y. 2000) (Scheindlin, J.) ............................................34

*GFL Advantage Fund v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001).................................................................20

*Grossman v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*,
    706 F. Supp. 221 (S.D.N.Y. 1989).................................................................10, 11

*Guttman v. CFTC*,
    197 F.3d 33 (2d Cir. 1999).................................................................29

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995).................................................................6

*In the Matter of Avista Energy, Inc. & Michael T. Griswold*,
   CFTC No. 01-21, 2001 WL 951736 (CFTC Aug. 21, 2001) .................................................22

*In the Matter of Indiana Farm Bureau Coop. Ass'n, Inc.*,
   CFTC No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982)........................................15, 17, 23

*In re Bayou Hedge Funds Inv. Litig.*,
   472 F. Supp. 2d 528 (S.D.N.Y. 2007).....................................................................................38

*In re College Bound Consol. Litig.*,
   No. 93 Civ. 2348, 94 Civ. 3033, 1995 WL 450486 (S.D.N.Y. July 31, 1995)........................19

*In re Cox*,
   CFTC Docket No. 75-16, 1987 WL 106879 (CFTC July 15, 1987) .......................................23

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)................................... passim

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677, 2007 WL 2589482 (S.D.N.Y. Sept. 8, 2007)..............................................40

*In re Currency Conversion Fee Antitrust Litig.*,
   265 F. Supp. 2d 385 (S.D.N.Y. 2003)...............................................................................33, 34

*In re First Cent. Fin. Corp.*,
   377 F.3d 209 (2d Cir. 2004).....................................................................................................39

*In re Hohenberg Bros.*,
   CFTC Docket No. 75-4, 1977 WL 13562 (CFTC Feb. 18, 1977)......................................14, 15

*In re Initial Public Offering Sec. Litig.*,
   544 F.Supp. 2d 277 (S.D.N.Y. 2008) (Scheindlin, J.) ...........................................................18

*In re Ivan F. Boesky Sec. Litig.*,
   36 F.3d 255 (2d Cir. 1994).......................................................................................................36

*In re Lernout & Hauspie Sec. Litig.*,
   230 F. Supp. 2d 152 (D. Mass. 2002) ....................................................................................31

*In re Motel 6 Secs. Litig.*,
   161 F. Supp. 2d 227 (S.D.N.Y. 2001)......................................................................................38

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004) ("*Natural Gas I*")......................................25, 30, 31, 35

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005) ("*Natural Gas II*")...........................................13, 14, 21

*In re Olympia Brewing Co. Sec. Litig.*,
   613 F. Supp. 1286 (N.D. Ill. 1985) ....................................................21

*In re Pfizer, Inc. Sec. Litig.*,
   538 F.Supp. 2d 621 (S.D.N.Y. 2008) (Scheindlin, J.) ...........................17

*In re Richardson Sec., Inc.*,
   Comm. Fut. L. Rep. (CCH) 21,145 (CFTC Jan. 27, 1981) ....................28

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ...........11

*Judith M. v. Sisters of Charity Hosp.*,
   93 N.Y.2d 932, 693 N.Y.S. 2d 67 (1999) .............................................36

*Kashfi v. Phibro-Salomon*,
   628 F. Supp. 727 (S.D.N.Y. 1986) ......................................................35

*Kolbeck v. LIT Am., Inc.*,
   923 F. Supp. 557 (S.D.N.Y. 1996) ........................................8, 10, 29, 37

*Korwek v. Hunt*,
   646 F. Supp. 953 (S.D.N.Y. 1986) ......................................................37

*Kramer v. Pollock-Krasner Found.*,
   890 F. Supp. 250 (S.D.N.Y. 1995) ......................................................38

*Krause v. Forex Exch. Mkt., Inc.*,
   356 F. Supp. 2d 332 (S.D.N.Y. 2005) ..............................................25, 28

*Leibowitz v. Cornell Univ.*,
   445 F.3d 586 (2d Cir. 2006) ...............................................................29

*Manela v. Gottlieb*,
   784 F. Supp. 84 (S.D.N.Y. 1999) ........................................................25

*Merrill Lynch Inv. Mgrs. v. OptiBase, Ltd.*,
   337 F.3d 125 (2d Cir. 2003) ...............................................................31

*Meyer v. Holley*,
   537 U.S. 280 (2003) ......................................................................32, 36

*Michelson v. Merrill Lynch Pierce, Fenner & Smith, Inc.*,
   619 F. Supp. 727 (S.D.N.Y. 1995) ......................................................37

*Miller v. N.Y. Produce Exch.*,
   550 F.2d 762 (2d Cir. 1977)................................................................13

*Mina Inv. Holdings Ltd. v. Lefkowitz*,
    51 F. Supp. 2d 486 (S.D.N.Y. 1999)........................................................39

*Modica v. Modica*,
    15 A.D.3d 635, 791 N.Y.S.2d 134 (2d Dep't 2005) ................................39

*Mormels v. Girofinance, S.A.*,
    544 F. Supp. 815 (S.D.N.Y. 1982)..........................................................13

*Moss v. Morgan Stanley, Inc.*,
    553 F. Supp. 1347 (S.D.N.Y. 1983)........................................................36

*Murray v. Miner*,
    74 F.3d 402 (2d Cir. 1996).......................................................................34

*Nanopierce Tech., Inc. v. Southridge Capital Mgmt.*,
    No. 02 Civ 0767, 2008 WL 250553 (S.D.N.Y. Jan. 29, 2008) ("*Nanopierce I*") ..................22

*Nanopierce Tech., Inc. v. Southridge Capital Mgmt.*,
    No. 02 Civ. 0767, 2008 WL 1882702 (S.D.N.Y. April 21, 2008) ("*Nanopierce II*") .......22, 23

*Natowitz v. Mehlman*,
    542 F. Supp. 674 (S.D.N.Y. 1982)..........................................................11

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
    No. 03 Civ. 0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ........................30, 32, 33

*O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*,
    529 F. Supp. 1179 (S.D.N.Y. 1981)........................................................36

*Pereira v. United Jersey Bank, N.A.*,
    201 B.R. 644 (S.D.N.Y. 1996)..................................................................27

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)......................................................38

*Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*,
    No. 07 Civ. 3494, 2007 WL 2044656 (S.D.N.Y. July 17, 2007) ...........................29

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)......................................................................12

*Royal Indus., Ltd. v. Kraft Foods, Inc.*,
    926 F. Supp. 407 (S.D.N.Y. 1996)..........................................................35

*Rudd v. KeyBank, N.A.*,
    No. C2-05-CV-0523, 2006 WL 212096, at *3 (S.D. Ohio Jan. 25, 2006) ...........................10

*Sahu v. Union Carbide Corp.*,
  No. 04 Civ. 8825, 2006 WL 3377577 (S.D.N.Y. Nov. 20, 2006) .....................................34, 36

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977).......................................................................................................12

*Schenley Distillers Corp. v. U.S.*,
  326 U.S. 432 (1946).......................................................................................................10

*SEC v. Competitive Tech., Inc.*,
  No. 04 CV 1331, 2005 WL 1719725 (D. Conn. July 21, 2005)............................................23

*SEC v. Masri*,
  523 F. Supp. 2d 361 (S.D.N.Y. 2007)................................................................................14, 22

*Smith v. Local 819 I.B.T. Pension Plan*,
  291 F.3d 236 (2d Cir. 2002)..............................................................................................11, 15

*Stander v. Fin. Clearing & Servs. Corp.*,
  730 F. Supp. 1282 (S.D.N.Y. 1990)....................................................................................27

*Stoneridge Inv. Partners, LLC v. Scientific Atlanta*,
  -- U.S. --, 128 S. Ct. 761 (2008) .......................................................................................30

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) ..............................................................................................21

*Tatum v. Legg Mason Wood Walker, Inc.*,
  83 F.3d 121 (5th Cir. 1996) ..............................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  -- U.S. --, 127 S. Ct. 2499 (2007) ...........................................................................15, 16, 18

*Thornock v. Kinderhill Corp.*,
  749 F. Supp. 513 (S.D.N.Y. 1990)......................................................................................26

*Transcontinental Gas Pipeline Corp.*,
  44 FERC ¶ 63,016 (FERC Aug. 29, 1988) .........................................................................10

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*,
  738 F. Supp. 1472 (S.D.N.Y. 1990).............................................................................15, 21

*U.S. v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991)..............................................................................................21

*Vitanza v. Bd. of Trade of the City of New York*,
  No. 00-cv-7393, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002)...........................................8, 15

*Volkart Bros., Inc. v. Freeman*,
    311 F.2d 52 (5th Cir. 1962) ....................................................................15

*Zinaman v. USTS New York, Inc.*,
    798 F. Supp. 128 (S.D.N.Y. 1992)..........................................................34


STATUTES

7 U.S.C. § 1 *et seq.* (2002)...........................................................................1

7 U.S.C. § 2(a)(1)(B) ........................................................................... passim

7 U.S.C. § 6(b) ..............................................................................................37

7 U.S.C. § 13b...........................................................................................9, 13

7 U.S.C. § 13c(b) ..........................................................................................37

7 U.S.C. § 25(a)(1)(D) ....................................................................................8


OTHER AUTHORITIES

317 C.F.R. § 166.3 ...............................................................................2, 37, 38

*Excessive Speculation in the Natural Gas Market: U.S.
    Senate Permanent Subcomm. on Investigations Staff Report With Additional Minority
    Views, 110*[th] ..........................................................................................7

Federal Rule of Civil Procedure 8(a) ........................................................ passim

Federal Rule of Civil Procedure 9(b)......................................................... passim

Federal Rule of Civil Procedure 12(b)(1) ......................................................1

Federal Rule of Civil Procedure 12(b)(6) .................................................1, 30

Pursuant to Federal Rules of Civil Procedure ("Rule") 8(a), 9(b), 12(b)(1) and 12(b)(6), Defendants Amaranth Advisors L.L.C. and Amaranth Advisors (Calgary) ULC, (together, "Amaranth Advisors"), Amaranth Group Inc. ("AGI"), Amaranth Management Limited Partnership ("AMLP") and Nicholas M. Maounis respectfully submit this joint memorandum of law in support of their motion to dismiss Plaintiffs' Complaint.[1]  Amaranth Advisors, AGI, AMLP and Mr. Maounis join and incorporate by reference the arguments of all other Defendants to the extent applicable.

## PRELIMINARY STATEMENT

In their Complaint, Plaintiffs throw everything against the proverbial wall, hoping something will stick.  Plaintiffs purport to assert: (1) primary manipulation under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* (2002), (2) at least four forms of secondary liability, (3) an unjust enrichment claim, and (4) a request for a constructive trust.  Plaintiffs, however, do not have standing to bring some of their claims, and the remaining ones lack the requisite factual allegations necessary to survive a motion to dismiss.

First, Plaintiffs assert a factually nonsensical and legally unsupportable primary CEA manipulation against AGI, AMLP, and Mr. Maounis.  Nowhere does the Complaint allege that AMLP, a holding company, or AGI, a non-trading service provider, directed or conducted any trading.  Similarly, the Complaint does not allege that Mr. Maounis, the Chief Executive Officer, directed or conducted any trading.  Further, the Complaint is devoid of any facts suggesting that AGI, AMLP or Mr. Maounis had the requisite specific intent to engage in manipulation.  The Complaint offers only bare legal conclusions and generalities with regard to AGI, AMLP and Mr. Maounis.

---

[1] Amaranth Advisors, AGI, AMLP and Mr. Maounis submit this joint brief per the Court's order during the telephone conference held in this matter on June 2, 2008.

Instead, virtually all of the factual allegations are tied to Plaintiffs' claim that Amaranth Advisors manipulated downward the natural gas futures contract *settlement price* on three specific days in 2006. The CEA, however, does not provide a private right of action for manipulation of a *settlement price*. Without a settlement price manipulation claim, Plaintiffs are left with one sweeping, but utterly implausible and totally unsupported manipulation claim: that Amaranth Advisors *contemporaneously* manipulated 72 different futures contracts extending six years into the future, at all times during the seven-month proposed Class Period, by "increasing" all the contract prices. (¶ 2b).[2] Plaintiffs' manipulation claim is subject to Rule 9(b), and Plaintiffs fail to plead pursuant to Rule 9(b) (or Rule 8(a) for that matter) that Amaranth Advisors even *traded in each of the 72 futures contracts at all times* during the seven-month Class Period, let alone possessed the requisite intent or ability to artificially increase the contract prices for all 72 contracts. Moreover, Plaintiffs' manipulation claim rests solely on an allegation of "large" volume trading. (¶ 2a). This Circuit, however, has held that large, open market trading alone does not constitute manipulative conduct. Finally, Plaintiffs fail to plead Amaranth Advisors caused artificially high prices in all 72 contracts throughout the Class Period.

Plaintiffs' claims for secondary liability are equally unavailing. Plaintiffs assert two theories for which no private right of action exists: control person liability under the CEA and failure to supervise under Commodity Futures Trading Commission ("CFTC") Rule 166.3.

As for their other theories of secondary liability, Plaintiffs offer no substantive allegations to support holding AGI or AMLP liable. Not a single fact is pled demonstrating that AMLP and AGI knew of any CEA violation or willfully assisted such a violation, both necessary

---

[2] Citations to Plaintiffs' Complaint shall take the form "¶ __".

for an aiding and abetting claim. Nor do Plaintiffs back their agency claim with any facts supporting a finding that AMLP or AGI were principals of any other Defendant.

As for Mr. Maounis, Plaintiffs seem to attempt to plead "alter ego" liability by alleging that Mr. Maounis "directed" the Amaranth Defendants, "an association-in-fact, which operated as a single entity under [his] direction." (¶ 29). If this is meant to assert an alter ego claim, not a single fact necessary to support this conclusory allegation is pled in support. Plaintiffs also assert that Mr. Maounis aided and abetted a CEA manipulation violation, but again fail to allege a single fact that Mr. Maounis knew of any alleged manipulation, intended to aid that manipulation, or took any act to further it. Additionally, Plaintiffs offer no facts to support a claim that a principal-agent relationship existed between Mr. Maounis and any other Defendant.

Plaintiffs further allege that Amaranth Advisors aided and abetted a purported manipulation by other Defendants, but the Complaint does not suggest which "other Defendant" was allegedly aided and abetted, much less how. The Complaint also lacks any factual allegation that Amaranth Advisors possessed the requisite specific intent for aiding and abetting. Instead, Plaintiffs merely lump Amaranth Advisors under the heading "Amaranth Defendants," which includes eight legally-distinct entities and three individuals. Likewise, any attempt to hold Amaranth Advisors liable under agency for the actions of employees fails, as employees would have been acting outside the scope of employment in taking part in any alleged manipulation.

Plaintiffs' unjust enrichment claim fairs no better. There are no factual allegations supporting a *substantial* relationship between any Plaintiff and any Defendant. Nor do Plaintiffs allege that any Defendant was enriched at Plaintiffs' *direct* expense, a requisite for such a claim. In fact, Plaintiffs concede that the Defendants *lost* money from the trading at issue.

Finally, because the unjust enrichment claim fails and there are no allegations of a confidential or fiduciary relationship or a transfer in reliance on a promise between Plaintiffs and any Defendant, the request for a constructive trust is improper.

For these reasons, as detailed below, and those stated in the briefs submitted by the other Defendants, the Complaint should be dismissed in its entirety. Dismissal should be with prejudice because, as discussed more fully below, Plaintiffs have had the benefit of extensive pre-Complaint information regarding the alleged manipulation, have already filed amended complaints, and have had further opportunities to correct the Complaint's shortcomings.

## FACTUAL BACKGROUND

A.    **The Parties**

1.    **Amaranth Advisors: Traders in Natural Gas Futures Contracts**

Amaranth Advisors served as investment advisor to Amaranth LLC, a multi-strategy hedge fund ("the Master Fund"). In September 2006, the Master Fund suffered substantial losses in its the natural gas portfolio, including natural gas futures contracts. As a result, the Master Fund is "winding-down" its business and Amaranth Advisors is no longer actively trading.[3]

A New York Mercantile Exchange ("NYMEX") natural gas futures contract ("NG contract") is a standardized contract, obligating the buyer to accept and the seller to deliver a specified quantity of natural gas at a specified place in the future. Traders can buy or sell NG contracts to deliver natural gas in any future month for six years. Thus, 72 NG contracts traded on any given trading day during the Class Period and a contract "expires," or ceases trading, monthly. The NYMEX determines settlement prices for expiring NG contracts after trading ends

---

[3] The feeder funds, Amaranth International Limited ("AIL"), Amaranth Partners LLC ("AP") and Amaranth Capital Partners LLC ("ACP"), as well as the Master Fund, are separately moving to dismiss. Winston & Strawn LLP represents AP and ACP, and the basis to dismiss claims against those two entities will be addressed in the memorandum submitted by the Master Fund and AIL.

on their last trading day, which is the third-to-last day of the month prior to which delivery is to be made (the "settlement day"). The settlement price is generally the volume weighted average selling price during the last half-hour on the settlement day (2:00-2:30 p.m. ET or the "settlement period").

If a trader has open contract positions at expiration, he must either accept or make physical delivery of natural gas (or use other limited options to discharge delivery obligations). The vast majority of NG contracts, however, are not left open at expiration, as buyers and sellers typically enter into offsetting contracts before the end of trading to avoid physical delivery.[4] Amaranth Advisors did not have the ability to make or take physical delivery, and thus always sought to offset its NG contract positions prior to expiration.

### 2.    AGI and AMLP: Non-Trading Entities

Neither AGI nor AMLP are alleged to have engaged in or directed any of the trading at issue. AGI is a Delaware S corporation that merely provided certain administrative (*i.e.*, non-trading) services to the "Amaranth Defendants." AMLP is a Delaware holding company owning a majority non-managing member interest in Amaranth Advisors L.L.C.

None of the allegations in the Complaint even suggest how AGI or AMLP possibly could be primarily or secondarily liable for manipulation. Plaintiffs simply plead that AGI "employed all the natural gas traders" and "executives" (¶ 25), without any substantive allegation that AGI controlled or directed these employees. In fact, Plaintiffs plead that it was "Amaranth Advisors … that directed the investments and employed the natural gas traders" (¶¶ 22, 248). As to AMLP, the Complaint lacks any substantive allegation regarding any action it allegedly took in

---

[4] *See* A Review of Recent Hedge Fund Participation in NYMEX Natural Gas and Crude Oil Futures Markets (NYMEX Mar. 1, 2005), *available at* http://www.nymex.com/media/ hedgedoc.pdf.

furtherance of any purported manipulation.  Moreover, Plaintiffs concede that AGI, AMLP, Amaranth Advisors L.L.C., Amaranth Advisors (Calgary) ULC, the Master Fund, and the feeder funds are all "legally distinct" entities.  (¶ 32).

### 3.    Nicholas Maounis: Amaranth's Non-Trading CEO

None of the handful of allegations that relate to Mr. Maounis begin to support a claim for primary or secondary liability for manipulation.  The Complaint alleges simply that Mr. Maounis was "owner," "founder," "Chief Executive Officer," "Chief Investment Officer," and "Managing Member" of some of the "Amaranth Defendants."  (¶¶ 25, 29).  Otherwise, the Complaint offers only legal conclusions and generalities as to Mr. Maounis, making conclusory, collective allegations of manipulation against all the corporations and individuals named in the Complaint under the label of the "Amaranth Defendants."  (¶¶ 1-2, 33).[5]

### B.    Plaintiffs' Complaints And Pre-Complaint Information

The four named Plaintiffs filed their respective complaints between July 12 and September 10, 2007, which were consolidated into the above-captioned action on September 19, 2007.  On December 17, 2007, Plaintiffs filed a consolidated complaint.  Then on February 14, 2008, Plaintiffs filed the operative corrected consolidated complaint.[6]

---

[5] Plaintiffs allege that "Amaranth — per the trading decisions of Nicholas Maounis, Brian Hunter, Matthew Donohue and other Amaranth agents and control persons — held and steadily added to massive natural gas contract positions on NYMEX and ICE." (¶ 73).  Mr. Maounis understands this allegation as merely a restatement of the claim that he was CEO and CIO of the company, because there is no factual basis to allege any specific involvement by him in the "trading decisions" relating to NG contracts.  Indeed, none of the evidentiary sources relied upon by Plaintiffs in the Complaint suggest that Mr. Maounis had any involvement in trading NG contracts.  (¶ 271).  Further, any such allegation would be inconsistent with the more specific allegations of the Complaint, which make clear that Mr. Maounis did not make trading decisions on NG contracts.  *See, e.g.*, ¶ 102; *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (a court need not credit generalized allegations belied by more specific allegations).

[6] Amaranth Advisors, AMLP, AGI and Mr. Maounis sent letters pursuant to this Court's rules to Plaintiffs' counsel stating the bases of the instant motion.  Plaintiffs stood by all their claims.

In addition to filing six complaints in seven months, Plaintiffs have had the benefit of extensive pre-Complaint information.   First, in June 2007, the U.S. Senate Permanent Subcommittee on Investigations ("PSI") issued a report on speculation in natural gas, detailing Amaranth Advisors' trading positions, strategy and corporate structure, information on which Plaintiffs relied in the Complaint.[7]  *See*, *e.g.*, ¶ 4.  Second, on July 25, 2007, the CFTC filed a complaint *solely* against Amaranth Advisors and Mr. Hunter under the CEA for *attempted manipulation* of the settlement price of the expiring NG contract on February 24 and April 26, 2006.[8]  Plaintiffs rely on allegations in and exhibits attached to the CFTC's complaint.  *See*, *e.g.*, ¶ 5a.  Third, Plaintiffs rely on the Federal Energy Regulatory Commission's ("FERC") July 26, 2007 Order to Show Cause, which alleges manipulation of NG futures settlement prices.[9]  *See*, *e.g.*, ¶ 5b.  Finally, Plaintiffs rely on extensive trading data produced by Amaranth Advisors to the CFTC, FERC and PSI that Plaintiffs obtained from the FERC on October 14, 2007 and November 21, 2007.

---

[7] The PSI did not find that Amaranth Advisors (or any other Defendant) either attempted to or actually manipulated the natural gas market.  *See Excessive Speculation in the Natural Gas Market: U.S. Senate Permanent Subcomm. on Investigations Staff Report With Additional Minority Views*, 110th Cong. (June 25, 2007) *available at* http://hsgac.senate.gov/ public/_files/REPORTExcessiveSpeculationintheNaturalGasMarket0.pdf.

[8] *See CFTC v. Amaranth Advisors, L.L.C., et al.*, Case No. 07-cv-06682 (S.D.N.Y., filed on July 25, 2007).  The CFTC did not allege attempted or actual manipulation of the contract prices of the 72 separate NG contracts at issue here, but rather only attempted manipulation of the settlement price of two specific contracts on two specific days.

[9] The FERC's action is pursuant to the Energy Policy Act, not the CEA, and Defendants strongly dispute FERC's jurisdiction as the CFTC has exclusive jurisdiction over futures markets under the CEA.  This jurisdictional issue is currently before the Court of Appeals for the D.C. Circuit.  *See Amaranth Advisors, L.L.C., et al., v. FERC* (D.C. Cir. Dec. 6, 2007) (No. 07-1491).  Regardless, FERC's allegations only concern settlement prices of three NG contracts on three days.

## ARGUMENT

**I.    PLAINTIFFS LACK STANDING TO ASSERT CLAIMS BASED ON MANIPULATION OF SETTLEMENT PRICES (COUNT I)**

Plaintiffs allege that Defendants violated the CEA by manipulating the *settlement prices* of the expiring March, April, and May 2006 NG contracts on February 24, March 29 and April 26, respectively.  *See, e.g.,* ¶¶ 2e, 5, 50.  To have standing to assert a private right of action, Plaintiffs *must* allege they fall within one of CEA Section 22(a)'s four categories, and only Section 22(a)(D), which provides a private right of action to a buyer or a seller of a futures contract "if the violation constitutes a manipulation of the *price of any such contract* or the *price of the commodity* underlying such contract," even arguably applies.  7 U.S.C. § 25(a)(1)(D) (emphasis added); *see Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 566 (S.D.N.Y. 1996).  The settlement price, however, is not the price of any contract that Plaintiffs bought or sold, or the commodity price underlying any such contract.

*Vitanza v. Bd. of Trade of the City of New York*, No. 00-cv-7393, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002), is directly on point.  In *Vitanza*, the plaintiffs asserted a CEA claim based on alleged manipulation of settlement prices of certain futures and options.  *Id.* at *4-5.  The court dismissed the claims for lack of standing because the "settlement price is not the value of the contract itself or the value of the commodity underlying the contract" necessary for standing under Section 22(a)(1)(D).  *Id.* at *5.  Although recognizing that settlement prices are an aspect of a commodities market, the court dismissed the manipulation claim explaining, that it was "extremely reluctant to imply a private right of action where the statute explicitly provides a different remedy."  *Id.*  (citing *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981)).  In fact, Defendants are not aware of any court upholding a private action under the CEA based on alleged manipulation of settlement prices.

As Plaintiffs do not, and cannot, assert that they bought or sold at settlement prices, which are determined by definition *after* all trading at contract prices ceases, Plaintiffs' manipulation claims based on settlement prices must be dismissed for lack of standing.

## II.     PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A CEA PRIMARY MANIPULATION CLAIM AGAINST DEFENDANTS (COUNT I)

Plaintiffs fail to plead a manipulation claim against AGI, AMLP, Mr. Maounis or Amaranth Advisors under either Rules 9(b) or 8(a) as to both the 72 NG contracts covering six years and the three settlement prices.  The well-established elements of manipulation under CEA Section 9(a)(2) are: (1) the defendant had the ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price.  *See In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007).  The manipulation claim against AGI, AMLP and Mr. Maounis readily should be dismissed because the Complaint does not plead a single fact in support of the claim.  As to Amaranth Advisors, Plaintiffs fail to satisfy Rule 9(b)'s pleading standards, and regardless, fail even to satisfy Rule 8(a).  Plaintiffs fail to plead the requisite intent or ability to raise artificially the 72 NG contract prices throughout the Class Period or to depress the three settlement prices, indeed to cause any artificial price, let alone a manipulative act.

### A.     The Primary Manipulation Claim Against AGI And AMLP Fails

Plaintiffs' manipulation claim does not allege a single manipulative act by AGI or AMLP.  Indeed, Plaintiffs concede that AGI and AMLP took no part in the trading at issue, and that instead, traders at Amaranth Advisors made all trading decisions.  (¶ 22).  Moreover, none of the isolated references to AGI and AMLP even remotely plead that they had the specific intent to manipulate the NYMEX market at any point in time, took any manipulative act in support of

such a manipulation, or had the ability to impact prices. The complaint does not, and cannot, allege how AMLP, a mere holding entity, or AGI, a non-trading service provider, had the ability to manipulate the market when they did not conduct or direct any trading. Asserting that AGI employed, but did not control, the natural gas traders in no way connects AGI to any alleged manipulation of the NYMEX market. Moreover, the Complaint is wholly lacking as to any action at all by AMLP.[10]

Plaintiffs attempt in vain to salvage the primary manipulation claim by lumping AMLP and AGI, which Plaintiffs themselves concede are "legally distinct" entities, with all the Defendants together as "Amaranth" or under the label the "Amaranth Defendants." (¶¶ 32, 33). Where, as here, the "complaint simply says nothing about [the individual defendant], except in the most general of terms in those 'kitchen sink' portions of the pleading where everyone is alleged to have done everything in violation of the [law,]" the complaint must be dismissed. *Grossman v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 706 F. Supp. 221, 232 (S.D.N.Y. 1989) (dismissing manipulation claim under the CEA for failure to state a claim or, in the alternative, under Rule 9(b)) (citations omitted); *see also Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 640 (S.D.N.Y. 1999) (dismissing market manipulation claims because Rule 9(b) is "not satisfied by a complaint in which defendants are clumped together in vague allegations") (citations omitted); *Kolbeck*, 923 F. Supp. at 569 (Rule 9(b) not satisfied by making "[b]road

---

[10] Plaintiffs assert a vague and conclusory allegation that all Defendants are liable because they were a "single entity" without any factual allegations in support and without explaining how this theory of liability applies to Defendants. *See* ¶¶ 29, 32. The single entity doctrine is only used in administrative law cases where the agency can show that the corporate structure was created to frustrate the purposes of a particular statute. *See Schenley Distillers Corp. v. U.S.*, 326 U.S. 432 (1946); *Transcontinental Gas Pipeline Corp.*, 44 FERC ¶ 63,016 (FERC Aug. 29, 1988). Thus, it is inapplicable here. Regardless, it is illogical that Plaintiffs can in one breath admit that each of the "Amaranth" entities are distinct, with different functions, different structures and different owners (¶¶ 23-28), and in the next attempt to hold them each liable as a single entity.

allegations that several defendants participated in a scheme"). *See also Rudd v. KeyBank, N.A.*, No. C2-05-CV-0523, 2006 WL 212096, at *3 (S.D. Ohio Jan. 25, 2006) (Rule 8(a) requires that the plaintiff provide each defendant with notice of the claims against it).

### B.    The Primary Manipulation Claim Against Nicholas Maounis Fails

The Complaint similarly pleads no facts setting out Mr. Maounis's role in the alleged manipulation. Not a single substantive allegation discusses Mr. Maounis, describes his role or any action he took in furtherance of the alleged manipulation. As in *Grossman*, *supra*, the Complaint merely alleges that the "Amaranth Defendants" collectively (defined to include eight legally distinct corporate entities and three individuals) manipulated the price of natural gas futures contracts. (¶¶ 1-2, 33). In the few instances where the Complaint touches on the alleged manipulation, it never once mentions Mr. Maounis' name, much less offers facts as to his involvement. *See, e.g.,* ¶¶ 102, 100-149. As this Court has recognized, because Plaintiffs have "sue[d numerous] defendants, [they] ha[ve] an obligation to allege specifically the fraud perpetrated by each defendant." *Natowitz v. Mehlman*, 542 F. Supp. 674, 676 (S.D.N.Y. 1982). As in the *Natowitz*, Plaintiffs fail to meet this obligation. The Complaint is "replete with vague accusations against 'the defendants' without reference to the specific parties or the specific acts." *Id.* Thus, Plaintiffs fail to "allege specifically the fraud perpetrated by each defendant."

Other than the "collective" allegations, Plaintiffs assert only that Mr. Maounis is the "founder," "Chief Executive Officer and Managing Member of Amaranth Advisors," and the "owner" of Amaranth Group Inc. (¶¶ 25, 29). Of course, position or ownership alone is not enough to state a claim for manipulation. "[B]oilerplate allegations … based solely on [a defendant's] board membership or executive positions are insufficient …." *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000). Likewise, the suggestions that Mr. Maounis had "de jure and de facto control over," or that he

was the "principal" of, the "Amaranth Defendants" (¶¶ 29, 250), are mere legal conclusions that do not provide a factual basis for a claim against him.  *See, e.g., Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).  The Complaint offers nothing more than an amalgam of conclusory or speculative allegations.  *See Bell Atlantic Corp. v. Twombly*, -- U.S. --, 127 S. Ct. 1955, 1974 (2007).  Thus, "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Id.*

### C.    The Primary Manipulation Claim Against Amaranth Advisors Fails

#### 1.    The Relevant Standard Of Pleading

##### a.    Rule 9(b) Applies To Plaintiffs' Manipulation Claim

Rule 9(b) mandates that "all averments of fraud" be pled with particularity.  In *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), the Second Circuit held that Rule 9(b) "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action," but is broader and applies to "claims insofar as the claims are premised on allegations of fraud."  *Id.* at 171.  As the Supreme Court explained, manipulation refers to fictitious or otherwise deceptive trading practices "that are intended to mislead investors by artificially affecting market activity."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

Rule 9(b) applies because Plaintiffs allege that Defendants deceived the market as to the true supply and demand of natural gas, resulting in an artificial price.  Indeed, the Second Circuit recently concluded: "[b]ecause a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  The Court reasoned,

> case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.  The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell

> securities are determined by the natural interplay of supply and
> demand, not rigged by manipulators.

*Id.* at 100 (citations omitted).

As the Court in *ATSI* noted, the link of market manipulation to deception was already part of the "case law in this circuit." In that regard, in *Crude Oil*, the court dismissed the plaintiff's claim alleging manipulation of futures contracts in violation of Section 9(a)(2) of the CEA for failure to comply with Rule 9(b). Notwithstanding that the plaintiffs, like Plaintiffs here, "carefully avoided the word 'fraud' in their complaint," the court found that because the "crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand," the manipulation claim was subject to Rule 9(b)'s heightened pleading requirements. *Crude Oil*, 2007 WL 1946553, at *5, *see also In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) ("*Natural Gas II*") (finding the alleged manipulation under the CEA was "classically associated with fraud" and thus Rule 9(b) applied).[11]

In *CFTC v. Amaranth Advisors, L.L.C.*, No. 07 Civ. 6682, 2008 WL 2123323 (S.D.N.Y. May 21, 2008), Judge Chin held that Rule 9(b) did not apply to the CFTC's *attempted* manipulation claim against Amaranth Advisors and Mr. Hunter, and clarified on a motion to reconsider that because *ATSI* involved securities and not commodities, it therefore "did not supersede case law regarding pleading standards for claims under the CEA." *CFTC v. Amaranth Advisors, L.L.C.*, No. 07 Civ. 6692, 2008 U.S. Dist. LEXIS 45638, at *3-4 (S.D.N.Y. June 10, 2008). To the contrary, cases interpreting the securities laws are applicable in evaluating CEA

---

[11] Both *Natural Gas II* and *Crude Oil* applied a "case-specific approach" to determine whether Rule 9(b) applies. *See Natural Gas II*, 358 F. Supp. 2d at 342-43; *Crude Oil*, 2007 WL 1946553, at *5. After *ATSI*, the "case-specific" approach is not necessary, but even under that analysis, the Complaint here is still subject to Rule 9(b). The essence of the allegations is that the trading was designed to mislead the market regarding the true supply and demand for NYMEX futures contracts. (¶¶ 2e, 5, 99, 101, 102). Thus, even if not all manipulation claims are subject to Rule 9(b), Plaintiffs' claim in this case must satisfy its heightened pleading requirements.

claims. *See Miller v. N.Y. Produce Exch.*, 550 F.2d 762, 769 n.4 (2d Cir. 1977) (in context of alleged CEA manipulation claim the court applied the reasoning of securities cases); *Mormels v. Girofinance, S.A.*, 544 F. Supp. 815, 817 n.8 (S.D.N.Y. 1982) ("Securities cases and principles are used as persuasive aids to interpretation.).  Moreover, in fact, there is *no difference* between manipulation of a security versus a commodity.  Both securities manipulation, as the Court stated in *ATSI*, 493 F.3d at 100, and commodities manipulation are based on deception caused when "investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *See, e.g., In re Hohenberg Bros.*, CFTC Docket No. 75-4, 1977 WL 13562, at *7 (CFTC February 18, 1977) (commodities case stating that "manipulation has been defined generally as conduct intentionally engaged in resulting in an artificial price, i.e., a price that does not reflect the basic forces of supply and demand*")*; *CFTC v. Dizona*, Civil Action No. H-05-332, slip op. at 6 (S.D. Tex. Apr. 24, 2008) (commodities case stating that "[m]anipulation is generally defined as conduct intentionally engaged in and that results in an artificial price, i.e., a price that does not reflect the basic forces of supply and demand.").  Ironically, in his decision Judge Chin placed much reliance on *SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), a securities manipulation case that did not mention *ATSI*.

Accordingly, consistent with *ATSI*, *Crude Oil*, and *Natural Gas II*, as the Complaint purports to allege a deception on the market as to the true price for NG contracts, Plaintiffs' manipulation claim under the CEA is subject to Rule 9(b).

### b.    Even Under Rule 8, The Complaint Would Fall Short

Even under Rule 8, a complaint must allege facts sufficient "to raise a right to relief above the speculative level."  *See Twombly*, 127 S. Ct. at 1965.  A complaint must plead facts that make the claim not just "conceivable," but "plausible." *Id.* at 1974.  Although on a motion to

dismiss the court must accept *factual* allegations as true, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *See Smith*, 291 F.3d at 240 (citations omitted); *accord Vitanza*, 2002 WL 424699, at *2. The Complaint fails this test as well.

### 2.     The Complaint Fails To Allege Sufficiently Intent To Manipulate

Intent is the essence of manipulation.  *See In Matter of Indiana Farm Bureau Coop. Ass'n, Inc.*, CFTC No. 75-14, 1982 WL 30249, at *4 (CFTC Dec. 17, 1982); *In re Hohenberg Bros.*, 1977 WL 13526, at *7.  Under either Rule 9(b) or Rule 8, allegations of general intent for a CEA manipulation claim are insufficient:  "[S]pecific intent to create an 'artificial' or 'distorted' price is a *sine qua non* of manipulation." *In re Indiana Farm Bureau*, 1982 WL 30249, at *5.  To demonstrate specific intent, Plaintiffs must show that the defendant acted "with the purpose or conscious object of causing or effecting a price that . . . did not reflect the legitimate forces of supply and demand."  *CFTC v. Johnson,* 408 F. Supp. 2d 259, 267 (S.D. Tex. 2005); *accord Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) (conduct must be calculated to produce a price distortion).  Where a trader acts with a legitimate investment or commercial purpose, no manipulative intent can be found.  *See Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1495 (S.D.N.Y. 1990).  Plaintiffs fail to plead allegations showing such an intent.

Moreover, under Rule 9(b), Plaintiffs must allege facts raising a strong inference of manipulative intent.  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, -- U.S. --, 127 S. Ct. 2499 (2007), the Supreme Court instructed courts to "take into account plausible opposing inferences" when determining whether the facts alleged give rise to a strong inference of scienter.  *Id.* at 2509.  The Supreme Court stated that: "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling . . . .  A complaint will survive,

we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510.[12]

Plaintiffs do not allege any direct or circumstantial evidence of an intent by Amaranth Advisors to manipulate *upward* the prices of the 72 NG contracts throughout the Class Period *or* to manipulate *downward* the three settlement prices (*i.e.* intent to create artificial market prices) that satisfies Rules 9(b) or 8(a). The Complaint states in a blunderbuss and conclusory fashion that "[e]ach Amaranth Defendant . . . specifically intended their activities alleged herein to move or support the prices of NYMEX natural gas contracts to or at artificial levels" and that "Amaranth's manipulation of the prices of the NYMEX NG Contracts during settlement was intended to benefit Amaranth's substantially larger short natural gas swaps positions on ICE and elsewhere." (¶¶ 239, 103). Such group allegations fail under Rules 9(b) and 8 (*see supra*, pp. 10-11). In any event, Plaintiffs allege no facts in support of the conclusory allegations.

In a futile attempt to allege intent to manipulate upwards the price of the 72 NG contracts, Plaintiffs refer to the allegedly "large" natural gas positions and how they changed throughout the Class Period. *See, e.g.*, ¶¶ 2a-c, 3a-d, 63-72. As discussed below, there is nothing inherently illegal or manipulative about "large" futures positions so as to provide a cogent or even plausible basis from which to infer manipulative intent. *See infra* Section II(C)(3). Further, in a factually analogous CEA manipulation case, a court in this District found that it is insufficient to infer intent from a generalized motive based on the claim that defendants had a large presence in the physical and NYMEX market, and also engaged in the purchase and

---

[12] Although *Tellabs* addressed claims governed by the Private Securities Litigation Reform Act ("PSLRA"), courts have applied *Tellabs*' heightened scienter requirement to non-PSLRA fraud claims. *See, e.g., Crude Oil*, 2007 WL 1946553 at *7 n.5 (applying Rule 9(b) to a CEA manipulation claim, stating that the "adoption of a heightened pleading standard in the context of the claims presented herein is in conformity with the direction of the Court" in *Tellabs*).

-16-

sale of over-the-counter contracts and thus stood to gain from manipulating prices, because that motive could be imputed to any corporation with a large market presence in any commodity market. *See Crude Oil,* 2007 WL 1946553, at *8. Moreover, "since the self-interest of every market participant plays a legitimate part in the price setting process, it is not enough to prove simply that the accused intended to influence price." *In re Indiana Farm Bureau*, 1982 WL 30249, at *5. Accordingly, Plaintiffs' allegations as to intent to manipulate the 72 NG contracts during the Class Period fail.

Otherwise, the most Plaintiffs have done is cite a few isolated instant messages ("IMs") from three trading days relating to the trading in the March, April and May 2006 NG contracts for which Plaintiffs claim the settlement price was manipulated *downwards*, thus irrelevant to an intent to manipulate contract prices *upward* for the 72 NG contracts *throughout* the entire Class Period. Moreover, the IMs are insufficient even to show Amaranth Advisors' intent to manipulate the settlement prices *downwards* on those three days. As discussed below, all the IMs show is that on the three settlement days, traders made lawful trades they hoped would be profitable. The Complaint does not explain how these IMs demonstrate a specific intent of any Defendant to create an artificial price, nor does it contain a basis to infer manipulative intent. *See ATSI*, 493 F.3d at 104 ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation.") (citations omitted); *see also In re Pfizer, Inc. Sec. Litig.*, 538 F.Supp. 2d 621, 635 (S.D.N.Y. 2008) (Scheindlin, J.) ("general allegations that the defendants acted in their economic self-interest" are insufficient) (citations omitted).

### a.    February 24, 2006

Plaintiffs refer to Mr. Hunter wanting to have "lots of futures" to sell on February 24 as an example of manipulative intent, but read in context, all that is shown is that Mr. Hunter

believed there would be "big changes" in pricing and large volume buying by another market participant, so he wanted "lots of futures" to protect his position. *See* Mollón Dec. Ex. A.[13] Plaintiffs also cite to an IM between Mr. Hunter and Matthew Calhoun, another natural gas trader, regarding the market getting "smashed", which in context indicates nothing more than a discussion of market conditions and the potential impact on their positions. This is evident from Mr. Hunter's comment that same day that there was "pain everywhere" in the market. *See* Mollón Dec. Ex. B. Additionally, Plaintiffs' reference to Mr. Hunter's comment that "today came together quite nicely" does not support any inference of intent as to Amaranth Advisors. *See* Mollón Dec. Ex. C. Again, it is typical and not nefarious for traders to discuss the profit and loss for the day. Thus, it is simply not the "cogent" and more "compelling" inference from the February 24, 2006 IMs that Mr. Hunter was engaged in a scheme to manipulate prices. *See Tellabs*, 127 S. Ct. at 2510.

### b.    March 29, 2006

Plaintiffs' allegations regarding intent to manipulate the March 29 settlement price are especially lacking.[14] Plaintiffs simply allege that "Amaranth held a large long position in the April 2006 contract prior to the settlement period, and proceeded to sell it [market on close] during the close." (¶ 122). This does not show intent to manipulate. In fact, as Plaintiffs concede, Amaranth Advisors sold over 400 April 2006 NG contracts on March 29, *before the*

---

[13] For purposes of a motion to dismiss, a complaint is deemed to include "any ... statements or documents incorporated into [it] by reference ... and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *In re Initial Public Offering Sec. Litig.*, 544 F.Supp. 2d 277, 284 (S.D.N.Y. 2008) (Scheindlin, J.) (citations omitted). Plaintiffs specifically referenced and relied upon in their Complaint all of the documents cited in this memorandum of law, thus, this Court may consider them.

[14] In its case, the CFTC did not allege even attempted manipulation of the settlement price of the April 2006 NG contract or any manipulation of any kind on March 29, 2006. *See CFTC v. Amaranth Advisors, L.L.C*, No. 07-cv-06682, 2008 WL 2123323 (S.D.N.Y. May 21, 2008).

*settlement period*, demonstrating that Amaranth Advisors was an active trader *throughout* the trading day. (¶ 123). Active trading throughout the day does not show an intent to manipulate.

Further, any attempt to base intent on Amaranth Advisors' short April swap position and that they "stood to benefit from a lowered natural gas futures contract price" also fails. (¶ 124). These allegations suggest nothing about intent and simply describe legitimate trading. *See supra* pp. 16-17. Indeed, presumably half the market was short and stood to benefit from lower prices.

### c.    April 26, 2006

With regard to the May 2006 NG contract, Plaintiffs assert that Amaranth Advisors obtained a large long NG futures position in order to sell it in the last half-hour on April 26. (¶ 127). This describes nothing more than lawful trading. Indeed, Plaintiffs allege that Amaranth Advisors' strategy was driven, in part, by concern that another hedge fund was going to be a large buyer near the close. (¶¶ 131-33). Further, Plaintiffs assert that Mr. Hunter thought other buyers existed and thus was waiting to sell. (¶¶ 135-36). Far from alleging manipulation, Plaintiffs describe a legitimate business response to the anticipated actions of other traders.

The Complaint makes much of the fact that "Amaranth" waited until the last eight minutes of trading on April 26 to sell NG contracts. (¶¶ 138-43). Importantly, however, Plaintiffs do not, and could not, allege that there is anything inherently improper about selling near the end of the close. *See In re College Bound Consol. Litig.*, No. 93 Civ 2348, 94 Civ. 3033, 1995 WL 450486, at *5-7 (S.D.N.Y. July 31, 1995) (dismissing claim based on open-market trading at end of trading day because such trading is neither illegal nor deceptive). The more compelling inference, especially given that the trading lacked any deceptive techniques, is that Amaranth Advisors was implementing a legitimate trading strategy based on its analysis of market conditions and the strategies of other traders.

### 3.    The Complaint Fails To Allege Manipulative Conduct

The Complaint rests on the theory that through large trading positions, Amaranth Advisors artificially increased the prices of all 72 NG contracts, on each day of the seven-month Class Period.  Plaintiffs do not even allege Amaranth Advisors traded in each of these contracts throughout the Class Period, much less that it traded in large volume or manipulated prices in each of these 72 NG contracts.  But even if such a broad, factually unsubstantiated claim was plausible, large volume trading alone does not constitute manipulative conduct in this Circuit. Manipulative conduct "must be willfully combined with *something more* to create a false impression of how market participants value a security."  *ATSI*, 493 F.3d at 101 (emphasis added).  The Second Circuit cited with approval the Third Circuit's approach, that to distinguish between manipulative and legal conduct it must be determined "whether the manipulation 'inject[ed] inaccurate information into the marketplace or created a false impression of supply and demand for the security . . . for the purpose of artificially depressing or inflating the price of a security.'" *Id.*  (quoting *GFL Advantage Fund v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001)).

In *ATSI*, the Second Circuit affirmed dismissal of a complaint alleging market manipulation based on high-volume short-selling, made with the intent to drive down the price of the stock, during key time periods that allegedly resulted in a substantial decline in stock price. The Court emphasized that "short selling – even in high volumes – is not by itself, manipulative." *ATSI*, 493 F.3d at 101.  "[M]arket manipulation requires an additional element, something beyond otherwise legal trading." *GFL Advantage Fund*, 272 F.3d at 204, 207, 211 (rejecting a manipulation claim based on an alleged scheme to depress stock prices through concentrated short sales because "[t]he fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct"; a plaintiff has to "present evidence that [a defendant] engaged in some other type of deceptive behavior in

conjunction with its short selling that either injected inaccurate information into the marketplace or created artificial demand for the securities") (citations omitted).[15]

Accordingly, CEA manipulation cases typically allege that a defendant made false or misleading statements to affect market prices or engaged in deceptive trading practices, such as wash sales, matched orders, rigged bids, fictitious trades, corners or squeezes. For instance, in *Natural Gas II*, defendants allegedly submitted false price and volume information to gas industry publications with the goal of artificially skewing the published reports regarding the natural gas physical market, and thereby artificially altered the natural gas market. *Natural Gas II*, 358 F. Supp. 2d at 340-41; s*ee also Transnor*, 738 F. Supp. at 1493-96 (the alleged CEA manipulative conduct included wash sales); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1164-72 (8th Cir. 1971) (dominant long position allegedly used to engage in a manipulative squeeze); *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1200 (D. Colo. 2007) (alleged manipulation included false reporting of natural gas physical trades); *CFTC v. Atha*, 420 F. Supp. 2d 1373, 1381 (N.D. Ga. 2006) (defendants allegedly made up fictitious counterparties to their transactions and fabricated price and volume reports); *Johnson*, 408 F. Supp. 2d 259, 266-68 (S.D. Tex. 2005) (defendants allegedly submitted biased trade information and fictitious gas trades to affect prices); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005) (defendants allegedly fabricated transaction information to manipulate prices); *In the Matter of Avista Energy, Inc. & Michael T.*

---

[15] *See also U.S. v. Mulheren*, 938 F.2d 364, 370-72 (2d Cir. 1991) ("the fact that [defendant] dominated the [open] market between 9:30 a.m. and 11:10 a.m. . . . carries little weight" in establishing manipulation without something more, *i.e.*, wash sales, matched orders or fictitious accounts); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) ("unprecedented massive short selling" did not create "a false impression of supply or demand" because there were "real buyers, betting against [defendant]"); *In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286, 1289, 1296 (N.D. Ill. 1985) (dismissing manipulation claim based on "short sales at end of the trading days" because "short selling is simply not unlawful, even in large numbers and even if the trading does negatively affect the purchase price").

*Griswold*, CFTC No. 01-21, 2001 WL 951736, at *2, 10 (CFTC Aug. 21, 2001) (alleged scheme to manipulate prices by selling futures contracts below prevailing bids and purchasing them higher than prevailing bids with no apparent business or economic rationale).

On May 21, 2008, Judge Chin denied motions of Amaranth Advisors and Mr. Hunter to dismiss the CFTC's CEA *attempted* manipulation claim against them, even though the CFTC did not allege any deceptive or fraudulent conduct. *See CFTC v. Amaranth Advisors, L.L.C.*, 2008 WL 2123323 at *1. The Court acknowledged that none of Amaranth Advisors' conduct was fraudulent or deceptive, but on a motion to reconsider, declined to apply *ATSI* because it involved securities manipulation, not commodities manipulation. *See id.* at *7, *9-10 and *CFTC v. Amaranth Advisors, L.L.C.*, 2008 U.S. Dist. LEXIS 45638 at *3-4. We respectfully submit that manipulation is manipulation and inherently involves deceiving market participants as to the true supply and/or demand, whether of a security or commodity. *See supra* p.14.[16]

In contrast to Judge Chin's analysis, in *Nanopierce Tech., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ 0767, 2008 WL 250553 (S.D.N.Y. Jan. 29, 2008) ("*Nanopierce I*"), Judge Sand recognized that the Second Circuit's decision in *ATSI* requires conduct that injects false information into the market or creates a false impression regarding supply and demand. *Id.* Accordingly, in light of *ATSI*, the court found that the defendant, who was accused of taking advantage of the struggling plaintiff company by negotiating a death spiral financing deal, and thereafter selling the plaintiff's stock in large volumes so as to drive down the price, did not engage in manipulation because the plaintiff failed to establish that the defendant's behavior was inherently deceptive. *Id.* at *2, 4. The court denied the plaintiff's motion to reconsider

---

[16] Again, even though Judge Chin refused to follow *ATSI* because it involved securities manipulation, in denying the motions to dismiss, Judge Chin relied on *SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), another securities manipulation case that ignored *ATSI*. *See CFTC v. Amaranth Advisors, L.L.C.*, 2008 WL 2123323 at *4-5.

*Nanopierce I*, stating that "[m]ere sales do not inject false information into the marketplace, nor can a party inject false information into the marketplace as required [by *ATSI*], simply by selling stock on the open market." *Nanopierce Tech., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ. 0767, 2008 WL 1882702, at *2 (S.D.N.Y. April 21, 2008) ("*Nanopierce II*") (citation omitted). The court explained, "[u]nusually large sales, without a doubt, cannot be the basis for a market manipulation claim after *ATSI*." *Id.*[17]

In contrast to the above CEA and securities manipulation cases, the conduct alleged here is nothing more than legitimate trading; no false reporting, wash sales, sales below prevailing bids or other deceptive activity is alleged. Plaintiffs' manipulation claim should be dismissed.

### 4.    The Complaint Fails To Allege Amaranth Advisors' Ability To Manipulate The Market.

The Complaint also lacks sufficient allegations that Amaranth Advisors had the ability to manipulate prices. In determining whether a trader has such ability, courts look at whether traders had to trade with the alleged manipulator. In this regard, the CFTC has observed:

> When analyzing the ability of the accused to influence market prices, we must recognize that there are two ways to satisfy futures obligations; offset in the futures market or delivery of the underlying commodity. *The accused lacks the ability to influence prices if other market participants can bypass his demands and extinguish their obligations elsewhere.*

*In re Cox*, CFTC Docket No. 75-16, 1987 WL 106879, at *4 (CFTC July 15, 1987) (emphasis added); *see also In re Indiana Farm Bureau*, 1982 WL 30249, at *8 ("without the ability to force shorts to deal with him either in the cash or futures market, the [long] manipulator is not able to

---

[17] *SEC v. Competitive Tech., Inc.*, No. 04 CV 1331, 2005 WL 1719725 (D. Conn. July 21, 2005), which is referred to in *Nanopierce II*, involves several trademark manipulative actions, such as "painting the tape" (placing successive, small-amount buy orders at increasing prices to simulate increased demand) and using "matching orders" (arranging identical buy and sell orders and other buy orders to simulate active trading and to offset the impact of other sales of the stock). *Id.* at *1. These traditional hallmarks of market manipulation are not alleged by Plaintiffs here.

successfully dictate prices because a short may buy grain from other sources"). The Complaint contains no allegations that market participants *had* to trade with Amaranth Advisors.

Indeed, the Seventh Circuit, which has seen many futures cases arising from the Chicago markets, has recognized the near impossibility of manipulating the futures market for a commodity without also gaining control over the physical market or the deliverable supply, explaining that absent such control, "there can never be a mismatch between demand and supply near the expiration, or at any other time." *Bd. of Trade of City of Chicago v. SEC*, 187 F.3d 713, 725 (7th Cir. 1999). Plaintiffs do not allege, nor could they, that Defendants had control over the deliverable supply of natural gas or even had control over any supply, because Amaranth Advisors was a trading entity lacking ability to take or deliver physical natural gas.

Plaintiffs' theory appears to be that Amaranth Advisors had the ability to cause artificial prices by virtue of its allegedly large positions. Some courts have considered the size of a trader's positions relative to existing open interest at the time of the alleged manipulation, finding positions in the 50 to 70 percent range possibly to be evidence of ability to manipulate prices. *See, e.g., Cargill*, 452 F.2d at 1164 ("On its face, ownership of 62 percent of the open contracts would appear to be a dominant interest."). The only allegations regarding Amaranth Advisors' open interest is that "[o]n almost every day from February through July 2006, Amaranth held more than 50% of the open interest on NYMEX in the January 2007 and November 2006 NYMEX natural gas futures contracts" (¶ 67), and that on July 31, 2006, Amaranth "increased [its] percentage of the March 2007 open interest from 46.68% to 58.01%" (¶ 98). Plaintiffs make no allegations regarding (1) open interest with respect to any of the remaining 69 NG contracts allegedly manipulated throughout the Class Period, and (2) open interest on *each* day during the Class Period as to any of the 72 NG contracts allegedly

-24-

manipulated.   Thus, Plaintiffs fail to plead adequately the ability to manipulate *all* 72 NG Contracts on *each day* during the Class Period.

> **5.** **The Complaint Fails To Allege Amaranth Advisors Caused Artificial Prices.**

Plaintiffs merely allege that "Amaranth intentionally caused artificial prices for all NYMEX natural gas contracts and artificial spreads throughout the Class Period" (¶ 178), without any factual basis as to how "Amaranth" caused artificial prices for these contracts. *See Manela v. Gottlieb*, 784 F. Supp. 84, 87-88 (S.D.N.Y. 1999) (dismissing complaint where "many of the allegations [we]re made against multiple defendants lumped together" and plaintiff's allegations did not "address actions taken or statements made" by the moving defendants with the requisite specificity).   Plaintiffs' causation allegations thus are also insufficient to sustain a manipulation claim.

## III.   THE SECONDARY LIABILITY ALLEGATIONS AGAINST DEFENDANTS ALSO FAIL TO STATE A CLAIM (COUNT II)

### A.   Aiding and Abetting

To plead an aiding and abetting claim under the CEA, Plaintiffs must allege facts to support: (1) a manipulation; (2) Defendants' knowledge of the principal's intent to manipulate; (3) Defendants' intent to further the manipulation; and (4) Defendants' provision of substantial assistance to the primary manipulators in committing the manipulation.[18]  *See Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005) (citations omitted); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004) ("*Natural Gas I*").  Plaintiffs do not meet their burden.

---

[18] The other Defendants' motions demonstrate that Plaintiffs failed to allege manipulation under the CEA against any other Defendant.  Thus, Plaintiffs' aiding and abetting claim must fail.  *See Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996).

In this regard, not only must defendants "know of the principal's violation of law, they must willfully assist in the violation and share the principal's intent." *Benfield v. Mocatta Metals Corp.*, No. 91-CIV-8255 (LJF), 1992 WL 58879, at *6 (S.D.N.Y. Mar. 13, 1992) (citations omitted). Further, "it must be shown that the assistance rendered was substantial." *Johnson*, 408 F. Supp. 2d at 268; s*ee also Benfield*, 1992 WL 58879, at *20. "Substantial assistance exists where the alleged aider and abettor has played an active role in furthering the [] violation." *Thornock v. Kinderhill Corp.*, 749 F. Supp. 513, 516 (S.D.N.Y. 1990).

### 1.    AGI and AMLP

As to AGI and AMLP, as discussed *supra* in Section II(A), the Complaint fails to connect the two distinct entities to any manipulative acts. The Complaint merely alleges each Defendant aided and abetted a CEA manipulation violation by the "Amaranth Defendants" (¶¶ 244-249, 251, 252), allegations insufficient to satisfy Rule 9(b) or Rule 8. *See supra* pp. 10-11 (insufficiency of group pleading).

Second, Plaintiffs also fail to plead sufficient facts regarding the requisite knowledge or intent. The Complaint does not allege that AGI or AMLP actually knew of any alleged manipulative activities of any Defendant, let alone that they specifically intended to assist such alleged activities. Instead, Plaintiffs simply assert that AGI "was general partner of [AMLP], controlled Amaranth Advisors, [and] employed the natural gas traders." (¶ 248). Likewise, Plaintiffs merely plead that AMLP "controlled and substantially owned Amaranth Advisors." (¶ 247). These allegations fail to plead that AGI or AMLP had actual knowledge of Amaranth Advisors' trading positions or strategy, let alone any alleged manipulation, and certainly do not plead facts supporting an inference of specific intent to further any manipulation.

Third, Plaintiffs have not pled that AMLP or AGI rendered substantial assistance in support of any alleged manipulation. Plaintiffs simply allege that AMLP had an ownership

interest in Amaranth Advisors. (¶ 24). Mere ownership does not equal substantial assistance. *See Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 671-72 (S.D.N.Y. 1996). As to AGI, Plaintiffs merely assert it provided employee services to Amaranth Advisors. (¶¶ 25, 248). Plaintiffs do not allege that they did so for any purpose other than for the investment manager to carry out its daily activities. Such allegations fail to plead substantial assistance. *Cf. Stander v. Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1286 (S.D.N.Y. 1990) ("the simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker").

### 2. Nicholas Maounis

Plaintiffs' claim against Mr. Maounis for aiding and abetting fails to allege a single fact to show that Mr. Maounis substantially assisted in the commission of the alleged violation. As discussed *supra* in Section II(B), the Complaint fails to connect Mr. Maounis to any manipulative acts. Allegations that Mr. Maounis served as "owner" and "chief executive" do not suffice. *Benfield*, 1992 WL 58879, at *6 (allegation that defendants allowed principal to market certain precious metal options, absent allegations showing that the defendants were involved in the fraud itself, was insufficient to withstand motion to dismiss). Moreover, nowhere in the Complaint do Plaintiffs allege, as they must, that Mr. Maounis had knowledge of, much less the specific intent to assist in, the alleged manipulation.[19] Plaintiffs' aiding and abetting claim against Mr. Maounis simply never gets off the ground.

---

[19] It is not surprising that Plaintiffs have failed to allege that Mr. Maounis knew of the alleged misconduct or had the specific intent to aid in the alleged manipulation, in light of the fact that the investigations by the PSI, the CFTC and FERC have not resulted in Mr. Maounis being charged, let alone found culpable. *See supra*, p. 6.

### 3. Amaranth Advisors

Plaintiffs' claim against Amaranth Advisors for allegedly aiding and abetting the "Amaranth Defendants[']" manipulation (¶¶ 244, 246-49) must be dismissed for failure to allege the requisite elements pursuant to Rule 9(b)[20] and/or for failure to set forth "plausible" grounds for relief under *Twombly*. The Complaint merely alleges that each Defendant aided and abetted a manipulation violation under the CEA by the "Amaranth Defendants" (¶¶ 244-249, 251, 252), another instance of group pleading. Plaintiffs also fail to plead facts demonstrating the requisite knowledge. Under the CEA, actual knowledge or "specific unlawful intent" is required. *See In re Richardson Sec., Inc.*, Comm. Fut. L. Rep. (CCH) 21,145, at 24,642-46 (CFTC Jan. 27, 1981) (Mollón Dec. Ex. D). All that is alleged is that Amaranth Advisors knew about its own trading positions. But, as discussed *supra* in Section II(C)(3), large trading positions alone are not evidence of manipulative activity. There are no facts alleged to infer that Amaranth Advisors specifically intended to assist in a manipulation.

Moreover, the Complaint contains only conclusory allegations as to actions by Amaranth Advisors and fails to show that "the assistance rendered was substantial." *Johnson*, 408 F. Supp. 2d at 268. Plaintiffs merely plead that Amaranth Advisors served as the "investment advisor and manager of the Amaranth Defendants" (¶ 244), but Amaranth Advisors served as the investment advisor of just the Master Fund. Moreover, as to Amaranth Advisors (Calgary) ULC, Plaintiffs simply plead they "allowed the natural gas traders to be based in Calgary." (¶ 249). The Complaint does not explain how "allowing" traders to be based in Calgary, a hub for natural gas trading, means that Amaranth Advisors (Calgary) ULC knowingly provided substantial assistance to a purported manipulation.

---

[20] As Rule 9(b) applies to Plaintiffs' manipulation claim, it also applies to the aiding and abetting manipulation claim. *See Krause*, 356 F. Supp. 2d at 339 n.50.

### B.     CEA Section 2(a)(1)(B) Claim

CEA Section 2(a)(1)(B) creates liability if (1) the violator acted as the other's agent when he engaged in the unlawful activity, and (2) the violator's actions were within the scope of his employment or office.  *See Guttman v. CFTC*, 197 F.3d 33, 37 n.6 (2d Cir. 1999).  A Section 2(a)(1)(B) claim of secondary liability for manipulation is also subject to Rule 9(b).  *See Kolbeck*, 923 F. Supp. at 569.  Plaintiffs' claim that all Defendants are liable as principals for the acts of their agents, the "Amaranth Defendants," is universally recognized as insufficient.  *See id.* ("Broad allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another . . . do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b).") (citations omitted).  Indeed, the allegations are so generic that Plaintiffs do not even give fair notice of the grounds for their claims pursuant to Rule 8(a).  *See Leibowitz v. Cornell Univ.*, 445 F.3d 586, 591 (2d Cir. 2006); *Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *9-10, n.7 (S.D.N.Y. July 17, 2007) (dismissing claims for failure to give "fair notice" where plaintiffs made allegations against four collective defendants without identifying with specificity the enterprise(s) involved in the violations).[21]

### 1.     AGI and AMLP

#### a.     The Complaint Does Not Allege Agency Between Either AGI And AMLP And Any Other Defendant

The Complaint fails to allege agency between AMLP or AGI and any other Defendant. Plaintiffs must allege "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of that undertaking; and (3) the understanding of the parties that the

---

[21] If the Court dismisses the manipulation claim, there of course cannot be vicarious liability. *See Kolbeck*, 923 F. Supp. at 570.

principal is to be in control of the undertaking." *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 522 (2d Cir. 2006) (citations omitted). There are no allegations that: (1) either entity ever gave authority to any Defendant to trade NG contracts on its behalf; (2) that any Defendant ever accepted such an undertaking; or (3) that there was an understanding that either entity was to be in control of trading NG contracts.

At most, Plaintiffs allege a remote connection between AMLP and AGI and Amaranth Advisors, based solely on AMLP's non-managing member interest in Amaranth Advisors L.L.C., AGI's one-percent ownership interest in AMLP, and shared associational names. *Id*. But none of these characteristics are enough to establish an agency relationship. Merely asserting that AGI and AMLP were "principals" in a conclusory manner is not enough to survive a Rule 12(b)(6) motion to dismiss.[22]

Moreover, the only allegation tying any individual Defendant to either AMLP or AGI is that AGI allegedly employed the three individual Defendants, but there are no factual allegations that AGI *controlled* any employee's trading or investing activities, necessary for agency. *See Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 GBD, 2004 WL 112948, at *4 (S.D.N.Y. Jan. 22, 2004). Even Plaintiffs concede this point as they plead that Amaranth Advisors, not AGI, "directed the investments." (¶ 22). Plaintiffs also contradict themselves and plead that Amaranth Advisors "employed the natural gas traders." (¶¶ 22, 248).

---

[22] The Complaint characterizes a host of distinct legal entities as a "tightly knit association-in-fact, which operated as a single entity" (¶¶ 29, 32), suggesting that Amaranth Advisors is the alter ego of AMLP and AGI. Plaintiffs' allegations as to AGI or AMLP do not come close to satisfying either prong of the test necessary to such a theory for "piercing the corporate veil." *See infra* pp. 33-35. Moreover, for the reasons stated in the Passive Investor Funds' Memorandum of Law, following the Supreme Court's decision in *Stoneridge Inv. Partners, LLC v. Scientific Atlanta*, -- U.S. --, 128 S. Ct. 761 (2008), there can no longer be a CEA private right of action for vicarious liability because the statute is silent in that regard. *Id.* at 772.

Plaintiffs otherwise rely on vague and conclusory allegations, which are insufficient under Section 2(a)(1)(B). *See In re Natural Gas I*, 337 F. Supp. 2d at 516 (dismissing CEA agency claims where plaintiffs' allegations did not allege a sufficient relationship between the parent corporation and the subsidiary upon which a principal-agent relationship could be inferred).

### b.    Plaintiffs Cannot Allege Agency Based Solely on A Corporate Relationship, Shared Associational Name And Ownership Interests

AGI and AMLP are not aware of any case in which a court has held a corporation liable under an agency theory for the actions of its subsidiary under CEA Section 2(a)(1)(B). Indeed, the court in *Natural Gas I* rejected the notion of holding a corporate parent liable for the acts of its subsidiary under Section 2(a)(1)(B). *See id.* at 515. The court held that agency requires more than "mere ownership" by the parent of the subsidiary, as such allegations "lack [] in detail" and are insufficient to allege a principal-agent relationship under Section 2(a)(1)(B). *Id.* at 515-16. Thus, AMLP's non-managing member interest in Amaranth Advisors and AGI's one percent interest in AMLP cannot result in their liability under agency.

Moreover, courts have held that sharing an associational name is not enough to allege agency between distinct legal entities. *See Merrill Lynch Inv. Mgrs. v. OptiBase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (declining to find an investment manager the principal of a broker-dealer where: 1) the two entities were "owned and controlled" by the same company; 2) two officers of the company that owned the two entities served as officers of the investment manager; 3) the broker-dealers' brokers offered clients products offered by affiliate entities who were advised by the investment manager; 4) the investment manager marketed the entire affiliate family of companies' services; and 5) that the affiliate companies present to the public the image of a single, integrated firm); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 170 (D. Mass.

-31-

2002) (dismissing a securities fraud class action, and stating that "[s]everal courts have declined to treat different firms as a single entity, holding them jointly and severally liable for one another's acts, simply because they shared an associational name") (citations omitted).

### 2.    Nicholas Maounis

Plaintiffs' effort to state a claim against Mr. Maounis under the CEA's agency provision fails for two distinct reasons.  First, the Complaint fails to provide even the most basic factual support necessary under either Rule 9(b) or 8(a) to show that Mr. Maounis, a CEO and investor in an LLC, was the "principal" of any of the other Defendants.  Second, Plaintiffs may not use agency law to make an end run around the corporate form.  As discussed *infra*, subsection b, because Plaintiffs have failed to plead an alter ego claim, their agency claim must be dismissed.

### a.    The Complaint Does Not Allege A Principal-Agent Relationship Between Mr. Maounis And Any Other Defendant

The Complaint does not allege any of the required elements of agency between Mr. Maounis and any other Defendant.  There is no allegation that:  (1) Mr. Maounis ever gave authority to any of the other Defendants to trade natural gas futures contracts on his behalf; (2) any other Defendant ever accepted such an undertaking; or (3) there was an "understanding" that Mr. Maounis was to be in control of the trading of natural gas futures contracts, which he had never traded himself.  *See Nuevo Mundo*, 2004 WL 11294, at * 4; *Cabrera v. Jakabovitz,* 24 F.3d 372, 386 (2d Cir. 1994).  Nor does the Complaint allege any special circumstances necessary to avoid the ordinary rule that a corporate officer and owner is not vicariously liable for the acts of a corporation or its employees or agents, even if he technically controlled or had the right to control an employee's actions.  *Meyer v. Holley*, 537 U.S. 280, 286 (2003).

Consistent with the rest of their allegations against Mr. Maounis, Plaintiffs offer only the barest conclusion of agency:  that the Amaranth Defendants operated "under the direction of

Defendant Maounis … [who] is also liable … for the acts of his officials, agents, or other persons acting within the scope of their employment or office, including the Amaranth Defendants." (¶ 29). Plaintiffs' wholly conclusory allegations are fatal, certainly under the heightened pleading requirements of Rule 9(b), but also under Rule 8(a) pleading standards. "[T]o withstand defendants' motion to dismiss, [plaintiffs'] complaint must clearly and specifically articulate allegations of fact which can support the existence of [an agency] relationship." *Nuevo Mundo,* 2004 WL 11294, at *4. The Complaint does not come close to meeting the legal requirements, whatever the standard of pleading. Therefore, the agency claim against Mr. Maounis must be dismissed.

### b.    Plaintiffs Do Not Allege The Requisites For Alter Ego Liability

The Complaint also appears to assert an "alter ego" theory of liability against Mr. Maounis. If Plaintiffs intend to plead it, the alter ego claim must be dismissed because Plaintiffs have offered no facts in support of such a claim. *See* ¶ 29.[23] To state a claim for alter ego liability, a complaint must allege facts to show "(i) that the [defendant] exercised complete domination over the [corporate entities] with respect to the transaction[s] at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (citations omitted); *accord Cary Oil Co., Inc. v. MG Refin. & Mktg., Inc.,* 230 F. Supp. 2d 439, 458 (S.D.N.Y. 2002). "To avoid dismissal, a party seeking application of the doctrine must come

---

[23] Paragraph 29 alleges merely that Mr. Maounis "directed" the Amaranth Defendants, "an association-in fact, which operated as a single entity under [his] direction." The ambiguity of Paragraph 29 leaves Defendants to guess whether Plaintiffs actually intended to bring an alter ego claim. Because of this ambiguity alone, the claim should be dismissed. *Christopher v. Harbury*, 536 U.S. 403, 418 (2002) (dismissing case where defendants were left to guess the cause of action). The Complaint fails the basic purpose to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 127 S. Ct. at 1959.

forward with factual allegations as to both elements of the veil-piercing claim." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005). "[P]urely conclusory allegations cannot suffice to state a claim based on [] alter-ego liability . . . ." *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003).[24]  Here, Plaintiffs have not alleged any facts in support of either element.[25]

With respect to the first prong, the Complaint's conclusory allegation is that Amaranth "operated as a single entity under the direction of Defendant Maounis," and that Mr. Maounis had "*de jure* and *de facto* control over the Amaranth Defendants, each of which acted under the direction, and at the behest, of, Defendant Maounis." (¶ 29).  This falls well short of alleging *facts* sufficient to establish the first element of an alter ego claim.  An "unadorned invocation of dominion and control is simply not enough." *In re Currency Conversion*, 265 F. Supp. 2d at 42. Moreover, "mere ownership of a controlling number of shares … is never enough on its own to demonstrate the level of direct intervention necessary for veil piercing." *Sahu v. Union Carbide Corp.,* No. 04 Civ. 8825, 2006 WL 3377577, at *4 (S.D.N.Y. Nov. 20, 2006).  Accordingly, courts in this District routinely dismiss alter ego claims based on allegations nearly identical to those proffered here. *See, e.g.,* *Zinaman v. USTS New York, Inc.*, 798 F. Supp. 128, 132 (S.D.N.Y. 1992) (allegation that parent "owns and controls" subsidiary insufficient "to plead the

---

[24] Although the alter ego claim fails to satisfy even the more liberal pleading standard of Rule 8, because Plaintiffs' claims sound in fraud, the alter ego allegations must themselves meet the heightened pleading requirement of Rule 9(b). *See, e.g., Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 434 (S.D.N.Y. 2000) (Scheindlin, J.).

[25] Courts are reluctant to pierce the corporate veil and will only do so under "extraordinary circumstances." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).  The principle of limited liability "serves the important social purpose of encouraging investment by individuals who are risk averse and therefore will not invest … in an enterprise if by doing so they expose their entire wealth to the hazards of litigation." *Browning-Ferris Indus. of Ill. v. Ter Maat*, 195 F.3d 953, 959 (7th Cir. 1999).  Thus, plaintiffs seeking to pierce an LLC's veil to reach its owner or principal must satisfy a "heavy burden." *See, e.g., Feitshans v. Kahn*, No. 06 Civ. 2125, 2007 WL 2438411, at *3 (S.D.N.Y. Aug. 24, 2007).

'control and domination'"); *In re Currency Conversion*, 265 F. Supp. 2d at 436 (allegations that "bank holding company exercised such dominion and control" and that "defendants were wholly owned subsidiaries of their respective bank holding companies" insufficient to plead alter ego).

As to the second prong, Plaintiffs allege no facts supporting a finding that Mr. Maounis used the corporate form to commit a fraud or wrong against them.  Plaintiffs have not alleged a single fact that Mr. Maounis had anything to do with any alleged manipulation, let alone "used" the corporate form to do so.  *See EED Holdings*, 228 F.R.D. at 512 (dismissing piercing claim against sole shareholder and director of two related entities because the complaint failed to establish that the director's domination of the entities was the means by which the wrong was done to plaintiff).  Accordingly, the Complaint lacks any support under either prong of the applicable test for holding Mr. Maounis liable under an alter ego theory.

### c.    Plaintiffs May Not Make An End Run Around The Corporate Form By Asserting Agency Liability Under The CEA

Plaintiffs' failure to allege facts sufficient to pierce the corporate veil also warrants dismissal of the principal-agent claims against Mr. Maounis.  Where, as here, Plaintiffs seek to hold an individual liable based on agency principles when that person would be shielded from liability under principles of corporate law, Plaintiffs must satisfy the test for piercing the corporate veil.  *Kashfi v. Phibro-Salomon*, 628 F. Supp. 727, 735 (S.D.N.Y. 1986); *Natural Gas I*, 337 F. Supp. 2d at 515 (recognizing that Section 2(a)(1)(B) of the CEA must be understood in light of the "equally well-established principles limiting piercing a corporate veil").

Application of the veil-piercing test to an alleged agency relationship "prevents a putative plaintiff from making an end run around the 'piercing the corporate veil' doctrine by styling its claim in agency terms."  *Royal Indus., Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 413 (S.D.N.Y.

1996).  It would make little sense for courts to enforce with care the limits of the veil-piercing law if a plaintiff could simply recharacterize their claim as one for agency.  This rationale applies with particular force here, where Plaintiffs seek to hold Mr. Maounis liable for the alleged misconduct of an employee of a corporation in which he has invested and is an officer:  "[T]he avoidance of personal liability for obligations incurred by a business enterprise is one of the fundamental purposes of doing business in a [limited liability] form."  *Sahu*, 2006 WL 337757, at *3 (citations omitted).  Accordingly, courts have consistently held that the owner or officer of a corporation will not be held vicariously liable for violations of a federal statute by a corporation, its employees or agents absent "special circumstances," such as facts indicating that the owner or officer was personally involved in the alleged conduct.  *See Meyer*, 537 U.S. at 285-28.  If the allegations of "control" and domination are insufficient to justify piercing the veil, then they cannot be sufficient to permit the same result simply by labeling Mr. Maounis as a "principal" for whom others at Amaranth Advisors were acting as "agents."

### 3.    Amaranth Advisors

The Complaint also fails to state a claim against Amaranth Advisors as principals liable for actions of their alleged agents, the "Amaranth Defendants."  Any alleged manipulation would be outside the scope of activity for which Amaranth Advisors can be liable.  When an employee "departs from the line of his duty so that for the time being his acts constitute an abandonment of his service, the master is not liable."  *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933, 693 N.Y.S. 2d 67, 68 (1999) (citations omitted).  *See also O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 529 F. Supp. 1179, 1194 (S.D.N.Y. 1981) ("Insider trading and tipping cannot ordinarily [be] said to be within the course of employment."); *Moss v. Morgan Stanley, Inc.*, 553 F. Supp. 1347, 1356 (S.D.N.Y. 1983) (same).  Indeed, the Second Circuit has held that when an employee breaches its duties to its employer, the employer cannot be held vicariously liable.  *See*

*In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1994) (affirming dismissal of vicarious liability claim against employer for its employee's wrongful disclosure of confidential information because the vice-president had a fiduciary duty to employer not to disclose confidential information).

Here, any manipulative trades would fall outside the permissible ambit of employment. Amaranth Advisors' employees owed a duty to act professionally and ethically so as not to knowingly violate any law or NYMEX trading rule. Indeed, as pled, Amaranth Advisors had compliance personnel to ensure that traders were educated as to anti-manipulation practices. (¶¶ 30, 204). Clearly, any employee's improper trading was not authorized, and thus, the employee would have been acting outside the scope of their employment.

### C.    CEA Section 13(b)

Count Two's CEA Section 13(b) control person claim must be dismissed as to Amaranth Advisors, AGI, AMLP, and Mr. Maounis as Section 13(b) provides standing only to the CFTC, not to private parties.[26] 7 U.S.C. § 13c(b) (a person who "controls any person who has violated [the CEA] may be held liable for such violation *in any action brought by the Commission*") (emphasis added). *See also Michelson v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 619 F. Supp. 727, 739 (S.D.N.Y. 1995) (finding no private right of action under § 13(b)).

### D.    Rule 166.3

Count Two's failure to supervise claim under Rule 166.3, 317 C.F.R. § 166.3, against Amaranth Advisors, AGI, AMLP and Mr. Maounis similarly fails because there is no private

---

[26] In Count Two, Plaintiffs allege that Amaranth Advisors, AGI, AMLP and Mr. Maounis are liable as "controlling person[s]" under Section 4b of the CEA, 7 U.S.C. § 6(b), the CEA's anti-fraud provision. (Compl. ¶ 255). It appears Plaintiffs mis-cited Section 4b, but to the extent Plaintiffs intended to assert a claim thereunder, they fail for two reasons. First, a general fraud on the market is not recognized under Section 4b. *See Korwek v. Hunt*, 646 F. Supp. 953, 972 (S.D.N.Y. 1986). Second, Plaintiffs fail to satisfy Rule 9(b). *See Kolbeck*, 923 F. Supp. at 568.

right of action for violations of that rule provision.  *See Fustok v. Conticommodity Servs. Inc.*, 618 F. Supp. 1069, 1070 (S.D.N.Y. 1985) (recognizing that Rule 166.3 does not create a private right of action).  Further, Rule 166.3 only applies to CFTC registrants, and Plaintiffs have not (and could not) allege that Amaranth Advisors, AGI, AMLP or Mr. Maounis were CFTC registrants during the Class Period.  17 C.F.R. § 166.3 ("Each Commission registrant . . . must diligently supervise . . . ."); *CFTC v. Commodities Fluctuations Sys., Inc.*, 583 F. Supp. 1382 (S.D.N.Y. 1984) (discussing Rule 166.3's applicability to registrants).  Accordingly, the Rule 166.3 claim should be dismissed.

## IV.    PLAINTIFFS FAIL TO PLEAD THE REQUIRED ELEMENTS OF UNJUST ENRICHMENT (COUNT V)

Plaintiffs' unjust enrichment claim fails for two reasons.[27]  First, Plaintiffs have not pled the requisite contractual or quasi-contractual relationship with any Defendant.  *See Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003) (unjust enrichment is "an alternative to contract, where a contractual relationship has legitimately failed").  There is not a single allegation of any contract between any Plaintiff and any Defendant.  At most, Plaintiffs have alleged a contemporaneous trading relationship with some of the Defendants, which does not suffice.  *See In re Motel 6 Secs. Litig.*, 161 F. Supp. 2d 227, 232 (S.D.N.Y. 2001) (dismissing unjust enrichment claim where Plaintiffs alleged a "contemporaneous trading relationship"); *see also CompuDyne, Corp. v. Shane*, 453 F. Supp. 2d 807, 833 (S.D.N.Y. 2006) (dismissing unjust enrichment claim because plaintiffs did not allege they were counterparties to any of the purported unlawful trades).  Indeed, as to AGI, AMLP, and Mr. Maounis, there is not even an allegation that they engaged in any trading of any kind.

---

[27] If the Court finds no underlying CEA violation, there can be no unlawful act upon which the unjust enrichment claim can rest, and thus must be dismissed.  *See Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995).

Second, Plaintiffs do not allege that Defendants benefited at Plaintiffs' *direct* expense. *See In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007) (dismissing unjust enrichment claim as it only alleged in a conclusory manner that the defendants were unjustly enriched and did not plead that defendants received any money from the plaintiffs during the class period). Plaintiffs' recitation of facts upon which manipulation could be found is not enough. *See Mina Inv. Holdings Ltd. v. Lefkowitz*, 51 F. Supp. 2d 486 (S.D.N.Y. 1999) (holding that allegations upon which dilution in stock price (due to the defendants' unlawful acts) could be found was not enough to allege that the defendants' enrichment came at the plaintiff-shareholders' expense). At the very *most*, this is what Plaintiffs have done in their Complaint. Moreover, as Plaintiffs concede, Defendants lost money on their trades (¶¶ 170-71), so it is impossible for Defendants to possess money belonging to Plaintiffs.[28]

## V.    THE ELEMENTS FOR A CONSTRUCTIVE TRUST HAVE NOT BEEN PLED

Plaintiffs also are not entitled to the establishment of a constructive trust. (¶ 270). New York law generally requires four elements for a constructive trust: 1) a confidential or fiduciary relationship; 2) a promise; 3) transfer in reliance on the promise; and 4) unjust enrichment. *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (rejecting request for a constructive trust because Plaintiffs fail to establish an unjust enrichment). Even if Plaintiffs' unjust enrichment claim survives, the constructive trust claim fails because Plaintiffs allege no facts as to the existence of a confidential or fiduciary relationship, or that any promise, much less a transfer in reliance on such a promise, was made between any Plaintiff and any Defendant. *See*

---

[28] Furthermore, AGI, AMLP and Mr. Maounis could not have received the necessary direct benefit at Plaintiffs' expense since they did not trade. Even if a trading Defendant received a direct benefit, which they did not, any resulting "benefit" to non-traders AGI, AMLP and Mr. Maounis would have been too attenuated to support a claim for unjust enrichment. *See Bangkok Crafts Corp. v. Capitalo di San Piertro in Vaticano*, 331 F. Supp. 2d 247, 256 (S.D.N.Y. 2004).

*Modica v. Modica*, 15 A.D.3d 635, 791 N.Y.S.2d 134 (2d Dep't 2005) (affirming dismissal of constructive trust claim where the plaintiffs could not show a promise, transfer in reliance, or unjust enrichment).

## VI.    DISMISSAL SHOULD BE WITH PREJUDICE

The Complaint should be dismissed with prejudice because not only have Plaintiffs had the benefit of extensive pre-Complaint information, they have had several opportunities to amend *after* obtaining such information.    The opportunities were: (1) upon filing the initial consolidated complaint; (2) upon filing the instant amended Complaint; (3) after receipt of Defendants' six separate pre-motion letters setting forth the basis for each Defendant's dismissal motion; (4) after receiving Defendants' initial dismissal motions to which Plaintiffs asked for leave to file excess pages; and (5) after additional discussion and exchange of e-mails between Plaintiffs' counsel and defense counsel regarding deficiencies in the Complaint prior to filing of the instant motion.    Therefore, because of "the procedural history of this case, which provided plaintiffs with numerous opportunities to amend as well as full notice of the deficiencies in their Consolidated Amended Complaint," dismissal should be with prejudice.    *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *4 (S.D.N.Y. Sept. 8, 2007) (dismissing complaint with prejudice after similar opportunities as here to amend).

## CONCLUSION

For all the foregoing reasons, and those stated in the briefs submitted by the other Defendants, Amaranth Advisors, AGI, AMLP and Mr. Maounis respectfully request that this Court dismiss the Complaint in its entirely with prejudice and grant such other relief as this Court deems just and proper.

Respectfully Submitted,                                              Dated: June 23, 2008
                                                                                        New York, New York

WINSTON & STRAWN LLP

By: /s/ David E. Mollón

David E. Mollón (DM-5624)
Steven M. Schwartz (SS-4216)
dmollon@winston.com
sschwartz@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700

Stephen J. Senderowitz (Of Counsel)
Kristen V. Grisius (Of Counsel)
Gretchen A. Vetter (Of Counsel)
ssenderowitz@winston.com
kgrisius@winston.com
gvetter@winston.com

35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

*Attorneys for Defendants*
*Amaranth Advisors L.L.C.,*
*Amaranth Advisors (Calgary) ULC,*
*Amaranth Group Inc., and*
*Amaranth Management Limited Partnership*


HELLER EHRMAN LLP

Geoffrey F. Aronow (*pro hac vice*)
Thomas S. Kimbrell (*pro hac vice*)
geoffrey.aronow@hellerehrman.com
thomas.kimbrell@hellerehrman.com

1717 Rhode Island Avenue NW
Washington, DC 20016
(202) 912-2000

Richard S. Goldstein (RG-9560)
Andrew Levine (AL-3552)
richard.goldstein@hellerehrman.com
andrew.levine@hellerehrman.com

Times Square Tower
7 Times Square
New York, NY 10036
(212) 832-8300

*Attorneys for Defendant Nicholas M. Maounis*