# Exhibit A

*United States Senate*
## *PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Norm Coleman, Ranking Minority Member*


JOINT ANALYSIS PREPARED BY
MAJORITY AND MINORITY STAFFS OF THE
SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
OF
MICHAEL GREENBERGER TESTIMONY
BEFORE
SENATE COMMITTEE ON COMMERCE, SCIENCE AND TRANSPORTATION
ON JUNE 3, 2008

June 24, 2008


Because many questions have been directed to the Senate Permanent Subcommittee on Investigations (PSI) about the written and oral testimony of Michael Greenberger before the Senate Committee on Commerce, Science and Transportation on June 3, 2008, we have prepared this analysis of the major issues he raised involving: (1) the recently enacted law to close the "Enron loophole," and (2) recent legislative proposals and administrative actions taken to strengthen U.S. oversight of futures contracts traded from within the United States on a foreign exchange.

The identified statements are excerpted from Mr. Greenberger's oral testimony or, where a page number is provided, from his prepared statement.

## ISSUES RELATED TO CLOSING THE ENRON LOOPHOLE

1.  **STATEMENT:**  *"[The legislation to close the Enron loophole] . . .  is the biggest joke in the world because it was written by the exchange that needs to be regulated."*

   **STATEMENT (p.3):** *"Virtually all parties now agree the Enron loophole must be repealed."*

   **RESPONSE:**  The legislation to close the Enron loophole was written by the United States Congress, not the Intercontinental Exchange.  Closing the Enron loophole has been the subject of repeated bills introduced on this subject since 2002.  In the fall of 2007, following a PSI report and hearings on excessive speculation and the resulting move in Congress towards legislative reforms, the Commodity Futures Trading Commission (CFTC) and the President's Working Group (consisting of the Departments of Treasury, the Federal Reserve, the Securities and Exchange Commission, and the CFTC) submitted to Congress draft legislation to close the Enron

loophole.  That draft underwent significant revision during the legislative process, including numerous significant changes proposed by Senators Levin, Feinstein, Snowe, Coleman and others.  The final language was the product of extensive bipartisan negotiations in both Houses of Congress and a conference committee led by the House and Senate Agriculture Committees. Throughout the legislative process ICE expressed numerous disagreements with many of the provisions in the various drafts of this legislation.  The final legislation did not include many of the provisions that ICE had sought.

The compromise legislation finally enacted into law as part of the Farm Bill enjoyed strong bipartisan support from Members in both Houses and from many energy, agricultural, consumer, and industrial organizations.[1] We are unaware of any consensus to alter this legislation, which represents a bipartisan achievement after years of work.

───────────

**2.  STATEMENT:** *"The End the Enron Loophole, because it was written by the Intercontinental Exchange, handed to the CFTC and then handed to Congress, does not deal with crude oil."*

**STATEMENT (p.4):** *"Thus, by CFTC pronouncement, crude oil, gasoline and heating oil futures will not be covered by the new legislation."*

**RESPONSE:**  These statements are incorrect or may leave an incorrect impression.  The law enacted by Congress to close the Enron loophole regulates the electronic trading of all types of energy and metal commodities on Exempt Commercial Markets without exception, including crude oil, gasoline, and heating oil, if the relevant contracts perform a significant price discovery function.  The CFTC has not made any statements or decisions to exempt any class of commodities or energy contracts from CFTC oversight under the new law.  At the same time, as a practical matter, the new law will not affect current trading of U.S. crude oil, gasoline, and heating oil futures contracts -- not because of who drafted the law or because of any gaps in the legislation -- but because futures contracts in those commodities are not currently being traded on U.S. Exempt Commercial Markets.  Rather, futures contracts in these commodities are being traded on futures exchanges in the United States and United Kingdom.  Should any of those energy commodities ever be traded on Exempt Commercial Markets, the new law makes it clear that the CFTC will be able to exercise oversight over them.  As a result of the legislation to close the Enron loophole, traders will no longer have the opportunity to trade crude oil, gasoline, or home heating oil on U.S. electronic markets without CFTC oversight.

───────────

[1]  This legislation was supported by the American Public Gas Association, American Public Power Association, Consumer Federation of America, Environmental Defense, Industrial Energy Consumers of America, Independent Oil Marketers Association of New England, Mid-Atlantic Petroleum Distributor's Association, National Association of Convenience Stores, National Association of Truck Stop Operators, National Association of Wheat Growers, National Barley Growers Association, National Farmers Union, National Grange, National Rural Electrical Cooperative Association, New England Fuel Institute, Pacific Northwest Oilheat Council, Petroleum Marketers Association of America, Petroleum Transportation and Storage Association, Public Citizen, Society of Independent Gasoline Marketers of America, Steel Manufacturers Association, and Western Petroleum Marketers Association.

3

**3. STATEMENT (p.4):** *". . . the Farm Bill amendment requires the CFTC and the public to prove on a case-by-case basis through lengthy administrative proceedings that an individual energy contract should be regulated if the CFTC can prove that contract 'serve[s] a significant price discovery function" in order to detect and prevent manipulation."*

**STATEMENT:** *"[The legislation to close the Enron loophole] puts 1,000 burdens on the CFTC and the public to prove that there needs to be regulation."*

**STATEMENT:** *"[The CFTC] has to go through complicated administrative hearings, which I can tell you will be challenged vigorously by people who can afford to make those challenges, and will have to prove by substantial evidence that that contract will be regulated."*

**STATEMENT (p.4):** *"It will doubtless be followed by lengthy and costly judicial challenges during which the CFTC and energy consuming public will be required to show that its difficult burden has not been met."*

**RESPONSE:** These statements are incorrect. The new law does not place any burden on the public, does not require extensive administrative proceedings to determine that a contract performs a significant price discovery function and is subject to CFTC oversight, and does not authorize judicial challenges to CFTC decisions in this area. To the contrary, the law explicitly gives the CFTC the "discretion" to determine which contracts perform significant price discovery functions and are subject to CFTC oversight. The statute and legislative history make it clear that formal administrative proceedings are not required and judicial challenges are not permitted. For example, during the Senate's consideration of the legislation, Senator Levin explained:

> The legislation also states clearly that a CFTC determination that a contract performs a significant price discovery function is a determination that is within the Commission's discretion; this determination is not intended to be subject to formal challenge through administrative proceedings."

The Statement of Managers in the Conference Report states:

> "The Managers do not intend that the Commission conduct an exhaustive annual examination of every contract traded on an electronic trading facility pursuant to the section 2(h)(3) exemption, but instead to concentrate on those contracts that are most likely to meet the criteria for performing a significant price discovery function.

The law directs the CFTC to determine which contracts are performing significant price discovery functions within 180 days of promulgating regulations setting forth the criteria to be considered when evaluating individual contracts.

_____

**4.  STATEMENT:**  *"The CFTC has said that farm bill amendment [sic] will affect one out of thousands of energy contracts."*

  **STATEMENT (p.4):**  *This contract-by-contract process will take months, if not years, to complete and it will then only apply to a single contract."*

  **RESPONSE:**   These statements are incorrect.  The CFTC has not made any statements or provided any indication of the number of commodities or contracts that will likely be determined to perform a significant price discovery function.  The CFTC certainly has not indicated that only one contract will be covered.  To the contrary, informed observers indicate multiple contracts are likely to qualify for CFTC oversight.

───────

**5.  STATEMENT (p.4):** *"Moreover, the Farm Bill's attempt to end the Enron Loophole will doubtless lead to further regulatory arbitrage.  If the CFTC should be able to prove that an individual energy futures contract has contract has [sic] a 'significant price discovery function,' and thus should be subject to regulation, traders will almost certainly simply move their trading to equivalent contracts that remain exempt from regulation."*

  **RESPONSE:**  Mr. Greenberger appears to be predicting that if the CFTC determines that one particular contract performs a significant price discovery function, then traders will begin trading a different contract that hasn't been deemed to perform a significant price discovery function and isn't subject to CFTC oversight.  Practical obstacles and the design of the new law, however, make this type of maneuvering unlikely.

        First, it is much more difficult for a trader to use a contract that does not perform a price discovery function since, by definition, it will have a lower trading volume and fewer counterparties.  During the PSI Amaranth investigation, numerous traders told the Subcommittee that the most significant factors in determining which market and contract to use for trading were price and liquidity.  All of the traders interviewed by the Subcommittee stated that they would trade the contract that provided the best price and most liquidity, regardless of whether it was in a regulated or unregulated market.  Secondly, if a significant amount of trading did migrate from a regulated contract to an unregulated contract simply to avoid regulation, the CFTC could readily determine that the second contract also performed a significant price discovery function and regain its ability to exercise oversight.  In fact, one of the statutory factors for determining whether a contract performs a significant price discovery function is whether that contract is being used for arbitraging purposes.  The new law thus contains provisions designed to prevent exactly the type of arbitrage scenario Mr. Greenberger describes.

───────

**6. STATEMENT:**  *"I would go back to the status quo ante before the Enron loophole was passed."*

   **STATEMENT (p.5):**  *"Again, the easiest course to end the Enron loophole was not chosen as part of the Farm Bill.  The most effective closure would have simply returned the Commodity Exchange Act to the status quo ante prior to the passage of the Enron loophole."*

   **STATEMENT (p.3):**  *"The simplest way to repeal [the Enron loophole] would be to add two words to the Act's definition of 'exempt commodity' so it reads:  an exempt commodity does 'not include an agriculture or energy commodity;' and two words to 7 U.S.C. § 7(e) to make clear that 'agricultural and energy commodities must trade on regulated markets."*

   **RESPONSE:**   Mr. Greenberger seems to be proposing a return to the legal framework for commodity trading prior to enactment of the Commodity Futures Modernization Act (CFMA) of 2000, and to require energy and metal commodities to be traded in the same way as agricultural commodities, which means they could not be traded on electronic exchanges other than a futures exchange.  This approach would prohibit energy traders from trading financially settled swap instruments on electronic exchanges that are not futures exchanges, even though under the legislation the trading of significant price discovery contracts on these electronic exchanges will be regulated just like futures contracts.  At the same time, the proposal would continue to permit those traders to trade these swap instruments amongst themselves by unregulated non-electronic means, such as through voice brokers, large financial institutions that operate as swap "dealers," and directly between each other using telephones and fax machines.

   One of the problems with this approach is that it would re-direct trading from electronic exchanges that promote price transparency and cleared trades, two mechanisms that increase market efficiency and stability, toward greater use of unregulated, non-transparent, and non-cleared trading of swaps that impair price transparency, increase systemic risk, and make it harder to detect and prevent manipulation.  It is partly because financially settled swaps do not require the physical delivery of a commodity, and partly because of the historic inability of the futures exchanges to develop active markets for  more specialized types of financial and energy swaps, that Congress has never required them to be traded on fully regulated futures exchanges.  To do so now would constitute a major change in U.S. commodity law, and would go much further than the status quo ante prior to the CFMA.  In addition, eliminating electronic exchanges open to large traders would dismantle an accepted commodity market mechanism – the significant portions of which are now regulated -- for little apparent regulatory gain.

──────────

**7. STATEMENT:**  *"Prior to the [Enron loophole], every futures contract – oil, collateralized debt obligations, credit default swaps -- had to be traded pursuant to regulation that had age-old and time-tested controls on speculation."*

   **RESPONSE:**  This statement is incorrect.  Prior to the Commodity Futures Modernization Act (CFMA), large traders trading financial instruments like collateralized debt obligations, credit default swaps, and energy swaps were eligible for the hybrid and swaps exemption from the requirement that all futures contracts be traded on a regulated futures exchange.  See, e.g., 17

C.F.R. Part 35 (Exemption of Swap Agreements).  Persons trading swaps under the various pre-CFMA swaps exemptions were not subject to speculative position limits.

———————

**8.  STATEMENT:**  *"Overnight, [prohibiting the trading of energy commodities in Exempt Commercial Markets] will bring down the price of crude oil, I believe, by 25 percent."*

   **RESPONSE:**  According to recent market data, there is little to no trading of crude oil contracts on exempt commercial markets in the United States.  Prohibiting the trading of energy commodities in a market in which no trading is currently taking place is, thus, unlikely to have an effect on the price of crude oil.  Moreover, although there have never been any Exempt Commercial Markets for agricultural commodities, many agricultural commodities have recently experienced substantial price spikes.  There is no credible evidence that simply amending the CEA to regulate energy commodities as if they were agricultural commodities will lead to lower energy prices.

———————

**ISSUES RELATED TO CLOSING THE LONDON LOOPHOLE**

**9.  STATEMENT:**  *"[B]ecause of that Enron loophole, which I believe has not been closed for crude oil, there are no speculation limits in these markets that are unregulated."*

   **RESPONSE:**  The Enron loophole has been closed for all energy and metal commodities, including crude oil traded on Exempt Commercial Markets in the United States.  But currently, crude oil is not being traded on those markets.

     Crude oil is instead being traded on the NYMEX exchange in New York, which has speculative position limits, and on the ICE Futures Europe exchange in London, which does not.  The ICE Futures Europe exchange in London has no speculative position limits, because until recently neither the British Financial Services Authority (FSA) nor ICE Futures Europe had imposed them for U.S. crude oil contracts traded on that exchange.

     Since 1982, Section 4 of the Commodity Exchange Act has authorized U.S. persons to trade on foreign exchanges and has prohibited the CFTC from imposing regulatory requirements upon those foreign exchanges.  Recently, this CEA exemption has been referred to as the London loophole, since it allows U.S. traders to trade on the ICE exchange in London without CFTC oversight and without speculative position limits.  On June 16, 2008, in response to concerns expressed about the London loophole, the CFTC announced that ICE Futures Europe would have to implement speculative position limits in order to be able to continue to offer U.S. traders the option of trading its U.S. crude oil contract through U.S.-based trading terminals.  The CFTC is also working with the FSA on an agreement to impose speculative position limits on this contract and to alert the CFTC when any trader has exceeded those limits.

———————

**10.  STATEMENT:**   *"There is now nothing in the law that sanctions foreign board of trades in the United States trading U.S. products being able to escape regulation. . . .  What is now in my belief, illegal, and will soon, if somebody wakes up, be invalidated by either a private individual being hurt by it or a state attorney general."*

   **STATEMENT (p.5):**  *"These staff no action letters have been referred to as Foreign Board of Trade exemptions (FBOTs) – a term which as of today is nowhere found in the CEA.*

   **STATEMENT (p.12):**  *"[T]here is no statute to date that provides any exemption for U.S. trading on Foreign Boards of Trade.  The Commodity Exchange Act says nothing about Foreign Boards of Trade."*

   **RESPONSE:**   These statements are incorrect.  The Commodity Exchange Act (CEA) explicitly excludes trading on a foreign board of trade from key CFTC regulations.  Section 4(a) of the CEA explicitly exempts from the requirement that all futures contracts be traded on a CFTC-regulated futures exchange contracts traded on or subject to the rules of any board of trade or exchange "located outside the United States."  Section 4(b) prohibits the CFTC from issuing any regulation that approves or "governs in any way any rule or contract, rule, regulation, or action of any foreign board of trade."

   _____

**11.  STATEMENT (p.5):**  *"It has been a fundamental tenet, recognized by exchanges all over the world, that if the trading of futures contracts takes place within the United States, that trading, unless otherwise exempted or excluded by the Act itself or by the CFTC through an exemption granted pursuant to the Futures Trading Practices Act of 1992 (otherwise referred to as section 4(c)) ,is subject to the regulatory jurisdiction of the Commodity Futures Trading Commission.  Recognition of that sweeping reach of U.S. jurisdiction is evidenced by the fact that most major foreign futures exchanges have asked the CFTC for an exemption from the full regulatory requirements of the Commodity Exchange Act (CEA) to which they might otherwise be subject in order to allow those foreign entities to conduct trading in the U.S. on U.S. based terminals of foreign delivered futures contracts.  That exemption, premised on section 4(c), has been issued to many foreign exchanges through staff no action letters, which permit trading on a foreign exchange's U.S.-based terminals without that exchange being subject to U.S. statutory or regulatory requirements."*

   **RESPONSE:** These statements mischaracterize the statutory and legal basis for the CFTC's determination to permit foreign exchanges to operate trading terminals in the United States without being subject to full CFTC regulation as a futures exchange.  The basis for the CFTC's determination to grant a foreign board of trade or exchange permission to operate trading terminals in the U.S. without being subject to the full regulatory requirements applicable to U.S. futures exchanges is not Section 4(c) of the CEA or Futures Trading Practices Act, but rather CEA Section 4(a).  Section 4(a) provides that all futures contracts traded in the United States must be traded on a regulated exchange <u>other than contracts traded on or subject to the rules of a board of trade or exchange located outside the United States.</u>   7 U.S.C. § 6(a).  Futures contracts traded from within the United States on a foreign exchange are, thus, excluded by statute from

8

the requirement that futures contracts traded in the United States be traded on a futures exchange regulated by the CFTC.

_____

**12. STATEMENT (p.6):** *"This exemption was entirely the creation of CFTC staff and it has never been formally approved by the Commission itself."*

   **RESPONSE:**   This statement is incorrect.  The decision to allow foreign exchanges to establish trading terminals in the United States and to permit trading on those terminals outside of CFTC oversight was formally approved by the CFTC in a Policy Statement issued on November 2, 2006.  The 2006 Policy Statement was issued after a process in which the CFTC sought public comment, received written comment letters, and held a public hearing on the issues raised.  In the Policy Statement, the CFTC wrote:

> "The Commodity Futures Trading Commission is issuing a Statement of Policy that affirms the use of the no-action process to permit foreign boards of trade to provide direct access to their electronic trading systems to U.S. members or authorized participants, and provides additional guidance and procedural enhancements."[2]

_____

**13.  STATEMENT (p.6):** *"The staff FBOT no action letter process never contemplated that an exchange owned by or affiliated with a U.S. entity would escape the CFTC regulation imposed on traditional U.S. exchanges."*

   **RESPONSE:**   This statement is incorrect.  In its 2006 Policy Statement, the CFTC determined it would not be appropriate to use any "bright-line" test based on the location of an affiliate or related corporate entity to determine whether to treat an entity as a U.S. or foreign exchange.  Instead, the CFTC adopted a flexible approach that considered the totality of circumstances for determining whether an exchange was foreign or domestic, including whether the exchange was affiliated with a U.S. exchange.  This approach was favored by most of the comments received by the Commission on this issue.

_____

**14. STATEMENT (p.3):** *"For purposes of facilitating exempt natural gas futures, ICE is deemed a U.S. 'exempt commercial market' under the Enron loophole.  For purposes of its facilitating U.S. WTI crude oil futures, the CFTC, by informal staff action, deems ICE to be a U.K. entity not subject to direct CFTC regulation even though ICE maintains U.S. headquarters and trading infrastructure, facilitating, inter alia, @ 30% of trades in U.S. WTI futures."*

   **RESPONSE:**   The statement gives the inaccurate impression that a single legal entity named "ICE" operates two exchanges, one in the United States and one in London, and is being treated

_____

[2] Commodity Futures Trading Commission, Policy Statement, *Boards of Trade Located Outside of the United States and No-Action Relief From the Requirement To Become a Designated Contract Market or Derivatives Transaction Execution Facility*, 71 Fed. Reg. 64443 (Nov. 2, 2006).

differently depending upon which exchange is at issue.  In fact, the legal entities that operate these two exchanges are different.

The legal entity that operates the electronic exchange within the United States is the Intercontinental Exchange ("ICE").  ICE is a Delaware corporation located in Atlanta, Georgia. ICE pays U.S. taxes, uses U.S. employees, and operates an exempt commercial market in the United States that, among other commodities, trades natural gas contracts.

ICE has several wholly-owned subsidiaries that operate regulated futures exchanges — ICE Futures US, ICE Futures Canada, and ICE Futures Europe.  Each subsidiary has its own management and an independent board of directors.  Each exchange is overseen by the regulatory authority of the country in which the exchange is physically located.  The regulatory authority oversees the exchange and the subsidiary that operates the exchange, but not the parent corporation, ICE.

ICE Futures Europe operates an exchange in London and, on it, trades European crude oil (Brent crude oil from the North Sea), European heating oil, European natural gas, and other European contracts as well as a financially-settled U.S. crude oil futures contract (based on the price of  West Texas Intermediate crude oil contracts traded in New York), U.S. gasoline, and U.S. home heating oil contracts.  ICE Futures Europe is registered in the United Kingdom, pays U.K. taxes, has U.K. employees, is treated as a U.K. corporation, and is regulated by the U.K. Financial Services Authority.

The CFTC has not deemed the parent corporation ICE to be a U.K. entity; it treats ICE as a U.S. corporation, which it is.  ICE Futures Europe, on the other hand, is a U.K. corporation, not because the CFTC has "deemed it to be" a U.K. entity, but by operation of U.K. law.  Moreover, under U.K. law, the parent corporation, ICE, is not permitted to direct the activities of its subsidiary, ICE Futures Europe, in operating the London exchange.  The CFTC thus treats ICE Futures Europe as a foreign board of trade, because ICE Futures Europe is, in fact, a foreign board of trade.

_____

**15. STATEMENT (p.3):**  *"[T]he statute should also be amended to forbid an exchange from being deemed an unregulated foreign entity if its trading affiliate or trading infrastructure is in the U.S.; or if it trades a U.S. delivered contract within the U.S. that significantly affects price discovery."*

 **RESPONSE:**  The 2006 Policy Statement issued by the CFTC discusses the various criteria for determining when a foreign board of trade should be permitted to operate within the United States and not be subject to full CFTC regulation as a domestic futures exchange.  The CFTC invited and considered public comments on all of the criteria urged by Mr. Greenberger.  The Policy Statement states that the Commission "decided not to adopt any objective standards establishing a threshold test of U.S. location.  Commission staff will continue to assess the legitimacy of any particular applicant to seek relief as a 'foreign' board of trade by considering the totality of factors presented by an applicant.  This flexible case-by-case approach will permit

staff, during a period of evolving market structure, to consider the unique combination of factual indicators of U.S. presence that may be presented by an applicant for relief."

———

**16. STATEMENT (p.5):** *"[T]he Dubai Mercantile Exchange, in affiliation with NYMEX, a U.S. exchange, has also commenced trading the U.S. delivered WTI contract on U.S. terminals, but is, by virtue of a CFTC no action letter, regulated by the Dubai Financial Service Authority."*

 **RESPONSE:**  This statement is incorrect.  The Dubai Mercantile Exchange (DME) has not commenced trading crude oil contracts in the United States, although it has announced its intention to seek permission to establish DME trading terminals in the United States to trade this contract.  Second, the DME is not considering trading a "U.S. delivered WTI contract," but rather a financially settled derivative contract whose price would be linked to the settlement price of the WTI contract traded on the NYMEX.  The Dubai WTI–related contract would not require the physical delivery of any crude oil.  Third, the trading of contracts on the DME will be regulated by the Dubai Financial Services Authority, not by virtue of any action or inaction by the CFTC, but rather by the operation of the law of Dubai, the jurisdiction in which the DME is located.

 The issue is not whether the DME will regulate trading on an exchange located in its country, but whether the CFTC will be able to exercise oversight of DME contracts traded here in the United States.  The CFTC has yet to grant DME permission to use trading terminals in the United States for the trading of its WTI contract and, prior to doing so, may follow the precedent set in the United Kingdom and require DME to provide daily trading data and apply speculative position limits to those contracts comparable to the reporting and trading requirements applicable to WTI-related contracts currently traded in the United States.  Legislation has been introduced in the Senate, S. 2995 and S. 3129, that would require the CFTC to follow that course of action for every foreign exchange seeking to trade within the United States.

———

**17. STATEMENT (p.12):** *"S. 2995 . . . opens the door to any foreign exchange operating under an FBOT exemption escaping U.S. regulation for any U.S. delivered commodity . . . ."*

 **RESPONSE:**  This statement is incorrect.  S. 2995 was introduced by Senators Levin and Feinstein in May.  In June, a new provision was added to the bill and it was reintroduced as S. 3129, the Close the London Loophole Act sponsored by Senators Levin, Feinstein, Durbin, Dorgan, and Bingaman.  There is nothing in either S. 2995 or S. 3129 that would "open the door" to any foreign board of trade "escaping U.S. regulation."  To the contrary, both bills would make it *more* difficult for the CFTC to grant a no-action letter to a foreign exchange than under current CFTC practice.  Both bills would require the CFTC, before granting or continuing permission for a foreign exchange to operate trading terminals within the United States, to make a specific finding that the foreign exchange has comparable transparency requirements and speculative positions limits to those in the United States.  S. 3129 goes further and gives the CFTC explicit authority to:  (1) prosecute U.S. persons who manipulate or attempt to manipulate the price of a commodity in interstate commerce through trading on a foreign exchange; (2) direct U.S. traders

to reduce their positions on a foreign exchange when those positions exceed the applicable position limits or accountability levels; and (3) impose recordkeeping requirements on U.S. traders trading on a foreign board of trade or exchange.  Both bills would strengthen U.S. oversight of foreign exchanges operating trading terminals in the United States.

---

**18.  STATEMENT (p.13):**  *"S. 2995 does not incorporate all of the conditions within the present FBOT no action letter typically issued by CFTC staff."*

   **RESPONSE:**  S. 2995 and its successor bill S. 3129 do not limit the conditions that the CFTC may impose upon a foreign exchange in a no-action letter; both bills simply require that certain conditions be met before a foreign exchange is allowed to operate trading terminals within the United States.  Nothing in either bill would restrict the conditions the CFTC may impose upon a foreign exchange to those specified in the bill language.

---

**19  STATEMENT (p.8):**  *"The Senate Permanent Investigating Subcommittee has now issued two reports, one in June 2006 and one in June 2007, that make a very strong (if not irrefutable case) that trading on ICE has been used to manipulate or excessively speculate in U.S. delivered crude oil and natural gas contracts.  The June 2006 report cited economists who then concluded that when a barrel of crude was @ $77 in June 2006, $20 to $30 dollars of that cost was due to excessive speculation and/or manipulation on unregulated exchanges."*

   **RESPONSE:**  The 2006 and 2007 PSI reports focused on the role of excessive speculation in U.S. commodity markets; neither report contained any findings on whether  traders manipulated crude oil or natural gas prices.